UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
RAMON A. GALEAS,                                    Case No.: _____
                              Plaintiff,
            - against-

HOUSLANGER & ASSOCIATES, PLLC,
TODD HOUSLANGER, and
VIRGO CAPITAL, LLC
                              Defendants.
------------------------------------------------------------------X

<u>**ORIGINAL COMPLAINT AND JURY DEMAND**</u>

Plaintiff Ramon A. Galeas brings suit against a debt collection law firm, HOUSLANGER

& ASSOCIATES, PLLC (the "PLLC"), as well as its principal, TODD HOUSLANGER,

(collectively "Houslanger"), and the putative judgment creditor assignee VIRGO CAPITAL,

LLC ("Virgo") for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et*

*seq.*, N.Y. Gen. Bus. Law § 349 and for conversion; and against Houslanger alone for their

violations of N.Y. Jud. § 487.

**Summary of Claims[1]**

Defendant debt collectors engaged in a four part scheme to 1) acquire for pennies on the

dollar judgements they knew were likely fraudulent, resulting from false affidavits of merit and

false affidavits of service; 2) commit debt collection violations in the course of collecting the

fraudulent judgments; 3) attempting to wear down consumers by obtaining multiple, baseless

adjournments, and 4) then attempting to dupe, and if not successful, strong-arm deceptive and

unconscionable Stipulations to vacate that in fact conceal a release of potential FDCPA and other

---

1 This summary is for the convenience of Defendants and the Court.  The summary is not intended to limit the basis
of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

claims against the Defendants.

VIRGO CAPITAL, LLC ("Virgo"),  a putative assignee of the default judgment obtained by LR Credit 11 LLC, its debt collection law firm HOUSLANGER & ASSOCIATES, PLLC (the "PLLC"), and the principal of the firm, TODD HOUSLANGER (Mr. Houslanger" (collectively "Houslanger"), attempted to collect on a putative assigned judgment 1) knowing that the judgment was likely entered based on false affidavits of merit and service as Virgo purchased the judgment during the *Sykes* class action; 2) without having a notice of assignment of the judgment sent to or received by Mr. Galeas, 3) without having an attorney meaningfully involved in the collection of the account to determine whether a notice of assignment had been sent or whether the judgment was likely fraudulent, and 4) without sending Mr. Galeas a notice required by  § 1692g of the FDCPA  to allow Mr. Galeas to dispute the debt and stay collection proceedings until the debt was verified. Defendants also 5) restrained a bank account based on a judgment obtained by a false affidavit of service; 6) continued to oppose an Order to Show Cause and made multiple adjournments to delay for more than **eight months** despite overwhelming evidence the judgment was obtained by sewer service; and 7) attempted to dupe and then to strong arm Mr. Galeas to a Stipulation seeming to be an agreement to vacate the judgment for a debt Defendants admitted they could not substantiate, but which in fact concealed a release of any potential FDCPA or other claims Mr. Galeas may have against Defendants.

For these reasons Virgo and Houslanger violated the FDCPA, GBL 349, and committed conversion; and Houslanger violated Judiciary Law 487.

## A.       JURISDICTION AND VENUE

1.    The Court has federal question jurisdiction over the lawsuit because the action arises

2

under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"). Jurisdiction of the Court arises under 28 U.S.C. § 1331 in that this dispute involves predominant issues of federal law under the FDCPA. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202. The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2.      Venue in this District is proper because all or a substantial part of the events or omissions giving rise to their claims occurred in Queens County, New York.

## B.      PARTIES

3.      Plaintiff Ramon A. Galeas is a natural person residing in Queens County, New York.

4.      Defendant HOUSLANGER & ASSOCIATES, PLLC ("the PLLC") is a professional corporation organized and existing under the laws of the State of New York, with its principal place of business at 372 New York Ave., Huntington, NY 11743. The PLLC also maintains an office at 243 Route 100, Floor 2, Somers, NY 10589.  The PLLC is licensed as a debt collection agency with the New York City Department of Consumer Affairs.

5.      Defendant TODD HOUSLANGER, a natural person, is the principal and sole member of the PLLC and, on information and belief, organizes, manages, oversees, and controls the operation of the PLLC. Mr. Houslanger, on information and belief, is a resident of the State of New York.

6.      The PLLC and Mr. Houslanger are collectively "Houslanger."

7.      The PLLC and Mr. Houslanger regularly collect or attempt to collect, directly or

indirectly, debts owed, or due or asserted to be due another, and that is their principal purpose. The PLLC collects debts by filing thousands of collection lawsuits, collecting on thousands of putative judgments, and sending thousands of collection letters, and that is their principle purpose, and it is what it regularly does. Many, if not most of the summons and complaints filed by the PLLC, as well as the income executions, information subpoenas, and bank restraints go out under the putative signature of Mr. Houslanger. Therefore, the PLLC and Mr. Houslanger are each a debt collector within the meaning of 15 U.S.C. § 1692a(6).

8.      Defendant Virgo Capital, LLC ("Virgo") is a limited liability corporation organized under the laws of the State of New York. Virgo is a registered as a debt collector with the New York City Department of Consumer Affairs. Virgo's principal (indeed sole) purpose is the purchase of putative consumer debt, primarily (if not exclusively) the purchase of judgments rendered against consumers for lawsuits seeking to collect consumer debts. Virgo then collects on those purchased judgments by using Houslanger – and only Houslanger --  to collect on those judgments by issuing thousands of information subpoenas, bank restraints, and garnishments, and sending thousands of collection letters. Virgo is a debt collector as defined under the FDCPA.

9.      Virgo is managed by Matthew Blake, the Director of Recovery Operations at Houslanger & Associates, PLLC. Virgo, along with other entities such as but not limited to Aries Capital Partners, Inc., is used by Blake to purchase consumer debts exclusively for collection by Houslanger.

10.     The lack of separation between Virgo as an independent corporation and Houslanger is evinced by the lack of corporate formalities. For example, in license applications for Virgo to the

NYC Department of Consumer Affairs, Blake has identified himself as the "managing agent" of Virgo and as an "owner, partner, or corporate officer of the license holder" in the same application. *See* **Exhibit A** (Virgo DCA File), pg. 13, 26.

11.     In all the applications, Blake gives "mattblake@ariesdata.com" as the email address of Virgo. *E.g.* **Exhibit A**, pg. 5. Blake is the Chief Executive Officer of Aries Capital Partners, Inc., which shares the same address (243 Route 100, Somers, NY 10589-3203) as Virgo. *Compare* **Exhibit A** and **Exhibit B** (NY Department of State Filing for Aries).

12.     Houslanger was an agent of Virgo Capital LLC acting within the course and scope of its agency in seeking to collect the putative debt and resulting judgment from Mr. Galeas. Therefore, Virgo is jointly and severally liable for the acts taken by Houslanger on Virgo's behalf. Virgo is also directly liable for its own misconduct as the putative judgment creditor assignee.

13.     The PLLC shares office space, a telephone number, and personnel with Virgo. The PLLC's Director of Recovery Operations, Matthew Blake, is also the managing agent of Virgo. Mr. Blake is, on information and belief, also an owner, partner or corporate officer of Defendant Virgo.  Mr. Blake is, according to Mr. Houslanger, the Director of Recovery Operations at the PLLC and is "integral" to the operation of the PLLC. ***See* Exhibit C** (LinkedIn website profile of Matthew Blake). [2]  Mr. Blake has worked at the PLLC for 17 years. *Id*. All Virgo judgments are collected on by Houslanger.

14.      Houslanger and Virgo also jointly and severally liable as being in a joint venture for Virgo to purchase judgments, and for Houslanger to collect upon them, including the putative

---

2 All Exhibits attached to this Complaint are incorporated by reference in their entirety.

judgment against Mr. Galeas.

## C.      STATEMENT OF FACTS

***Houslanger and Virgo executed on a judgment against Mr. Galeas they know was likely the result of a false affidavit of service and of merit for a debt Mr. Galeas did not owe.***

15.      On or about March 19, 2007, LR Credit 11, LLC through its collection law firm Mel S. Harris & Associates, LLC filed a collections lawsuit in Queens County Civil Court against now-Plaintiff Ramon A. Galeas. The suit was captioned *LR Credit 11, LLC  vs. Ramon A. Galeas*, Index No. CV-038328-07/QU ("the Collection Lawsuit"). *See* **Exhibit D** (Collection Lawsuit Complaint).

16.      LR Credit[3] and Mel Harris engaged in a joint enterprise to obtain over 100,000 sewer service default judgments against New York residents. The Second Circuit recently upheld certification in a class action alleging that LR Credit and Mel Harris used false affidavits of service and false affidavits of merit as part of a criminal conspiracy to fraudulently obtain debt judgments *en masse*:

> In this case, four plaintiffs allege that a debt-buying company [Leucadia[4]], a law firm [MSH], a process service company, and others engaged in a scheme to fraudulently obtain default judgments against them and more than 100,000 other consumers in state court. Defendants allegedly acted in concert to defraud these consumers in violation of [the FDCPA, RICO, GBL 348, and Judiciary Law 487].  Plaintiffs… move for class certification.
>
> The motion is granted. The record before the Court establishes that defendants obtained tens of thousands of default judgments in consumer debt actions, based on thousands of affidavits attesting to the merits of the action that were generated *en masse* by sophisticated computer programs and signed by a law firm employee who did not read

---

3 There are LR Credit entities number 1 – 24.  They are all controlled by the same parent entity. Therefore this complaint will refer to them and their parent, Leucadia, collectively as "LR Credit."

4 Leucadia is the parent company of the LRC Entities.

the vast majority of them and claimed to, but apparently did not, have personal knowledge of the facts to which he was attesting. The record also shows that on hundreds of occasions the defendant process servers purported to serve process at two or more locations at the same time. As discussed more fully below, defendants' unitary course of conduct purportedly to obtain default judgments in a fraudulent manner presents common questions of law and fact that can be resolved most efficiently on a class-wide basis.

*Sykes v. Mel Harris & Associates, LLC*, 285 F.R.D. 279, 282-83 (S.D.N.Y. 2012) ("*Sykes II*") aff'd sub nom. *Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70 (2d Cir. 2015) ("*Sykes III*")

17.    The attorney-verified complaint against Mr. Galeas vaguely alleged "the defendant(s) entered into a Retail Charge Account Agreement, with ASSOCIATES" and that Mr. Galeas "defaulted in payment under the terms of agreement" and now owed $2,517.20 with interest from March 28, 2002. *Id.*

18.    These unsubstantiated and vague claims of debt were typical of LR Credit and Mel Harris:

The Leucadia and Mel Harris defendants had limited proof to substantiate the claims made in their affidavits of merit because they typically did not possess documentation of the underlying debt, and moreover, because the affiant lacked "personal knowledge" of such claims, contrary to what is stated in the affidavit.
*Sykes*, 285 F.R.D. at 283-284.

19.    Additionally, Mr. Galeas has been the victim of mass identity theft, with several consumer credit accounts taken out in his name without his consent or knowledge. *See* **Exhibit E** (Identity Theft Report). Upon information and belief, the putative debt here (if any) arose from this identity theft.

20.    The process server hired by LR Credit, through Mel Harris, was Andrew Lindauer.

21.    Lindauer executed an affidavit of service which alleged to have effectuated service on

Mr. Galeas on April 3, 2007 by leaving a copy of the summons and complaint with his "wife" "Jane" Galeas, then mailing a copy to the address. *See* **Exhibit F** (Affidavit of Service).

22.     Mr. Galeas has been divorced since December 18, 2006, and has not had a wife since then. Further, in another affidavit of service from two months earlier in another lawsuit against Mr. Galeas, Lindauer described this "wife" as being 10 years younger, with different weight, height, and hair color. *See* **Exhibit G** (Previous Affidavit of Service).

23.     Lindauer had his license to serve process revoked by the New York City Department of Consumer Affairs for repeatedly making false entries in his logbooks, engaging in sewer service, executing false affidavits of service and testifying falsely at an investigatory hearing. *See* **Exhibit H** (Assurance of Discontinuance against Andrew Lindauer).

24.     Mr. Galeas, like the over hundred thousand New Yorker sued by LR Credit, through Mel Harris, was the victim of sewer service.

25.     LR Credit and Mel Harris used the false affidavit of service to enter a default judgment against Mr. Galeas on May 30, 2007 for $1,484.52 plus 9 percent post judgment interest, or approximately $2,757.62 as of the date of the filing of this FDCPA action. *See* **Exhibit I** (Default Judgment).

26.     Following class certification, the parties settled the *Sykes* lawsuit. As part of the settlement, the *Sykes* defendants agreed to stop all collections and to cooperate in the *Sykes* plaintiffs' efforts to secure vacatur of the LR Credit Judgments in state court. The *Sykes* defendants stipulated as part of the settlement that all defendants in debt collection actions brought by LR Credit in New York would have been entitled to interpose a defense predicated upon "fraud, misrepresentation, illegality, unconscionability, lack of due service, violations of

law, or other illegalities."

27.     Shortly before the class settlement, LR Credit sold approximately 25,000 judgments to various third parties (collectively, the Sold Fraudulent Judgments). In January 2012, approximately 15,000 of the judgments were purchased by Virgo, to be collected upon by Houslanger.[5]

28.     Virgo was chartered on November 18, 2011, just 2 months prior to purchasing to Fraudulent Judgments. *See* **Exhibit J** (NY State Department Filing of Virgo). Upon information and belief, Virgo was created by Matthew Blake to purchase the fraudulent LR Credit judgments and have them collected on by Houslanger. As such, Virgo was created to knowingly benefit from LR Credit's fraud.

29.     Following final approval of the class settlement, the New York State Attorney General brought a CPLR 5015(c) proceeding in New York Supreme Court on behalf of Deputy Chief Administrative Judge Fern Fisher to vacate *all* judgments obtained by LR Credit.  *Fern Fisher v, Leucadia National Corp., et al*, Index 452328/2016, New York Supreme Court.

30.     The State Court initially vacated all LR Credit Judgments.  The state court granted the relief sought by the Attorney General on May 2, 2017, stating that Petitioner's "petition seeking to vacate and set aside all default judgments obtained by Respondents Leucadia National Corp., L-Credit, LLC, LR Credit, LLC, and LR Credit 1-23 against consumers in the State of New York and to stay all marshals and/or sheriffs who hold executions under such judgments from

---

5  Most of the remaining Sold Fraudulent Judgments were purchased by Aquarius Capital, LLC. Just as with Virgo, Matthew Blake is the managing agent for Aquarius.  Aquarius shares office space, a telephone number, and personnel with Houslanger, as well as with Virgo. Like Virgo, all of the Sold Fraudulent Judgments were collected upon by Houslanger.

executing to collect such judgments is granted without objection."

31.    Consequently, on June 12, 2017, Houslanger sent Marshal Ronald Moses an email instructing him to stay collections all judgments originally entered by LR Credit, which would include the putative judgment against Mr. Galeas. *See* **Exhibit K** (Houslanger Email to Marshal Moses). Notably, Matthew Blake, the managing agent of Virgo, was copied on the email. *Id*.

32.    Houslanger and Virgo objected to the vacature of the Sold Judgments, including the judgment as to Mr. Galeas.

33.    Consequently, the Court amended its order on July 20, 2017, to exclude the Sold Fraudulent Judgments.

34.    Despite being fully aware of the unlawful circumstances under which the LR Credit Judgments were obtained, Defendants sought to collect from Mr. Galeas the fraudulently obtained judgment.

### *The Pending Sanders Class Action Tolls Many of Mr. Galeas' Claims*

35.    On or about November 16, 2017 a class action lawsuit was filed in the Southern District of New York against the same defendants as in the case at bar, and an additional debt buyer, for seeking to collect on these Sold Fraudulent Judgments. *Sanders et al. v. Houslanger & Associates, PLLC, et al.*, No. 1:17-cv-08985 (SDNY). ***See* Exhibit L** (Sanders Complaint).

36.    Mr. Galeas was a member of the class in the *Sanders* class action lawsuit against both Houslanger and Virgo for, regarding the purchase of the LR Credit Judgments excluded from the *Sykes* settlement, "being fully aware of the unlawful circumstances under which the LR Credit Judgments were obtained" and yet still "garnish[ing] people's wage and freez[ing] their bank

accounts in execution of the fraudulently obtained judgments." *See* **Exhibit M** (List of class members in *Sanders*).

37.     Therefore, Mr. Galeas' claims are timely under the *Sanders* class-action and are thus tolled under *American Pipe*: "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554, 94 S. Ct. 756, 766, 38 L. Ed. 2d 713 (1974).

### *No Notice of Assignment*

38.     Mr. Galeas never received, and on information and belief was never sent, a notice of assignment of the judgment when the judgment was allegedly assigned from LR Credit to Virgo. Upon information and belief, Virgo does not have any proof that it was assigned the judgment by LR Credit.

39.     Upon information and belief, Virgo and Houslanger took no steps to send a notice of assignment or to take any steps to discover whether one had been sent in the past by any of the other entities. Mr. Galeas never received a notice of assignment from anyone regarding the judgment or, indeed, regarding the underlying alleged debt.

40.     A condition precedent for an assignee of a putative debt (including assignments of judgments) is for a notice of assignment to be sent and received by the putative debtor.

### *The Wage Garnishments on Fraudulent Judgment*

41.     On or about November 17, 2016, Houslanger executed an income execution to Rite Aid, Mr. Galeas' employer.  *See* **Exhibit N** (Income Execution).

42.     The Income Execution was (purportedly) personally signed by Mr. Houslanger. The income execution stated that Virgo had obtained a judgment for $1,484.52 on May 30, 2007 "[p]lus interest from 5/30/2007." The Execution directed Rite Aid to satisfy the judgment by withholding and paying over to the Marshal in installments amount to 10% of wages. *See* **Exhibit N**.

43.     As a result of the Income Execution, Rite Aid began to garnish 10% of each of Mr. Galeas' paychecks.

44.     Mr. Galeas does not speak English as his first language and is 69 years old. He had previously been self-employed and was not familiar with what his paystubs should look like. He believed that the money being taken out was because of union dues.

45.     It was only when a family member explained to him that it was not union dues that he learned he was being garnished.

46.     Over the next several months, Mr. Galeas began to try to uncover and resolve all the instances of identity theft that had been perpetuated against him. After receiving a Notice of Garnishment regarding another matter, he went to the Marshal who told him to call the debt collectors to find out what the debt was about.

47.     This process was very frustrating because the debts were fraudulent and Mr. Galeas didn't owe money to anyone. He felt impotent because he did not know what to do.

48.     Mr. Galeas works a night shift starting at 10 PM and leaving at 6:30 AM – it was exhausting to have to try to figure out what was happening during the day and then going to work after. Throughout this time, he would only get around four hours of sleep a day.

49.     Prior to their issuance of the Income Execution, neither Houslanger nor Virgo sent Mr. Galeas a letter with the disclosures required by 15 U.S.C. § 1692g of the FDCPA.

50.     By signing and serving the Income Execution, Houslanger implicitly represented to Mr. Galeas that that an attorney meaningfully reviewed the facts and circumstances of the file and made a reasoned professional determination that Houslanger had the right to issue the Income Execution.

### *Plaintiff's claims are tolled by pending Sanders class action against Houslanger and Virgo*

51.     However, if Houslanger had performed a meaningful review, it would have been clear that the underlying debt was one of the fraudulently obtained judgments of LR Credit and Mel Harris, over which the firm is currently being sued for in *Sanders et al. v. Houslanger & Associates, PLLC, et al.*, No. 1:17-cv-08985 (SDNY).

52.     Mr. Galeas was a member of the class in the *Sanders* class action lawsuit against both Houslanger and Virgo for, regarding the purchase of the LR Credit Judgments excluded from the *Sykes* settlement, "being fully aware of the unlawful circumstances under which the LR Credit Judgments were obtained" and yet still "garnish[ing] people's wage and freez[ing] their bank accounts in execution of the fraudulently obtained judgments." *See* **Exhibit M**.

53.     Therefore, Mr. Galeas' claims are timely under the *Sanders* class-action and are thus tolled under *American Pipe*: "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554, 94 S. Ct. 756, 766, 38 L. Ed. 2d 713 (1974).

54.     Houslanger knew that they were required to perform a meaningful attorney review, and that such a review requires a determination whether a notice of assignment of the putative judgment was sent to the consumer prior to their attempting to collect on an assigned judgment.

Houslanger knew of these requirements because that was a holding in a case where it was a defendant. *Musah v. Houslanger & Assocs., PLLC*, 962 F. Supp. 2d 636, 641 (SDNY 2013) ("although ordinarily an attorney's determination that there exists a valid judgment may obviate the need for further review of a case file, in situations such as the instant case, where the judgment was assigned to a third party, §1692e(3) requires that an attorney seeking to collect that judgment engage in a review of the case file sufficient to determine that the judgment debtor received notice of the assignment"). In *Musah*, the Court held that the consumer stated a claim against Houslanger by alleging Houslanger did not check to see whether a notice of assignment was sent to the consumer prior to Houslanger collecting on an assigned judgment.

55.     Houslanger and Virgo had even more notice of the fraudulent nature of their purchased judgment when, on April 28, 2017, an Order was issued in *Fisher v. Leucadia National Corp., et al.,* Index No. 452328/2016, to stay execution on all the LR Credit judgments. Houslanger and Virgo, among others, sought relief from that order and, on July 20, 2017, the Honorable Erika M. Edwards amended the Order to exclude judgments sold and assigned by LR Credit.

56.     While these judgments were not owned by the LR Credit entities and thus not within the relief granted by the *Sykes* settlement, upon information and belief this difference has no bearing on their fraudulent origins and Defendants' knowledge thereof. The similarities between these exempt judgments and those under the *Sykes* settlement is obvious: not only is there a false affidavit of merit and false affidavit of service in this matter, but the false affidavit of merit was also executed by Todd Fabacher and also alleges, like the *Sykes* judgments, that the original creditor was "ASSOCIATES." Thus even the most tertiary of review would have put Defendants on notice that the judgments they owned, while exempt from the *Sykes* settlement, were invalid

for the same reasons and should not be collected on.

### *Galeas files OSC and Defendants' Drag Out for Eight Months a Hearing on the OSC Via Baseless Adjournments*

57.    On or about April 6, 2018, Mr. Galeas went to the Queens County Civil Court to file an Order to Show Cause. *See* **Exhibit O** (OSC). The Civil Court Judge, finding merit to the application, signed the Order and a hearing was set for April 18, 2018. *See* **Exhibit O.**

58.    At the April 18, 2018 hearing, Mr. Galeas was assisted by the Volunteer Lawyer for the Day program (VLFD).

59.    At this hearing, Houslanger offered to settle the case by ceasing collections but not returning any of the money garnished. When Mr. Galeas rejected the offer, Houslanger sought and was granted a nearly six month adjournment.

60.    This hearing was already anxiety inducing for Mr. Galeas, who could not directly communicate with his volunteer attorneys due to the language barrier, because he was simultaneously seeking to vacate two other judgments that day that had arisen from the identity theft against him.

61.    Astonishingly, during the pendency of the OSC, garnishments began again on May 11, 2018.

62.    On May 16, 2018, Mr. Galeas submitted a FTC Identity Theft Report. *See* **Exhibit E**.

63.    Garnishments of Mr. Galeas' paychecks continued until July 12, 2018 – it is unclear why it continued through the pendency of the OSC, and why it stopped on this date in particular.

64.    Despite knowing of the fraudulent nature of LR Credit judgments and being told that Mr. Galeas was a victim of identity theft, Houslanger sought an additional two adjournments on the

October 2 and October 30, 2018 hearings.

65.     On information and belief, Defendants took no steps to obtain additional evidence to oppose the order to show cause. This was because Defendants knew they had no such evidence.

66.     Defendants purpose in seeking and obtaining the adjournments was in hopes that Mr. Galeas that he would miss a hearing (because he had to go to work) so that Defendants could win on default. Further, Defendants sought and obtained repeated adjournments to wear down and intimidate by inflicting additional damages of lost time from work, and resulting lost wages; to embarrass Mr. Galeas to have to disclose to his employer that he had to take off from work because he had been sued for allegedly not paying his bills; and to increase the stress and anxiety that Defendants might prevail. Defendant. The purpose of wearing down Mr. Galeas was to pressure him to give up, to sign anything the Defendants wanted, and to forfeit his wrongfully garnished wages.

67.     Indeed, Defendants demanded Mr. Galeas forfeit any funds garnished from the fraudulent judgment as a precondition to a discussion of vacating the sewer service judgment. This demand was rejected.

68.     Finally, on December 3, 2018, the motion was submitted for a decision by Judge Butler.

69.     By this time, Mr. Galeas had managed to compile a supplemental affidavit for his OSC which clearly showed that: (1) he was divorced at the time of alleged service on his "wife"; (2) the process server Andrew Lindauer had his license to serve process revoked; (3) Lindauer had described the "wife" as ten years younger with different weight, height, and hair color only two months earlier; and (4) no consent to change attorney was filed in court. *See* **Exhibit P** (Supplemental Affidavit to OSC).

16

70.     On December 6, 2018, Marshal Moses returned the money garnished from Mr. Galeas during the pendency of the OSC, $423.26. It is unclear whether this is the full amount that Defendants caused to be garnished from Mr. Galeas' wages.

71.     On January 25, 2019, Judge Laurentina McKetney Butler held that Mr. Galeas had controverted service and a traverse hearing was warranted, and ordered one to be held on March 6, 2019.

72.     Defendants took no steps to obtain the process server to testify or gather any evidence to oppose a traverse hearing. Indeed, Defendants knew they would not and could not obtain such evidence for any of the Fraudulent Judgments purchased from LR Credit.

73.     Despite knowing they had no evidence to opposed a traverse hearing, Defendants still required Mr. Galeas to take off from work again to attend the hearing.

74.     Mr. Galeas appeared on March 6 expecting a traverse hearing to be held.

75.     Indeed, Defendants had no process server or any other witness.

76.     When Mr. Galeas' volunteer lawyer attorney of the day[6] for the day asked the appearance attorney from Houslanger whether a process server would be produced, the attorney simply handed Mr. Galeas' volunteer lawyer a stipulation to vacate the judgment, discontinue the case with prejudice, and general release. *See* **Exhibit Q** (the "Stipulation").

77.     Through the dense language of the Stipulation Vacating Judgment, Houslanger and Virgo did everything they could to obfuscate the fact that the Stipulation would release any claims Mr.

---

6 A volunteer attorney for the day cannot file a notice of appearance, cannot represent the consumer other than for a very limited scope that one day at court, cannot represent the consumer generally, and cannot represent the consumer at a trial on the merits.

Galeas may – and does – have against Houslanger and Virgo, as well as allow them to keep the garnished funds. [7]

78.     Paragraph 1 of the Stipulation Vacating Judgment certainly comport with the cover letter in that Houslanger and Palisades are vacating the default judgment and releasing any bank restraints or garnishments. The first paragraph, written in fairly straightforward language states the judgment is being vacate "due to the inability to obtain witnesses and documents to establish the underlying claim."  Likewise, Paragraph 2 is fairly short, and dismisses the lawsuit without

_____

[7] The full text of the Stipulation Vacating Judgment states, after the caption of the action, the following:

IT IS HEREBY  STIPULATED AND AGREED,  by and between the Attorney for the Plaintiff/Judgment Creditor and the Defendant/Judgment Debtor herein:

1. Due to the Defendant's claims of lack of receipt of service of process, the Judgment entered by the Clerk of the Civil Court of the City of New York, County of Queens on May 30, 2007 in the sum of $1,484.52 in the above entitled action is hereby vacated and all bank restraints, income executions and all other judgment enforcement remedies are hereby vacated. Any sums currently held in trust by the New York City Marshal Moses under docket number Q293737 shall be directed to be returned to the Defendant upon execution of this Stipulation.

2.  The parties further agree that the above entitled action, and any counterclaims, if any, be and the same is hereby discontinued with prejudice, and without costs to either party as against the other.  Any Orders to Show Cause or pending Motions are hereby withdrawn with prejudice.

3.  Upon execution  of this stipulation,  the current  Judgment  Creditor,  Virgo Capital, LLC, the successor to Plaintiff, LR Credit 11, LLC, the assignee of Associates, shall  cease all  collection  and judgment enforcement remedies  regarding  the Account (ending in  2253),  including  any and all related fees, charges, interest, or monies,  and further agree to release and forever discharge all claims, demands, liabilities, damages  or losses against  Defendant,  his heirs,  assigns,  co-signors,  and/or guarantors,  agents,  and attorneys, related to the Account, from the beginning  of time to the date of execution  of this agreement by all parties; and likewise, Defendant,  Jose Vargas [sic], upon the execution  of this Stipulation,  shall release and forever discharge  Virgo Capital, LLC, LR Credit 11, LLC, Associates, Houslanger & Associates,  PLLC,  its former, present  and future parents,  subsidiaries  and/or affiliates,  whether  direct or indirect,  and any and all former, present and future officers, directors, employees, representatives, predecessors,  successors,  agents, attorneys, independent  contractors or assigns, from any and all claims, demands,  liabilities, damages,  losses  or expenses  relating  to the account and attempts to collect same, including  any and all alleged improper debt collection  acts, including  claims alleged to be based upon federal  FDCPA  and/or other New York  laws which  may  govern  the collection  of debts, from the beginning  of time to the  date of execution of this agreement by all parties.  Any sums previously received, if any, may be retained by the Plaintiff.

4.  It is further stipulated that a facsimile copy may be submitted to the Court in lieu of the original and that Plaintiff's counsel shall submit this stipulation to the Court on behalf of both sides.

limiting the rights of the consumer.[8]

79.     However, paragraph 3 is an entirely different matter.

80.     The first sentence of paragraph 3 goes on for an incredible *18 lines* and is some of the most dense, convoluted, legalese imaginable. There are no less than 53 commas in this labyrinthine first sentence, creating 8 lists which are full of obviously obtuse and unnecessary phrases like "its former, present  and future parents,  subsidiaries and/or affiliates,  whether direct or indirect,  and any and all former, present and future officers, directors, employees, representatives, predecessors,  successors,  agents, attorneys, independent  contractors  or assigns." The purpose of this language is to conceal from any *pro se* consumer, least sophisticated or otherwise, that the consumer is releasing any rights she may have against Virgo, but also non-parties including Mr. Houslanger.

81.     To the degree that the first 6 lines are intelligible to a lay consumer, it states that Houslanger and Virgo cease all collection and judgment enforcement remedies regarding the putative debt. Of course the vacating of the judgment means, by definition, the judgment cannot be enforced, and the discontinuance with prejudice means, by definition, that the putative debt cannot be collected upon.

82.     There is no purpose for the first six lines other than to obfuscate lines 7 – 13: it merely

---

8 There is a phrase that the consumer dismisses "any counterclaims, if any."  However, given the case was closed because of the entry of the default judgment, a consumer would be precluded from filing a counterclaim. Even if the judgment was vacated and the case was restored to the calendar, it is extremely a pro se consumer would file a counterclaim or even know she had a right to do so. Lastly, even in the unlikely even a counterclaim was filed, and the counterclaim dealt with the debt collection practices of the plaintiff in the collection lawsuit, a dismissal of such a counterclaim would not affect the rights a consumer would have against Houslanger, who is not a party to the collection lawsuit and thus is not susceptible to being sued in a counterclaim.

restates what is agreed to elsewhere. Lines 7-13, in even more dense language, would release very real claims Mr. Galeas has against Houslanger and Virgo that are brought by way of this action.

83.     The purpose of the Stipulation Vacating Judgment is to dupe *pro se* consumers into releasing the very rights the FDCPA was designed to protect. Whether Mr. Galeas was ultimately duped is immaterial as both GBL 349 and the FDCPA use an objective standard to determine whether a communication is deceptive that does not turn on the subjective understanding of the consumer.[9]

84.     Further a *pro se* consumer may not notice the clause that he has "withdrawn with prejudice" the Order to Show Cause.

85.     Mr. Galeas is precisely the kind of consumer who this stipulation could harm: elderly and speaking little English, the already dense legalese would have to be translated by an interpreter, adding yet another barrier to understanding that Mr. Galeas was giving up rights as well as having the judgment vacated.

86.     Luckily, the volunteer lawyer was able to see through Houslanger's deceit and demanded

---

[9] The FDCPA was designed for the protection of all consumers, "even the naive and the trusting, against deceptive debt collection practices." Whether a debt collector complies with the FDCPA is determined from the perspective of the "least sophisticated consumer." *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir.1993). The Second Circuit applies an objective test based on the understanding of the "least sophisticated consumer" in determining whether a communication is "false, deceptive or misleading" under 15 U.S.C. 1692e and its subsections. *Id*. "The basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd." *Id*. at 1318. The standard "protects the naive and the credulous" *Id*. at 1319. *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil  actions brought by others.").

the paragraph be stricken.

***Defendants' scheme, from buying the fraudulently-obtained debts to prolonging the lawsuit to try to wear Galeas down, made Galeas feel anxious, distracted, powerless, and restless.***

87.    Mr. Galeas should never have been in court that day. It is clear from the appearance attorney's actions that Houslanger had no intention of conducting a traverse hearing. It was the last of several times, beginning with Houslanger's decision to garnish wages without meaningful attorney review of the known-fraudulent LR Credit judgment, that Houslanger could have prevented Mr. Galeas from being dragged to court for no substantive reason. Rather than preventing this harm, Houslanger promoted it by repeated adjournments and ultimately a stipulation seeking to limit Mr. Galeas' rights and retain his wages.

88.    Mr. Galeas felt like Houslanger had taken advantage of him because of his age and lack of English proficiency.

89.    He felt powerless in an English language court system up against a law firm like Houslanger. It was especially frustrating because he did not owe the money.

90.    Mr. Galeas depended on family to help him to navigate this process, so any time he could not get someone to accompany him to translate, he was thrown into anxiety about what to do. The whole process was compounded by Houslanger's repeated adjournments and Mr. Galeas felt that it was wearing him down more and more with each time he went to court.

91.    He was very worried during the more than eleven months that the court case was going on because he did not know if he was going to get his money back and how long it would take to get it back.

92.     Mr. Galeas worked the graveyard shift at this time, from 10:00 PM to 6:30 AM.

93.     Every time he saw his paycheck and that money was being taken out, he wanted to cry. Worse still, he got his paycheck at the end of his shift, at 6:30 AM, right before he would go to the court and elsewhere to try to figure out how to get out of this debt he did not owe.

94.     The more he worked to try to make up for these garnishments, the more money would be taken from him – it did not feel fair to him.

95.     He would get his paycheck when leaving work, so the stress damaged his ability to sleep. He would watch TV to try to distract himself so he wouldn't think about what was happening, and would wind up falling asleep on the couch, which only made his sleep even more restless and gave him back pains. It would take him two hours just to fall asleep, and he would only get around four hours of sleep.

96.     Before and during every court appearance, he was anxious that the result was not going to be in his favor. When he had to work the night before going to court, he could not concentrate on the tasks he had to do.

### HOUSLANGER AND ITS CLIENTS SYSTEMATICALLY SEEK TO GUT PROTECTIONS UNDER THE FDCPA WITH THEIR PATTERN AND PRACTICE OF ATTEMPTING TO DUPE, AND IF UNSUCCESSFUL TO STRONG-ARM, A MUTUAL RELEASE

*Gutting FDCPA protections by systematically requiring releases for the debt collector*

97.     In recent years, Legal Services attorneys representing low-income consumers have seen Houslanger demand *all* consumers, who are seeking to vacate a default judgment or to discontinue an action, sign these mutual releases that include language that is identical or substantially similar to the language used with Mr. Galeas. The mutual release is demanded no

matter how strong the evidence is that the judgment was entered by way of a false affidavit of judgment, was for a debt that was not owed or was time barred, or was for the collection of an assigned judgment for which no notice of assignment was sent, among other possible consumer claims or defenses. Houslanger, on behalf of itself and putative judgment creditor clients such as Palisades, is attempting to eviscerate the very protections the FDCPA was enacted to provide. *Pro se* consumers are duped or pressured by Houslanger (and its clients) into signing releases of claims. They hold over the consumers' heads the threats that Houslanger may prevail at the OSC, and that the consumer will then lose the restrained money in their bank accounts, or that, for 20 years from the date of the entry of judgment, that their wages will be garnished and bank accounts restrained in the future.

### *ISAAC LEVY: another consumer Houslanger attempted to dupe then, when unsuccessful, attempted to strong-arm, with the same form Stipulation Vacating Judgment and cover letter.*

98.     The Stipulations Vacating Judgment are form documents that debt collection law firms such as Houslanger as well as debt-buyer plaintiffs in collection lawsuits use as a matter of course.

99.      For example, the undersigned has filed a separate action in the Eastern District of New York against Houslanger for essentially doing to another consumer what it did to Mr. Galeas. The action is captioned *Isaac Levy v. Platinum Financial Services Corp. LLC, et al.*, 1:18-cv-06936. *See* **Exhibit R** (*Levy* Complaint without exhibits).

100.    In *Levy*, the consumer had his bank account frozen for a judgment on a suit he was never served with or knew about.  Just as with Mr. Galeas, Mr. Levy, *pro se*, filed an initial OSC but could not immediately view the affidavit of service because his file was in archives. Houslanger had frozen Mr. Levy's account on behalf of its client, Palisades Collection, among one of the

largest debt buyers in the nation. Just as with Mr. Galeas, Houslanger attorney Bryan Bryks executed the Affirmation in Opposition to the OSC, (the "Opposition") and did not provide Mr. Levy with the Opposition until the day of the hearing. Just as with Mr. Galeas, the Opposition included the affidavit of service, which Houslanger and Palisades were able to cite to in their Opposition but which Mr. Levy did not have the opportunity to review prior to drafting his OSC. Just as with Mr. Galeas, Houslanger and Palisades planned to force Mr. Levy to either lose at the hearing, or, at best, get an adjournment to file a supplemental OSC to challenge the facts alleged in the affidavit of service. Just as in Stinson, Houslanger forced Mr. Levy to obtain an adjournment to pressure him to make a payment, or in the hope that he would not appear and thus default at the next hearing. Just as with Mr. Galeas, Mr. Levy would have to take more time off work to fight the sewer service judgment. Just like Mr. Galeas, the adjournment allowed Houslanger and Palisades to apply more pressure on Mr. Levy as he needed access to his restrained bank account to pay for rent and other essential expenses for himself, his wife, and his newborn daughter.

101.    On July 6, 2018, Houslanger and Palisades sent a Letter and Stipulation Vacating Judgment that used identical or nearly identical language Houslanger and DEMI sent to Mr. Galeas. The Letter admitted that Houslanger and Palisades had decided to drop the case "due to the passage of time beyond the retention period of the original creditor," and "the inability to obtain witnesses and documents to support the underlying claim." *See* **Exhibit R**.

102.    Just as with Mr. Galeas, Houslanger buried deep in the third paragraph, in the 7th line of a 13 line single sentence, a release of any FDCPA or other claims Mr. Levy may have against Palisades and against Houslanger, who was not a party in the collection action.

103.    Mr. Levy first saw the affidavit of service when it was attached to the Opposition to his OSC. *See* **Exhibit R**. In the affidavit of service, process server Gerald Murray of Capital Process Servers averred in his affidavit of service that on October 11, 2002 he delivered at Mr. Levy's purported "dwelling residence" at 151 1st Ave. # 42, New York, NY 10003 the summons and complaint for the collection lawsuit "to "Jane Doe: - Cotenant." (hereinafter, the "Manhattan address")

104.    On July 16, 2018, Mr. Levy filed a Supplemental Affidavit in Support of his Order to Show Cause to challenge the specific factual allegations in the affidavit of service. *See* **Exhibit R.**

105.    In the Supplemental Affidavit, Mr. Levy swore that from May 2002 – January 2004 he lived in Brooklyn at 505 Johnson Ave., Unit 4, Brooklyn, NY (the "Johnson Address"), and from May 2000 until May 2002 in Brooklyn at 1024 Greene Ave, Brooklyn, NY (the "Green Address"). Mr. Levy also swore that he has never – at any time – lived in the Manhattan Address identified in the Affidavit of Service, nor has he known anyone who ever lived at that address. Mr. Levy also noted that the process server was notorious for sewer service and was disciplined by the NYC Department of Consumer Affairs. In support, Mr. Levy provided the following documentary evidence as exhibits that demonstrate his residence was at the Brooklyn Address:

      a.    Exhibit 1: land-line telephone bills from October 2002 through November 2002 at the Johnson Address.

      b.    Exhibit 2: the final 2004 electric, gas, and hard-line telephone bills at the Johnson Address.

      c.    Exhibit 3: correspondence from the property management company listing his Johnson Address, including a January 29, 2003 "insurance request letter," and payment stubs for rent at his Brooklyn Address covering November 2003 and December 2003.

      d.    Exhibit 4: wage statements from his employers in 2002 and 2003 listing his

Johnson Address.

e.  Exhibit 5: the lease for his Greene Address apartment dated June, 2000.

f.  Exhibit 6: copies of rent receipts from September 2001 through May, 2002 for his Greene Address Apartment.

g.  Exhibit 7: list of process servers disciplined by the New York City Department of Consumer Affairs ("DCA") including Gerald K. Murray, the process server who allegedly served Mr. Levy.

h.  Exhibits 8: DCA records describing, in great detail, specific documented instances of sewer service by process server Gerald Murray. This includes a DCA Consent Order with Gerald Murray where he surrendered his process server license because of repeated, documented instances of sewer service.[10]

106.  Houslanger did not file a response to the Supp. OSC because they had nothing to rebut the overwhelming documentary evidence Mr. Levy presented, and by their own admission they did not have the documents or witnesses necessary to prove this claim.

107.  Nonetheless, at the August 8, 2018 hearing, Houslanger and Palisades still refused to – and continued to oppose – vacating the default judgment without Mr. Levy releasing the claims he may have against Houslanger and Palisades.

108.  Mr. Levy was *pro se* at the August 8, 2018 hearing, as he had been throughout the case.

109.  Houslanger and Palisades had hung over Mr. Levy's head the possibility that the judgment may not be vacated, and that they would be able to clear out his bank account containing funds of approximately $11,000. This was an enormous pressure on Mr. Levy. He desperately needed that money to pay rent, and other essentials, as well as to support his wife and newborn child.

110.  But Mr. Levy stayed strong.

111.  By the end of the August 8, 2018 hearing, the Court signed an order granting all relief sought by Mr. Levy in his OSC, and dismissing the collection lawsuit.

---

10  Exhibit 8, which was attached to the Supp. OSC is not attached to this complaint given its length, 95 pages.

112.    On December 5, 2018, Mr. Levy filed an FDCPA lawsuit against Houslanger and others

the use of the deceptive and abusive Stipulations, among other claims, in case 1:18-cv-06936-

DLI-RER, *Levy v. Platinum Financial Services Corp. et al*  (ED NY). Mr. Levy is represented in

that action by the undersigned. That suit is pending.

**BARBARA STINSON: another consumer Houslanger attempted to dupe, and, when
unsuccessful, attempted to strong-arm.**

113.    The Stipulations Vacating Judgment are form documents that debt collection law firms

such as Houslanger as well as debt-buyer plaintiffs in collection lawsuits use as a matter of

course.

114.    Putative assignee-creditor DEMI, through its debt collection law firm Houslanger, sued

consumer Barbara Stinson for debt she never owed and obtained a default judgment by use of a

false affidavit of service. *See* **Exhibit S** (*Stinson v. Houslanger & Associates, PLLC* complaint

without exhibits).

115.    Ms. Stinson first learned of the lawsuit filed by DEMI when, thirteen years after the

lawsuit was filed, Houslanger attempted to garnish her wages.

116.    Ms. Stinson, pro se, filed an Order to Show Cause ("OSC") to vacate the default

judgment. In the OSC, Ms. Stinson documented with a death certificate that her son who

allegedly served was, in fact, dead; and documented with W-2 tax forms, pay stubs, DMV

records, and voter registration documents that she had not resided for years at the address where

she was allegedly served.

117.    Further, DEMI and Houslanger admitted in writing they had no evidence to establish the

existence of the putative debt. *See* **Exhibit S**.

118.    In the face of this irrefutable and undisputed evidence supporting the vacature of the

default judgment and dismissal of the collection lawsuit, DEMI and Houslanger attempted to dupe Ms. Stinson into signing a Stipulation Vacating Judgment "so that you may avoid the further inconvenience of coming to Court." *See* **Exhibit S**.

119.    Just as with Mr. Galeas, the Stipulation buried the same release of potential claims Ms. Stinson may have against the DEMI and Houslanger in the 7th line of a 13-line long sentence made up of dense legal jargon difficult for any consumer to parse through. *See* **Exhibit S**.

120.    When Ms. Stinson refused to release any claims she might have, DEMI and Houslanger forced her to once again go to court and opposed her order to show cause. Just as with Mr. Galeas' wage garnishments, they held over Ms. Stinson's head that they could continue to garnish her wages if Ms. Stinson, pro se, lost her motion to vacate the default judgment.

121.    Ultimately, the state court judge issued a ruling vacating the judgment and dismissing the lawsuit finding that, in fact, Ms. Stinson was never served.

122.    By forcing Ms. Stinson to obtain the death certificate of her son, who died when he was only three years old, in order to prove she was never served, Defendants made Ms. Stinson relive the extreme trauma of a mother losing her child.

123.    On December 5, 2018 Ms. Stinson filed an FDCPA lawsuit against Houslanger for his deceptive and abusive Stipulations, among other claims, in case 1:18-cv-11350 JPO-OTW, *Stinson v. Houslanger & Associates PLLC et al*  (SD NY). Ms. Stinson is represented in that action by the undersigned. That suit is pending.

### *WANDA CEPEDA: a consumer with a sewer service judgment successfully strong-armed by Houslanger to release her potential claims*

124.    Houslanger engaged in similar deceptive conduct in the action *Colonial Credit Corporation v. Wanda Then*, CV-030370-05/NA in the District Court of Nassau County.

125.    Ms. Cepeda was alleged to have been served by "nail and mail" service on November 9, 2005. However, Ms. Cepeda was never served in this matter, and the allegations regarding service were false. Further, Ms. Cepeda did not owe any debt to the Plaintiff. It allegedly arose from a fitness club which Ms. Cepeda never belonged to. Ms. Cepeda had previously been a victim of identity theft.

126.    On or about February 14, 2006 a default judgment was entered against Ms. Cepeda in the amount of One Thousand Three Hundred Seventy-Five Dollars and Thirty-Seven Cents.

127.    As with Mr. Levy, Ms. Cepeda's bank account was frozen by Houslanger on behalf of the debt buyer Palisades, who had allegedly been assigned the debt by Colonial Credit Corporation.

128.    Ms. Cepeda never received either a copy of the judgment or the notice of entry of the judgment. She did not learn about the lawsuit until November of 2017 when after a failed attempt to withdraw funds she realized her bank account was frozen.

129.    Just as with Mr. Galeas, the Affidavit of Service was falsified. The process server did not describe any attempt whatsoever to locate a place of employment for Ms. Cepeda. Instead, the affidavit claimed that a neighbor allegedly consulted, "Jane" Powell, did not know Ms. Cepeda's place of employment. Ms. Cepeda did not know of any neighbors at that address with the last name Powell. All attempts at service were made on weekdays; no weekend attempts were made. The address given was not where Ms. Cepeda resided at the time of service and had not lived at that address for nearly two years. She did not even reside in the same state as the address given: she resided in Maryland, not New York, at the time of the alleged service.

130.    The process server had no reason to believe that Ms. Cepeda still resided at the address in the affidavit. Ms. Cepeda had updated her address with the Maryland DMV, the New York DMV, and the post office when she had moved. She then updated her address again when she

moved from Maryland to Florida with the Florida DMV and the post office.

131.    In the Supplemental Affidavit, Ms. Cepeda swore that she moved on or around December 2004 from the address allegedly served (1 Holland Avenue, Elmont, NY) to 47 Golden Ave., Deer Park, NY. She then moved to Maryland on or around August 2005, and resided there on the date of alleged service (November 9, 2005). Lastly the name used in the affidavit of service, "Wanda Then," had not been used by Ms. Cepeda since 2002.

132.    Ms. Cepeda provided the following documents to establish that the address in the affidavit was incorrect:

    a. Exhibit 1: Maryland DMV record confirming that Ms. Cepeda resided in Maryland at the time of service of process.

    b. Exhibit 2: New York DMV record confirming that Ms. Cepeda no longer lived at the address at the time service was allegedly made.

    c. Exhibit 3: Verification that Ms. Cepeda had been the victim of identity theft from the Internal Revenue Service.

133.    The case was an unmistakable instance of sewer service. Houslanger did not file a response to the OSC because they had nothing to rebut the overwhelming documentary evidence Ms. Cepeda presented, and by their own admission they did not have the documents or witnesses necessary to prove this claim.

134.    On February 20, 2018, Ms. Cepeda entered into the same Mutual Stipulation with Houslanger that Mr. Galeas entered into. Ms. Cepeda was pressured into entering into this agreement while she was out of the country and thus dependent on her then-frozen bank account for any money. Just as with Mr. Galeas and Mr. Levy, Houslanger buried deep in the third paragraph, in the 7th line of a 13 line single sentence, a release of any FDCPA or other claims Ms. Cepeda may have against Houslanger and Palisades.

**D.**    **COUNT 1: FAIR DEBT COLLECTION PRACTICES ACT (as to all Defendants)**

135.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

136.    The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e); see also *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

137.    Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general."  *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil  actions brought by others.").

138.    The obligation alleged to be owed by plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative credit card debt was incurred primarily for family, personal or household purposes.

139.    Virgo and Houslanger admit in their verified complaint that the putative debt arose from

a "consumer credit transaction."

140.    For the reasons stated in the "Parties" section of this Complaint, each Defendant is a debt collector within the meaning of 15 U.S.C. § 1692a(6).

141.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt."

142.    Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f.  By way of example and not limitation, Defendants violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; the representation that nonpayment will result in the "seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful," § 1692e(4);threatening to take and actually taking an action prohibited by law; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.  Defendants also engaged in unfair or unconscionable litigation in violation of 15 U.S.C. § 1692f by unduly prolonging the legal proceedings in bad faith and requiring Plaintiff to appear at unnecessary hearings. *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 138 (2d Cir. 2017).

**E.    COUNT 2: NEW YORK GENERAL BUSINESS LAW SECTION 349 *ET SEQ.*
(as to all Defendants )**

122.    Plaintiff repeats and re-alleges each and every allegation set forth above as if reasserted and re-alleged herein.

123.    New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state…"

124.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. Law § 349(h). An individual may also be awarded punitive damages.

125.    As enumerated in the Statement of Facts, Defendants violated N.Y. Gen. Bus. Law § 349 *et seq*. by using deceptive acts and practices in the conduct of their businesses that have broad impact on consumers at large.

126.    Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

127.    As a direct and proximate result of those violations of N.Y. Gen. Bus. Law § 349 *et seq*, Plaintiff suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and punitive damages, together with costs and attorney's fees.

### F.    COUNT 3: CONVERSION (as to all Defendants)

128.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

129.    The elements of conversion in New York State include: 1) having a possessory interest in property; and 2) having the possessory interest taken or interfered with by another in a manner that is contrary to the possessor's rights.

130.    Property subject to conversion includes, *inter alia*, readily identifiable funds garnished from wages.

131.    Defendants intentionally and without authority, assumed and exercised control over Plaintiff's wages and money, interfering with his right to possession of the same, by willfully refusing to comply with a court order to return the previously garnished funds forthwith.

132.    The judgment, upon which the wage garnishment was executed by Defendants, was entered via "sewer service" – a false affidavit of service that was used to obtain a default judgment without actually having served the summons and complaint upon the Plaintiff. Further, the judgment was obtained with a false affidavit of merit. Because the judgment was obtained through these false affidavits, any amounts collected are conversion from the outset regardless of whether the default judgment had been vacated. *See Polanco v. NCO Portfolio Management, Inc.*, 23 F. Supp. 3d 363, 371 (S.D.N.Y. 2014) ("Further, Plaintiff argues that Defendant obtained a default judgment in its collections suit 'based on the systematic use of false affidavits by [Defendant's] law firm.' If this allegation is taken as true, then Defendant cannot use the Bronx Civil Court's order to immunize itself from liability.") [internal citations removed].[11] Thus the improper garnishment by Defendants of Plaintiff's money, which harmfully interfered with Plaintiff's rights to control his own property, constitutes conversion.

133.    For the reasons stated in the statement of facts, the conduct of Defendants is gross, wanton or deliberate and demonstrates a high degree of moral culpability. Further, said

---

11 While the Defendant in *Polanco* obtained the default judgment itself, rather than purchasing the default judgment as with the Defendants here, as aforementioned Houslanger and Virgo purchased the Mel Harris and LR Credit judgments knowing that the firms had obtained thousands of such judgments through false affidavits of service and false affidavits of merit, and thus Houslanger and Virgo have also engaged in "the systematic use of false affidavits" and should not be permitted to use the Queens County Civil Court's order "to immunize itself from liability."

Defendants conduct as alleged in the statement of facts demonstrates malice, insult, and/or willful or reckless disregard of Plaintiff's rights, or other aggravated acts by said Defendants. For these reasons, Plaintiff is entitled to punitive damages, in addition to actual damages against Defendants Houslanger and Palisades.

### G.      COUNT 3: NY JUDICIARY LAW § 487
### (as to the PLLC and Mr. Houslanger)

134.    New York Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;" or "willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

135.    As enumerated in the Statement of Facts, Houslanger violated Judiciary Law § 487.

136.    Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for the violations of N.Y. Judiciary Law § 487, and Plaintiff so seeks.

### H.      JURY DEMAND.

137.    Plaintiff demands a trial by jury.

## I.                              PRAYER

138.    WHEREFORE, Plaintiff requests the following relief:

a.      A declaration that all Defendants have committed the violations of law alleged in this action;

b.      Statutory damages under 15 U.S.C. § 1692k and GBL 349;

c.      Reasonable attorney's fees and costs;

d.      Actual damages;

e.      Treble damages;

f.      Exemplary and punitive damages;

g.      An order, pursuant to GBL 349(h), enjoining and directing Defendants to cease violating that statute;

h.      Prejudgment and post judgment interest as allowed by law;

i.      All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.

Dated:  Brooklyn, New York
        July 24, 2019

        /s/

Ahmad Keshavarz
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax:    (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com