**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
RAMON A. GALEAS,                                Case No.: 1:19-cv-04270-PKC-RLM
                             **Plaintiff,**
             - against-

HOUSLANGER & ASSOCIATES, PLLC,
TODD HOUSLANGER, and
VIRGO CAPITAL, LLC
                             **Defendants.**
-------------------------------------------------------------------X

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**</u>
<u>**MOTIONS TO DISMISS**</u>

The Law Office of Ahmad Keshavarz
16 Court Street, 26th Floor,
Brooklyn, NY 11241-1026
(718) 522-7900
*Counsel for Plaintiff Ramon A. Galeas*

i

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ............................................................. 1

II.   STANDARD OF REVIEW............................................................. 1

III.   SUMMARY OF RELEVANT FACTUAL ALLEGATIONS ............................ 2

IV.   ARGUMENT AS TO HOUSLANGER ............................................. 12

  A.   **Houslanger's Use of the Stipulation to Attempt to Retain Funds Garnished from Mr. Galeas and Protect Defendants from Liability for Their Illegal Conduct States a Claim under the FDCPA.**................................................................ 12

    1.   **Mr. Galeas' use of a single day, limited scope volunteer attorney does not shield Defendants from liability for their multi-step scheme, replete with unfair and unconscionable means culminating in the Stipulation.**.................................. 13

    2.   **Houslanger cannot insulate themselves from liability under speculation that the court system would have prevented the unfair stipulation from being entered.** ........... 16

    3.   **The use of the Stipulation was not an arms-length transaction; it was a backstop to retain the profitability of the multi-step fraudulent scheme.** ........................... 17

  B.   **Houslanger's Attempts to Collect on Mr. Galeas, from the Income Execution to the Baseless Adjournments, Were Part of a Deceptive Scheme to Knowingly Benefit from the Fraud that Created the Sold Fraudulent Judgments, and Thus Violate GBL § 349.**....... 19

    1.   **Knowingly benefitting from fraud, particularly by and through the court system, is egregiously deceptive.** ....................................................... 19

    2.   **Houslanger's adjournments would mislead a reasonable consumer, and the adjournments were one of the greatest contributors to Mr. Galeas' emotional distress.** 22

  C.   **Houslanger's Income Execution and Baseless Adjournments Sought to Perpetuate an Extreme Deception on the Court and Mr. Galeas that Caused Him to Suffer Emotional Distress, Thus Violating Judiciary Law § 487.** ................................. 26

    1.   **Houslanger's intent is well-pleaded, and the alleged inconsistency with the allegations as to deceit is conclusory.** ...................................... 26

    2.   **Plaintiff sufficiently plead that Houslanger engaged in its litigation conduct to knowingly benefit from fraud, including not discontinuing the action prior to the traverse hearing after Mr. Galeas had served his Supplemental Affidavit.** .............. 27

    3.   **Houslanger knew from the day it purchased the Sold Fraudulent Judgments that they should not be collected on, so the adjournments were a perpetuation of collection that was per se deceptive, and were done in order to wear Mr. Galeas down.**.............. 28

**D.   Houslanger Committed Conversion by Garnishing Mr. Galeas' Funds through a Judgment They Knew Was Fraudulent.** ............................................................................. 29

**E.   The Allegations as to Other Consumers Harmed by Similar Conduct from Houslanger Is Relevant to Establishing that Houslanger's Pattern and Practice Both for Establishing that It Was Consumer-Oriented under GBL § 349, for Establishing the Maximum Amount of Statutory Damages under the FDCPA, and for rebutting any defense of bona fide error.** ........................................................................................... 30

V.   ARGUMENT AS TO VIRGO CAPITAL LLC ................................................................. 32

**A.   The Court Only Needs to Consider the "Principal Purpose" Definition of Debt Collector under the FDCPA, and Plaintiff Has Adequately Pled that Virgo's Principal Purpose Is Debt Collection.** ........................................................................................... 32

   1.   *Henson*'s holdings are limited to a definition of debt collector not at issue in this case since the Court expressly refused to rule on the "principal purpose" definition of debt collector and whether an entity can be both a creditor and debt collector. .......... 32

   2.   Virgo's attempt to resurrect century old applications of the Commerce Clause is unavailing. .......................................................................................................... 36

   3.   Virgo has the principal and indeed sole purpose of debt collection. ...................... 37

   4.   The FDCPA was passed specifically with the intent of prohibiting wrongful conduct from debt collectors like Virgo that do not have the kind of customer relationship that an original creditor or debt servicer would have with a consumer. ... 40

**B.   No Allegations in the First Amended Complaint Are Outside the Statute of Limitations.** ..................................................................................................................... 41

   1.   The FDCPA and GBL § 349 claims are timely. ................................................... 41

   2.   The conversion claims are timely. ...................................................................... 42

**C.   Virgo Is Directly and Vicariously Liable for Violations of the FDCPA and GBL § 349, and for Committing Conversion.** ........................................................................... 42

   1.   Virgo is directly liable for violations of the FDCPA and GBL § 349, and for committing conversion. ....................................................................................... 42

   2.   Virgo is an alter ego of Houslanger and thus joint and severally liable for its violations. .......................................................................................................... 43

   3.   Virgo is vicariously liable for violations of the FDPCA and GBL § 349, and for committing conversion. ....................................................................................... 47

**D.   Virgo Is Liable for Failing to Provide a 1692g Notice and a Notice of Assignment.** . 49

   1.   Virgo failed to provide Mr. Galeas with a 1692g notice. ..................................... 49

   2.   Virgo failed to provide Mr. Galeas with a notice of assignment. ......................... 50

VI.    CONCLUSION.................................................................................................................... 51

## <u>TABLE OF AUTHORITIES</u>

*Cases*

*Abreu v. Receivable Collection Servs., LLC*, No. 18-CV-04103 (PK)(CLB), 2019 WL 1876722, at *4 (E.D.N.Y. 2019) ................................................................................................ 13

*American Protein Corp. v. AB Volvo,* 844 F.2d 56, 60 (2d Cir. 1988).......................................... 44

*Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 135-136 (2d Cir. 2017) 14, 16-18, 26, 43.......................................................................................................................................

*B–Real, LLC v. Rogers,* 405 B.R. 428, 431–32 (M.D.La.2009) .................................................... 16

*Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*, 417 U.S. 703, 713, 94 S. Ct. 2578, 2584, 41 L. Ed. 2d 418 (1974) ................................................................................................................ 46

*Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1546 (S.D.N.Y. 1991) ........... 47

*Bd. of Trustees of Operating Engineers Pension Tr. v. JPMorgan Chase Bank, Nat. Ass'n*, No. 09 CIV. 9333 BSJ DCF, 2012 WL 1382274, at *3 (S.D.N.Y. Apr. 20, 2012) ................................ 49

*Beasley v. Blatt*, 1994 WL 362185 (N.D. Ill. July 11, 1994)......................................................... 32

*Bishop v. Ross Earle & Bonan, P.A.*, 817 F.3d 1268, 1271–73 (11th Cir. 2016)......................... 13

*Boyd v. J.E. Robert Co.*, 2010 WL 5772892, at *13 (E.D.N.Y. Mar. 31, 2010) .......................... 13

*Bradley v. Selip & Stylianou, LLP,* No. 17-CV-6224 (FPG), 2018 WL 4958964, at *5-6 n. 3 (W.D.N.Y. Oct. 15, 2018)............................................................................................................ 35

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) ........................................... 14

*Calamia v. City of New York*, 879 F.2d 1025, 1031 (2d Cir.1989)................................................ 20

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 349–50 (S.D.N.Y. 2013) .......................................................................................................................... 44

*Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir.1993) .............................................................. 17

*Coble v. Cohen & Slamowitz, LLP*, 824 F. Supp. 2d 568, 572 (S.D.N.Y. 2011) ......................... 22

*Colavito v. New York Organ Donor Network, Inc.,* 827 NYS 2d 96, 100 (Ct. App. 2006) ......... 42

*Currier v. First Resolution Investment Corp.,* 762 F.3d 529 (6th Cir. 2014) ............................... 19

*Diaz v. Portfolio Recovery Assocs., LLC*, No. 10 CV 3920 MKB CLP, 2012 WL 1882976, at *5 (E.D.N.Y. May 24, 2012) ........................................................................................................... 23

*Dina v. Cuda & Assocs.*, 950 F. Supp. 2d 396, 406 (D. Conn. 2013) .......................................... 14

*Dodd v. United States,* 545 U.S. 353, 357, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005).................. 41

*Easterling v. Collecto, Inc.*, 692 F.3d 229, 233 (2d Cir. 2012) ............................................. 17, 25

*Ellis v. Solomon & Solomon, P.C.*, 599 F. Supp. 2d 298, 300 (D. Conn. 2009), *aff'd,* 591 F.3d 130 (2d Cir. 2010)....................................................................................................................... 36

*Fils-Aime v. Ryder TRS, Inc.*, 837 N.Y.S.2d 199, 200 (App. Div. 2d Dep't 2007)..................... 47

*Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ...................................................... 43-44

*Frink Am., Inc. v. Champion Rd. Mach. Ltd.,* 2000 WL 754945, at *2 (2d Cir. 2000)............... 29

*Gabriele v. Am. Home Mortg. Servicing, Inc.*, 503 Fed. Appx. 89, 95 (2d Cir. 2012)................ 13

*Gold v. Shapiro, Dicaro & Barak, LLC*, No. 18CV6787PKCSJB, 2019 WL 4752093, at *8 (E.D.N.Y. Sept. 30, 2019).................................................................... 16, 33-35, 38, 40, 43

*Goldstein v. Hutton, Ingram, Yuzek, Carroll & Bertolotti*, 374 F. 3d 56, 61 (2d Cir. 2004)........... ............................................................................................................................... 33, 38, 40

*Goswami v. Am. Collections Enter., Inc.*, 377 F.3d 488, 495–96 (5th Cir.2004) ........................ 18

*Grammar v. Sharinn & Lipshie, P.C.*, No. 14 CIV. 6774 (JCF), 2016 WL 4249155, at *3 (S.D.N.Y. Aug. 5, 2016) ........................................................................................................... 32

*Guzman v. Mel S. Harris & Assocs., LLC*, No. 16 Civ. 3499 (GBD), 2018 WL 1665252, at *12 (S.D.N.Y. Mar. 22, 2018) .......................................................................................... 21, 34, 35

*Hasemann v. Gerber Prod. Co.*, 331 F.R.D. 239, 266 (E.D.N.Y. 2019)...................................... 24

*Heintz v. Jenkins*, 514 U.S. 291, 297, 299 (1995)....................................................................... 17

*Henson v. Santander Consumer USA Inc.,* 137 S. Ct. 1718, 1720-21 (2017) .................. 14, 32-41

*Hirsch v. ANI Management Group, Inc.*, No. 12 CV 3454, 2013 WL 3093977, at *3 (E.D.N.Y. June 18, 2013)............................................................................................................................ 32

*Hunter v. Palisades Acquisition XVI, LLC*, No. 16 CIV. 8779 (ER), 2017 WL 5513636, at *9 (S.D.N.Y. Nov. 16, 2017) ................................................................................... 25, 30, 48

*In re Bear Stearns Mortgage Pass-Through Certificates Litigation*, 851 F.Supp.2d 746, 768 (S.D.N.Y. 2012) .............................................................................................................. 30

*In re Lehman Bros. Sec. & ERISA Litig.,* 683 F.Supp.2d 294, 303 (S.D.N.Y.2010) .................. 49

*In re OSG Sec. Litig.*, 12 F.Supp. 3d 619, 620-622 (S.D.N.Y. 2014).......................................... 31

*Jones v. Midland Funding, L.L.C.*, 2012 WL 13027349 (D. Conn. Aug. 13, 2012) ................... 18

*Kirno Hill Corp. v. Holt,* 618 F.2d 982, 985 (2d Cir.1980)........................................................ 42

*Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49-50 (2d Cir. 1996) 29

*Link v. Wabash R. Co.,* 370 U.S. 626, 633–34 (1962) ................................................................ 48

*Lipsky v. Commonwealth United Corp.*, 551 F.2d887 (2d Cir. 1976). ........................................ 30

*Mar. Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.*, 689 F. Supp. 1340, 1348 (S.D.N.Y. 1988) ............................................................................................................................. 42

*Martinez v. Lvnv Funding, LLC*, No. 14CV00677RRMST, 2016 WL 5719718, at *4 (E.D.N.Y. Sept. 30, 2016) ................................................................................................................. 31

*Martsolf v. JBC Legal Grp., P.C.,* 2008 WL 275719, at *10–11 (M.D.Pa Jan. 30, 2008).......... 47

*Mazart v. State*, 441 N.Y.S.2d 600, 605 (Ct. Claims 1981) ...................................................... 47

*McAdory v. M.N.S. & Assocs., LLC,* 2017 WL 5071263 (D. Or. Nov. 3, 2017)......................... 37

*McAdory v. M.N.S. & Assocs., LLC*, No. 18-35923, 2020 WL 1128813, at *3 (9th Cir. Mar. 9, 2020) .............................................................................................................................. 37

*Meyer v. Holley*, 537 U.S. 280, 285 (2003) ............................................................................... 47

*Minner v. Navient Corp.,* No. 1:18-cv-1086S, 2020 WL 906628, at *11 (W.D.N.Y. Feb. 25, 2020). .............................................................................................................................. 31

*Musah v. Houslanger & Assocs., PLLC,* 962 F.Supp.2d 636, 641 (S.D.N.Y. 2013) ............ 22, 50

*Nikkel v. Wakefield & Assocs., Inc.*, No. 10-CV-02411-PAB-CBS, 2012 WL 5571058, at *11 (D. Colo. Nov. 15, 2012)................................................................................................................... 18

*Oei v. N. Star Capital Acquisitions, LLC,* 486 F.Supp.2d 1089, 1094-95 (C.D.Cal. 2006) ......... 48

*Okyere v. Palisades Collection, LLC,* 961 F. Supp. 2d 522, 534 (S.D.N.Y. 2013)..................... 27

*Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) ............................................. 24

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741,745 (N.Y. 1995).............................................................................................................................. 25

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 396–97 (1993)............ 48

*Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 587 (S.D.N.Y. 2015) . 20, 29, 36, 48

*Portfolio Recovery Assoc., LLC v. King,* 927 N.E.2d 1059, 1061 (N.Y. 2010) ............................ 5

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 731 (S.D.N.Y. 2014)......... 25

*Rocanova v. Equitable Life Assur. Soc. of U.S.*, 83 N.Y.2d 603, 613, 634 N.E.2d 940, 943 (1994) .................................................................................................................................................. 31

*Rodriguez v. It's Just Lunch, Int'l,* 300 F.R.D. 125, 147 (S.D.N.Y. 2014) ............................... 25

*Schlegel v. Wells Fargo Bank, NA,* 720 F.3d 1204, 1209 (9th Cir. 2013).................................. 38

*Schneider v. JTM Capital Management LLC,* No. 6:16-cv-2057-JR, 2018 WL 2276238 (D. Or. Mar. 22, 2018)................................................................................................................... 37-38, 49

*Schroeder v. Diamond Parking, Inc.*, No. CIV. 12-00378 HG-RLP, 2013 WL 5348472, at *13 (D. Haw. Sept. 17, 2013), *aff'd on other grounds*, 646 F. App'x 505 (9th Cir. 2016) ................ 36

*Security Pacific Mortg. & Real Estate Servs., Inc. v. Herald Ctr., Ltd.*, 891 F.2d 447, 448 (2d Cir. 1989).............................................................................................................................. 47

*Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd.*, 401 F. Supp. 3d 433, 440 (S.D.N.Y. 2018). ...................................................................................................................................... 45

*Shapiro v. Credit Prot. Ass'n I, Inc.*, 53 F. Supp. 2d 626, 627 (S.D.N.Y. 1999)......................... 32

*Simmons v. Roundup Funding, LLC*, 622 F.3d 93, 96 (2d Cir. 2010) .......................................... 16

*Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 825 (8th Cir. 2009) ........................................ 14

*Solomon v. Bell Atl. Corp.,* 777 N.Y.S.2d 50, 55 (N.Y.App.Div.2004) ..................................... 24

*Somerset v. Stephen Einstein & Assocs., P.C.,* 351 F. Supp. 3d 201, 207-08 (E.D.N.Y. 2019)... 27

*Sykes v. Mel Harris & Associates, LLC,* 757 F.Supp.2d 413, 428 (S.D.N.Y. 2010)............ *passim*

*Sykes v. Mel S. Harris & Assocs. LLC,* 780 F.3d 70 (2d Cir. 2015)..................................... *passim*

*Teng v. Metro. Retail Recovery*, 851 F. Supp. 61, 66 (E.D.N.Y. 1994) ...................................... 36

*Tepper v. Amos Fin., LLC,* 898 F.3d 364, 371 (3d Cir. 2018).................................................... 35

*Tri City Roofers, Inc. v. Ne. Indus. Park,* 61 N.Y.2d 779, 781, 461 N.E.2d 298, 299 (1984)...... 50

*Vernot v. Pinnacle Credit Servs., LLC,* 2017 WL 384327, at *5 (E.D.N.Y. Jan. 26, 2017) ........ 13

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)
.................................................................................................................... 44, 46

### Statutes

Fed. R. Civ. P. 12(b)(6).................................................................... *passim*

15 U.S.C. § 1692, *et. seq.*............................................................... *passim*

N.Y. Gen. Bus. Law § 349.............................................................. *passim*

N.Y. Jud. Law § 487 ....................................................................... *passim*

## I.     PRELIMINARY STATEMENT

Defendants' Motions to Dismiss have a clear strategy in common despite their different angles: divide-and-conquer. Defendants want this Court to look at all of their wrongful acts in isolation from one another, when in fact they are merely components of a deceptive debt and unfair collection scheme almost a decade in the making. Defendants want this Court to accept a legal fiction that Houslanger and Virgo are different and separate entities, when in fact Virgo is an alter ego of Houslanger formed to profit off the Sold Fraudulent Judgments. Defendants want to the Stipulation to be considered in a vacuum so as to obfuscate its clear intent as insurance in case any of the many consumers harmed by their deceptive and unfair scheme tried to fight back.

However, artful drafting is not enough to hide how the deceptive and unfair debt collection conduct here was all part of a scheme started by Houslanger forming Virgo and then Virgo purchasing the Sold Fraudulent Judgments that had already been exposed, and continued to be further exposed before the Income Execution on Mr. Galeas, as fraudulent by the *Sykes* class action. Plaintiff's allegations are extensive and particular, from the precise factors that form the basis for disregarding Virgo's corporate form to the prolonging of litigation by Houslanger even after the submission of Mr. Galeas' supplemental affidavit providing irrefutable proof that the affidavit of service was false. Herein, Plaintiff will apply these allegations to the law to show that he has stated claims as to violations of the FDPCA, GBL § 349, and Judiciary Law § 487, and as to conversion.

## II.     STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim, the plaintiff must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Johnson v. Rowley*, 569 F.3d 40, 43-44 (2d Cir. 2009) (internal citation and quotation marks

omitted). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court must accept as true all factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002).

### III.     SUMMARY OF RELEVANT FACTUAL ALLEGATIONS

On or about March 19, 2007, LR Credit 11, LLC through its collection law firm Mel S. Harris & Associates, LLC filed a collections lawsuit in Queens County Civil Court against now-Plaintiff Ramon A. Galeas, captioned *LR Credit 11, LLC v. Ramon A. Galeas,* Index No. CV-038328-07/QU ("the Collection Lawsuit"). *See* **Exhibit 1 to Keshavarz Declaration** (Plaintiff's First Amended Complaint) ("FAC") at ¶ 15. The complaint against Mr. Galeas vaguely alleged "the defendant(s) entered into a Retail Charge Account Agreement, with ASSOCIATES" and that Mr. Galeas had "defaulted in payment under the terms of agreement" and now owed $2,517.20 with interest from March 28, 2002. *Id.* at ¶ 17. Mr. Galeas had been the victim of mass identity theft, with several consumer credit accounts taken out in his name without his consent or knowledge and, upon information and belief, the putative debt here arose from this identity theft. *Id.* at ¶ 19. The unsubstantiated and vague claim against Mr. Galeas was typical for LR Credit and Mel Harris, who "had limited proof to substantiate the claims made in their affidavits of merit because they typically did not possess documentation of the underlying debt, and moreover, because the affiant lacked 'personal knowledge' of such claims, contrary to what is stated in the affidavit." *Id.* ¶ 18. LR Credit and Mel Harris filed an affidavit of service for the summons and complaint and entered a default judgment against Mr. Galeas on May 30, 2007 for

2

$1,484.52 plus 9 percent post judgment interest. *Id.* at ¶ 25.

Unbeknownst to Mr. Galeas, he had just become one of the over 100,000 sewer service default judgments against New York residents by LR Credit and Mel Harris in a criminal conspiracy to fraudulently obtain debt judgments *en masse*. *Id.* at ¶ 16, 24. The process server in this Collection Lawsuit was Andrew Lindauer, who alleged to have effectuated service on Mr. Galeas on April 3, 2007 by leaving a copy of the summons and complaint with his "wife" "Jane" Galeas, then mailing a copy to the address. *Id.* at ¶ 21. This allegation was false – Mr. Galeas has been divorced since December 18, 2006, and has not had a wife since then. *Id.* at ¶ 22. But perhaps even more demonstrative was that Lindauer had executed another affidavit of service two months earlier in a different lawsuit against Mr. Galeas wherein he described this "wife" as being 10 years younger, with different weight, height, and hair color. *Id.* Lindauer had his license to serve process revoked by the New York City Department of Consumer Affairs for exactly this kind of conduct: repeatedly making false entries in his logbooks, engaging in sewer service, executing false affidavits of service and testifying falsely at an investigatory hearing. *Id.* at ¶ 23.

Eventually LR Credit and Mel Harris were sued in a class action called *Sykes* for their conspiracy to defraud consumers like Mr. Galeas. *Id.* at ¶ 26. Class certification was granted on September 4, 2012. *Sykes et al. v. Mel Harris and Associates, LLC, et al.,* 285 F.R.D. 279 (S.D.N.Y. 2012),. In so deciding, the Court held that "Fabacher sign[ed] hundreds of affidavits a week, purportedly based on personal knowledge, purporting to certify that the action has merit, without actually having reviewed any credit agreements, promissory notes, or underlying documents, and, indeed, without even reading what he was signing." *Id.* at 285, and FAC at **Exhibit L** (*Sanders* Complaint), ¶ 3.When it settled, the *Sykes* defendants agreed to stop all collections and to cooperate in the *Sykes* plaintiffs' efforts to secure vacatur of the LR Credit

Judgments in state court. FAC at ¶ 26. The *Sykes* defendants stipulated that the consumers affected by their conspiracy would have been entitled to interpose a defense predicated upon "fraud, misrepresentation, illegality, unconscionability, lack of due service, violations of law, or other illegalities." *Id.* But shortly before the class settlement, LR Credit had sold approximately 25,000 judgments ("the Sold Fraudulent Judgments"), including approximately 15,000 judgments purchased by Defendant Virgo in January 2012 to be collected upon by Defendant Houslanger. *Id.* at ¶ 27.

Virgo Capital, LLC ("Virgo") was chartered by Matthew Blake, the Director of Recovery Operations at Houslanger, on November 18, 2011, just 2 months prior to purchasing the Fraudulent Judgments. *Id.* at ¶ 28. Virgo was created to knowingly benefit from LR Credit's fraud by purchasing the Sold Fraudulent Judgments and having them collected on by Defendant Houslanger. *Id.*. Virgo's principal (indeed sole) purpose is the purchase of putative consumer debt, primarily (if not exclusively) the purchase of judgments rendered against consumers for lawsuits seeking to collect consumer debts. *Id.* at ¶ 8. Virgo then collects on those purchased judgments by using Houslanger – and only Houslanger – to collect on those judgments by issuing thousands of information subpoenas, bank restraints, and garnishments, and sending thousands of collection letters. *Id.* Virgo is one among numerous entities, such as but not limited to Aries Capital Partners, Inc., used by Matthew Blake to purchase consumer debts exclusively for collection by Houslanger. *Id.* at ¶ 9. There is a lack of separation between Virgo, Aries, the other Blake entities, and Houslanger, as evinced by Blake being the Director of Recovery Operations at Houslanger, the managing agent and CEO of Virgo, and the CEO of Aries, which share email addresses and office addresses. *Id.* at ¶¶ 10, 11, and 13. Notably, there had been an order in the *Sykes* class action about a year before on December 29, 2010 denying a Motion to

Dismiss. *See Sykes et al. v. Mel Harris and Associates, LLC, et al.,* 757 F.Supp.2d 413 (S.D.N.Y. 2010). But following final approval of the class settlement in *Sykes* on May 24, 2016, the New York State Attorney General brought a CPLR 5015(c) proceeding New York Supreme Court on behalf of Deputy Chief Administrative Judge Fern Fisher to vacate all of the judgments obtained by LR Credit. *Id.* at ¶ 29. The State Court initially vacated all the LR Credit Judgments including those purchased by Virgo. *Id.* at ¶ 30. Houslanger was consequently forced on June 12, 2017 to send New York City Marshal Ronald Moses an email instructing him to stay collections on all judgments originally entered by LR Credit, which would include the putative judgment against Mr. Galeas. *Id.* at ¶ 31.

Houslanger and Virgo objected to the vacature of the Sold Judgments, including the judgment as to Mr. Galeas, and consequently the Court amended its order on July 20, 2017 to exclude the Sold Fraudulent Judgments. *Id.* at ¶ 32-33. Despite being fully aware of the unlawful circumstances under which the LR Credit Judgments were obtained, Defendants sought to collect from Mr. Galeas the fraudulently obtained judgment. *Id.* at ¶ 34.

On or about November 16, 2017, a class action lawsuit was filed in the Southern District of New York against the same defendants as in the case at bar (and an additional debt buyer) for seeking to collect on these Sold Fraudulent Judgments, captioned *Sanders et al. v. Houslanger & Associates, PLLC, et al.,* No. 1:17-cv-08985 (S.D.N.Y.). *Id.* at ¶ 35. Mr. Galeas was a member of the class in the *Sanders* class action lawsuit against both Houslanger and Virgo for, regarding the purchase of the LR Credit Judgments excluded from the *Sykes* settlement, "being fully aware of the unlawful circumstances under which the LR Credit Judgments were obtained" and yet still "garnish[ing] people's wage and freez[ing] their bank accounts in execution of the fraudulently obtained judgments." *Id.* at ¶ 36.

Mr. Galeas never received, and on information and belief was never sent, a notice of assignment of the judgment when the judgment was allegedly assigned from LR Credit to Virgo and further that Virgo does not have any proof that it was assigned the judgment by LR Credit. *Id.* at ¶ 38. Upon information and belief, Virgo and Houslanger took no steps to send a notice of assignment or to take any steps to discover whether one had been sent in the past by any of the other entities. *Id.* at ¶ 39; *see also Id.* at **Exhibit L** (*Sanders* Complaint), at ¶ 76 ("Defendants do not review the files of *Sykes* class members to determine whether the judgments were entered based on false affidavits of merit, false affidavits of service, and/or whether the judgment debtors received actual notice of the assignments"); **Exhibit R** (*Levy* Complaint), at ¶¶ 36-39 ("Upon information and belief, Palisades and Houslanger took no steps to send a notice of assignment or to take any steps to discover whether one had been sent in the past by any of the other entities").

On or about November 17, 2016, Houslanger executed an income execution to Rite Aid, Mr. Galeas' employer. *Id.* at ¶ 41. The Income Execution was (purportedly) personally signed by Mr. Houslanger, and started garnishment by the Marshal of 10% of each of Mr. Galeas' paychecks. *Id.* at ¶¶ 42-43. Mr. Galeas does not speak English as his first language and is 69 years old. *Id.* at ¶ 44. He had previously been self-employed and was not familiar with what his paystubs should look like, so he thought that the money being taken out was because of union dues. *Id.* It was only when a family member explained to him that it was not union dues that he learned he was being garnished. *Id.* at ¶ 45. Over the next several months, Mr. Galeas began to try to uncover and resolve all the instances of identity theft that had been perpetuated against him. *Id.* at ¶ 46. After receiving a Notice of Garnishment regarding another matter, he went to the Marshal who told him to call the debt collectors to find out what the debt was about. *Id.* This process was very frustrating because the debts were fraudulent and Mr. Galeas didn't owe money

6

to anyone; he felt impotent because he did not know what to do. *Id.* at ¶ 47. Mr. Galeas works a night shift starting at 10 PM and leaving at 6:30 AM – it was exhausting to have to try to figure out what was happening during the day and then going to work after. *Id.* at ¶ 48. Throughout this time, he would only get around four hours of sleep a day. *Id.* Prior to their issuance of the Income Execution, neither Houslanger nor Virgo sent Mr. Galeas a letter with the disclosures required by 15 U.S.C. § 1692g of the FDCPA. *Id.* at ¶ 49. Like the other *Sykes* judgments, the affidavit of merit and affidavit of service were false and the affidavit of merit for Mr. Galeas was signed by Todd Fabacher. *Id.* at ¶ 56. The *Sykes* Court found in 2012, years before Defendants attempted to collect on Mr. Galeas, that "Fabacher sign[ed] hundreds of affidavits a week, purportedly based on personal knowledge, purporting to certify that the action has merit, without actually having reviewed any credit agreements, promissory notes, or underlying documents, and, indeed, without even reading what he was signing." *Id.* at **Exhibit L** (*Sanders* Complaint), ¶ 3. The affidavit of merit for Mr. Galeas, as with the rest of the *Sykes* judgments, was signed by Fabacher without personal knowledge and thus misrepresents his personal knowledge as well. *See* **Exhibit  to Keshavarz Decl.** (Affidavit of Merit) ("TODD FABACHER being duly sworn, deposes and says...I am hereby fully and personally familiar with, and have personal knowledge of, the facts and proceedings relating to the within action").

On or about April 6, 2018, Mr. Galeas went to the Queens County Civil Court file an Order to Show Cause. *Id.* at ¶ 57. The Court set a hearing for April 18, 2018. *Id.* at ¶ 57. The Order to Show Cause was stamped in the upper right corner "FILE ORDERED" and, on the second page, Mr. Galeas had not checked the box that read "I have read the Affidavit of Service, and I disagree with it because." *Id.* at **Exhibit O** (OSC). Per Advisory Notice 17 of the Civil Court of the City of New York, the Honorable Fern A. Fisher directed effective April 23, 2015

that "If a file is unavailable, the file will be marked by a clerk with such an indication." *See* **Exhibit 2 to Keshavarz Decl.** (Advisory Notice). At the April 18, 2018 hearing, Mr. Galeas was assisted by the Volunteer Lawyer for the Day program (VLFD). *Id.* at ¶ 58. The VLFD program provides "limited scope representation for the date of the defendant's court appearance." **Exhibit to Keshavarz Decl. 3** (VLFD Referral). The consumer has no guarantee of representation through VLFD:

> "While your consumer debt matter meets the eligibility requirements for the VLFD-CCP, you are not guaranteed representation by a volunteer lawyer. The number of clients VLFD-CCP can represent each day depends on the number of volunteer lawyers available. If the VLFD-CCP is already at capacity on your court date, you will not be represented. All decisions of the Coordinating Attorney with respect to representation are final." **Exhibit 3 to Keshavarz Decl.** (VLFD Referral).

Even if a consumer receives assistance from VLFD at a hearing, "[r]egardless of result, however, the representation terminates after that day." *Id.*

At this hearing, Houslanger offered to settle the case by ceasing collections but not returning any of the money garnished. *Id.* at ¶ 59. When Mr. Galeas rejected the offer, Houslanger sought and was granted a nearly six month adjournment. *Id.* This hearing was already anxiety inducing for Mr. Galeas, who could not directly communicate with his volunteer attorneys due to the language barrier, because he was simultaneously seeking to vacate two other judgments that day that had arisen from the identity theft against him. *Id.* at ¶ 60.

Astonishingly, during the pendency of the OSC, garnishments began again on May 11, 2018. *Id.* at ¶ 61. On May 16, 2018, Mr. Galeas submitted a FTC Identity Theft Report. *Id.* at ¶ 62. Garnishments of Mr. Galeas' paychecks continued until July 12, 2018 – it is unclear why it continued through the pendency of the OSC, and why it stopped on this date in particular. *Id.* at ¶ 63. Despite knowing of the fraudulent nature of LR Credit judgments and being told that Mr. Galeas was a victim of identity theft, Houslanger sought an additional two adjournments on the

October 2 and October 30, 2018 hearings. *Id.* at ¶ 64; *see also* **Exhibit 4 to Keshavarz Decl.** (January 25, 2019 Order) ("This matter was adjourned twice for opposition after the court file was ordered…Plaintiff however, did not submit opposition"). On information and belief, Defendants took no steps to obtain additional evidence to oppose the Order to Show Cause because Defendants knew they had no such evidence. *Id.* at ¶ 65.

Defendants' purpose in seeking and obtaining the adjournments was in hopes that Mr. Galeas would miss a hearing (because he had to go to work) so that Defendants could win on default. *Id.* at ¶ 66. They sought and obtained repeated adjournments to wear down and intimidate Mr. Galeas by inflicting additional damages of lost time from work, and resulting lost wages; to embarrass Mr. Galeas by disclosing to his employer that he had to take off from work because he had been sued for allegedly not paying his bills; and to increase the stress and anxiety that Defendants might prevail. *Id.* The purpose of wearing down Mr. Galeas was to pressure him to give up, to sign anything the Defendants wanted, and to forfeit his wrongfully garnished wages. *Id.* Indeed, Defendants demanded Mr. Galeas forfeit any funds garnished from the fraudulent judgment as a precondition to a discussion of vacating the sewer service judgment – this demand was rejected. *Id.* at ¶ 67.

Finally, on December 3, 2018, the motion was submitted for a decision by Judge Butler. *Id.* at ¶ 68. By this time, Mr. Galeas had managed to compile a supplemental affidavit for his OSC which clearly showed that (1) he was divorced at the time of alleged service on his "wife"; (2) the process server Andrew Lindauer had his license to serve process revoked; (3) Lindauer had described the "wife" as ten years younger with different weight, height, and hair color only two months earlier; and (4) no consent to change attorney was filed in court. *Id.* at ¶ 69. On December 6, 2018, Marshal Moses returned $423.26 garnished during the pendency of the OSC.

*Id.* at ¶ 70. On January 25, 2019, Judge Laurentina Butler held that Mr. Galeas had controverted service and a traverse hearing was warranted, and ordered one to be held on March 6, 2019. *Id.* at ¶ 71. Defendants took no steps to obtain the process server to testify or gather any evidence to oppose a traverse hearing. *Id.* at ¶ 72. Indeed, Defendants knew they would not and could not obtain such evidence for any of the Fraudulent Judgments purchased from LR Credit. *Id.*

Despite knowing they had no evidence to oppose a traverse hearing, Defendants still required Mr. Galeas to take off from work again to attend the hearing. *Id.* at ¶ 73. Mr. Galeas appeared for the March 6 hearing expecting that a traverse hearing would be held, but Defendants had no process server or any other witness. *Id.* at ¶¶ 74-75. When Mr. Galeas' volunteer lawyer attorney for the day asked the appearance attorney from Houslanger whether a process server would be produced, the attorney simply handed Mr. Galeas' volunteer lawyer a stipulation to vacate the judgment, discontinue the case with prejudice, and general release. *Id.* at ¶ 76. A volunteer attorney for the day cannot file a notice of appearance, cannot represent the consumer other than for a very limited scope that one day at court, cannot represent the consumer generally, and cannot represent the consumer at a trial on the merits. *Id.* at ¶ 76, fn. 7. Through the dense language of the Stipulation Vacating Judgment, Houslanger and Virgo did everything they could to obfuscate the fact that the Stipulation would release any claims Mr. Galeas may – and does – have against Houslanger and Virgo, as well as allow them to keep the funds garnished via their judgment based on false affidavits. *Id.* at ¶ 77.

The purpose of the Stipulation is to dupe *pro se* consumers into releasing the very right the FDCPA was designed to protect. *Id.* at ¶ 83. Additionally a *pro se* consumer may not notice the clause that he has "withdrawn with prejudice" the Order to Show Cause. *Id.* at ¶ 84. Mr. Galeas is precisely the kind of consumer who this Stipulation could harm: elderly and speaking

little English, the already dense legalese would have to be translated by an interpreter, adding yet another barrier to understanding that Mr. Galeas was giving up rights as well as having the judgment vacated. *Id.* at ¶ 86. Houslanger demands all consumers, who are seeking to vacate a default judgment to sign Stipulations that are identical or substantially similar to the language used with Mr. Galeas no matter how strong the evidence is that the judgment fraudulently obtained. *Id.*at ¶ 97.

Mr. Galeas should never have been in court that day since, as is clear from the appearance attorney's actions, Houslanger had no intention of conducting a traverse hearing. *Id.* at ¶ 87. It was the last of several times, beginning with Houslanger's decision to garnish wages without meaningful attorney review of the known-fraudulent LR Credit judgment, that Houslanger could have prevented Mr. Galeas from being dragged to court for no substantive reason. *Id.* Rather than preventing this harm, Houslanger promoted it by repeated adjournments and ultimately a Stipulation seeking to limit Mr. Galeas' rights and retain his wages. *Id.*

Mr. Galeas felt like Houslanger had taken advantage of him because of his age and lack of English proficiency – he felt powerless in an English language court system up against a law firm like Houslanger, and it was especially frustrating because he did not owe the money. *Id.* at ¶¶ 88-89. Mr. Galeas depend on family to help him to navigate this process, so any time he could not get someone to accompany him to translate, he was thrown into anxiety about what to do. *Id.* at ¶ 90. He was very worried during the more than eleven months that the court case was going on because he did not know if he was going to get his money back and how long it would take to get it back. *Id.* at ¶ 91. Mr. Galeas worked the graveyard shift at this time, from 10:00 PM to 6:30 AM. *Id.* at ¶ 92. Every time he saw his paycheck and that money was being taken out, he wanted to cry. *Id.* at ¶ 93. Worse still, he got his paycheck at the end of his shift, at 6:30 AM,

11

right before he would go to the court and elsewhere to try to figure out how to get out of this debt he did not owe. *Id.* The more he worked to try to make up for these garnishments, the more money would be taken from him – it did not feel fair to him. *Id.* at ¶ 94. He would get his paycheck when leaving work, so the stress damaged his ability to sleep. *Id.* at ¶ 95. He would watch TV to try to distract himself so he wouldn't think about what was happening, and would wind up falling asleep on the couch, which only made his sleep even more restless and gave him back pains. *Id.* It would take him two hours just to fall asleep, and he would only get around four hours of sleep. *Id.* Before and during every court appearance, he was anxious that the result was not going to be in his favor. *Id.* at ¶ 96. When he had to work the night before going to court, he could not concentrate on the tasks he had to do. *Id.*

### IV.    ARGUMENT AS TO HOUSLANGER

#### A.  <u>Houslanger's Use of the Stipulation to Attempt to Retain Funds Garnished from Mr. Galeas and Protect Defendants from Liability for Their Illegal Conduct States a Claim under the FDCPA.</u>

This case is not seeking to overturn basic principles of releases in settlements, just as the FDCPA does not seek to prohibit debt collection. Houslanger was not some well-meaning debt collector that decided to give a consumer the benefit of the doubt. Houslanger knew, from Virgo's purchase of the Sold Fraudulent Judgments (FAC at ¶ 28) and certainly by the time of the Income Execution on Mr. Galeas (*Id.* at ¶ 34) onward, that Defendants should not be collecting on the Sold Fraudulent Judgments and doing so was perpetuating the frauds in *Sykes*. Defendants should have never collected on the judgment against Mr. Galeas, so the Stipulation was not an exchange since Houslanger knew it had no basis to continue the litigation (*Id.* at ¶¶ 55-56), and certainly not by the time of the traverse hearing (*Id.* at ¶ 72) that it did not bring any witnesses to (*Id.* at ¶ 75). It was a final attempt to insulate Houslanger from liability for all of its

other deceptive debt collection acts, and as such it is an unfair practice prohibited by the FDCPA. *Id.* at ¶ 83.

> **1. Mr. Galeas' use of a single day, limited scope volunteer attorney does not shield Defendants from liability for their multi-step scheme, replete with unfair and unconscionable means culminating in the Stipulation.**

Houslanger argues that, since the Stipulation was handed to the VLFD attorney for the day, Mr. Galeas' FDCPA claim in relation to the Stipulation "fails because he is complaining about a communication made exclusively to a third-party representative." Houslanger MTD pp. 5, 6. As Your Honor has noted, while the Second Circuit "has not squarely addressed the issue," several district courts in the Second Circuit have rejected the argument that misrepresentations made to third parties, including to a consumer's attorney, are actionable. *Abreu v. Receivable Collection Servs., LLC*, No. 18-CV-04103 (PK)(CLB), 2019 WL 1876722, at *4 (E.D.N.Y. 2019); *but see Bishop v. Ross Earle & Bonan, P.A.*, 817 F.3d 1268, 1271–73 (11th Cir. 2016) (describing circuit split on the issue). However, the key current throughout this authority is that the courts have addressed communications. *Vernot v. Pinnacle Credit Servs., LLC*, 2017 WL 384327, at *5 (E.D.N.Y. Jan. 26, 2017) (J. Bianco) ("communications made by debt collectors to attorneys"); *Boyd v. J.E. Robert Co.*, 2010 WL 5772892, at *13 (E.D.N.Y. Mar. 31, 2010) (J. Reyes), *adopted by*, 2011 WL 477547 (E.D.N.Y. Feb. 2, 2011) ("the June Payoff Quote is a communication"); *Gabriele v. Am. Home Mortg. Servicing, Inc.*, 503 Fed. Appx. 89, 95 (2d Cir. 2012) (claims based on false statement, false affidavit, and misrepresentation).

However, the FDCPA governs not just "representations," but also "means,' *i.e.* conduct. Specifically, 1692e false, deceptive, or misleading "representation or means," and 1692 prohibits unfair or unconscionable "means." While some violations may both be a deceptive communication and an "unfair or unconscionable means," to treat them as synonymous clearly

controverts the plain text of 15 U.S.C. § 1692e which has both "representation and means," and likewise just "means" for 1692f. When interpreting statutes, courts "presume differences in language like this convey differences in meaning." *Henson*, 137 S. Ct. at 1723; *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). Where, as here, Congress has provided two options, courts construe each to refer to "something different to avoid being superfluous." *Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 825 (8th Cir. 2009). Courts have found FDCPA violations based on means without misrepresentations. *See Dina v. Cuda & Assocs.*, 950 F. Supp. 2d 396, 406 (D. Conn. 2013) (use of invalid execution is deceptive means even if only communicated to a third party). In *Arias*, the Second Circuit found liability under 1692f for "us[ing] unfair or unconscionable means to collect on the default judgment," specifically:

> "(1) that GMBS had "documentary proof that [all of the] funds restrained [in Arias's bank account] were exempt SSRI"; (2) that GMBS refused to release the restraint and filed an objection in State court despite having "no good-faith basis for objecting ... in order to abuse and intimidate [Arias] into agreeing to send [GMBS] payments from his exempt funds, or in hopes that [Arias] would default at the hearing"; (3) that "it is the pattern and practice of GMBS to object to ... exemption claims whether or not [it has] a good faith basis for doing so, in order to abuse and intimidate consumers"; and (4) that GMBS agreed to release Arias's funds at the State court hearing only after one of its lawyers reviewed documents that had previously been produced and sent with Arias's exemption claim form." *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 138 (2d Cir. 2017)(alterations in the original).

The Court explained that "unduly prolong[ing] legal proceedings or requir[ing] a consumer to appear at an unnecessary hearing" violated 1692f. *Id.* The term "unfair or unconscionable means" refers to "***practices*** that are 'shockingly unjust or unfair, ***or*** affronting the sense of justice, decency, or reasonableness' to the least sophisticated consumer. *Arias* at 135 (emphasis added) (citation omitted). The Court in *Arias* considered the entirety of the debt collector's litigation misconduct to conclude it was unfair and unconscionable. *Id.*

14

Similarly, this Court should not consider the Stipulation in a vacuum. Regardless of the limited scope single-day volunteer attorney representation for Mr. Galeas, the Stipulation was an **_integral_** device in connection with a multi-step fraudulent scheme against Mr. Galeas, beginning with the purchase of the Sold Fraudulent Judgments and culminating in the Stipulation. See FAC pp. 1,2 (summarizing scheme). Houslanger knew when Virgo purchased the Sold Fraudulent Judgments what they were (FAC at ¶ 28; FAC at **Exhibit L** (*Sanders* Class Action), at ¶ 57 ("Houslanger closely followed the *Sykes* litigation over the years and was well aware of the *Sykes* plaintiffs' allegations and the various decisions issued by the District Court and the Second Circuit"), executed on Mr. Galeas' income knowing their basis for doing so was fraudulent affidavits (FAC at ¶ 56), prolonged litigation to try to wear Mr. Galeas down (such as but not limited to not discontinuing the case voluntarily upon the traverse hearing being set) (*Id.* at ¶¶ 57-73), and then attempted to have Mr. Galeas sign the Stipulation releasing his potential claims and giving up the money which had already been garnished (*Id.* at ¶¶ 76-85). Mr. Galeas did not have a valid judgment against him where he could have made a free choice to accept or reject a stipulation releasing his potential claims. Mr. Galeas had a judgment procured with false affidavits of merit (*Id.* at ¶ 56) and service (*Id.* at ¶ 24) held over his head by Defendants to knowingly profit off the frauds (*Id.* at ¶ 87) originally committed by the defendants in *Sykes*. The least sophisticated consumer would have the unfair choice of fighting to re-litigate a debt they never owed or releasing their potential claims and losing the money illegally garnished. Without the Stipulation as a backstop for immunity, Defendants whole multi-part fraudulent scheme would collapse, or at least be a far less profitable business venture. For example the Sanders class action for collecting on fraudulent LR Credit judgments seeks a return of all moneys collected, treble damages under Judiciary Law 487, up to $500,000 in FDCPA statutory

damages, and attorney's fees. FAC at **Exhibit L** (*Sanders* Class Action). There would be serious obstacles to that relief had the named Plaintiff signed the Stipulation.

Finally, it would also be a perverse result that a stopgap volunteer attorney program can be used as a shield by unscrupulous debt collectors to engage in systematic fraud against Mr. Galeas and thousands of other consumers.

> ## 2. Houslanger cannot insulate themselves from liability under speculation that the court system would have prevented the unfair stipulation from being entered.

Knowing that their argument as to protection by an attorney would not likely carry the day, Houslanger follows it by arguing that the supervision of the Civil Court would prevent any unfairness. The case relied on by Houslanger, *Simmons v. Roundup Funding, LLC,* is inapposite, referring particularly to the protections provided by the bankruptcy system. *Simmons v. Roundup Funding, LLC*, 622 F.3d 93, 96 (2d Cir. 2010) ("There is no need to protect debtors who are already under the protection of the bankruptcy court"). The authority that *Simmons* itself relies on is also specific to bankruptcy. *See e.g. Id. citing B–Real, LLC v. Rogers,* 405 B.R. 428, 431–32 (M.D.La.2009) ("Debtors in bankruptcy proceedings do not need protection from abusive collection methods that are covered under the FDCPA because the claims process is highly regulated and court controlled"). The Second Circuit itself confirmed this limitation. *See Arias,* 875 F.3d at 137.

Your Honor laid out the difference between civil court debt collection litigation and bankruptcy proceedings very well in the *Gold* decision:

> "[T]he Supreme Court noted key differences between a bankruptcy proceeding and other civil proceedings [...]For example, Plaintiff, brought into state court as a defendant, did not have the benefit of a bankruptcy trustee to guide him through the unfamiliar process of a foreclosure proceeding." *Gold v. Shapiro, Dicaro & Barak, LLC*, No. 18CV6787PKCSJB, 2019 WL 4752093, at *8 (E.D.N.Y. Sept. 30, 2019) (internal citations and quotations removed).

16

Houslanger's belief that the court system would have prevented an unfair stipulation from being entered is entirely speculative, and there is more than sufficient basis to doubt the speculation. *See* FAC ¶ 16 (LR Credit and Mel Harris obtaining over 100,000 sewer service default judgments). Prior to the instant lawsuit, Mr. Galeas did not know the factual circumstances of the Sold Fraudulent Judgments and as such did not raise them to the Court. *See* FAC, **Exhibit P**. The idea that the FDCPA was enacted "not because of attorney[s'] conduct in the courtroom, but because of their conduct in the backroom" was rejected by the Supreme Court: "the Act applies to attorneys who 'regularly' engage in consumer-debt-collection activity, even when that activity consists of litigation. *Heintz v. Jenkins*, 514 U.S. 291, 297, 299 (1995).

### 3. The use of the Stipulation was not an arms-length transaction; it was a backstop to retain the profitability of the multi-step fraudulent scheme.

Courts determine whether a debt collector has engaged in unfair conduct through the "least sophisticated consumer" objective standard. *Arias*, 875 F.3d at 135. "The standard is objective, 'pays no attention to the circumstances of the particular debtor in question,' and asks only 'whether the hypothetical least sophisticated consumer could reasonably interpret' the representation in a way that is inaccurate." *Id. citing Easterling v. Collecto, Inc.*, 692 F.3d 229, 234 (2d Cir. 2012). "Employing the least sophisticated consumer standard 'ensures the protection of all consumers, even the naive and the trusting, against deceptive debt collection practices.'" *Arias,* 875 F.3d at 135 *quoting Clomon v. Jackson,* 988 F.2d 1314, 1320 (2d Cir. 1993).

As aforementioned, the use of the Stipulation is similar to the unfair litigation conduct in *Arias*. The Court in *Arias* looked at the unfair conduct that happened to Mr. Arias and then evaluated how it would impact the least sophisticated consumer – "it required Arias to prepare needlessly for a hearing that GMBS knew was frivolous [...] Attending a hearing can be expensive, forcing consumers to take unpaid leave from work, incur additional dependent care

17

expenses, and so on." *Arias*, 875 F.3d at 138. Here, it would be unfair if one of the Sold Fraudulent Judgments was collected against the least sophisticated consumer and then a Stipulation was pushed on the least sophisticated consumer that would release any potential claims and retain the money illegally garnished. The analysis in this case benefits from seeing that indeed other consumers were subjected to the same or similar unfair debt collection conduct due to Houslanger collecting on the Sold Fraudulent Judgments. *See* FAC, **Exhibit L** (*Sanders* Class Action, ¶¶ 79-133); **Exhibit R** (*Levy* Complaint, ¶¶ 72-79); **Exhibit S** (*Stinson* Complaint, ¶¶ 66-74).

Houslanger asserts that its "actionable behavior before proposing an exchange of releases did not make the Stipulation itself 'unfair or unconscionable.'" Plaintiff has no argument with the general assertion that, under many circumstances, a settlement in a collection lawsuit may be appropriate. However, "[w]hile collection agencies may enter into settlement agreements with indebted consumers, the FDCPA requires that debt collectors do so in a manner that is not unfair or unconscionable." *Nikkel v. Wakefield & Assocs., Inc.*, No. 10-CV-02411-PAB-CBS, 2012 WL 5571058, at \*11 (D. Colo. Nov. 15, 2012) *citing Goswami v. Am. Collections Enter., Inc.*, 377 F.3d 488, 495–96 (5th Cir.2004); *see also Jones v. Midland Funding, L.L.C.*, 2012 WL 13027349 (D. Conn. Aug. 13, 2012) (holding that settlement offer violated the FDCPA).

Critically, as explained *supra*, the Stipulation in this case cannot be viewed in a vacuum: in the case at bar the Stipulation was an integral part of a multi-part fraudulent debt collection scheme as to Mr. Galeas and thousands of others. The courts in this Circuit have stated consistently that the context of debt collection conduct may make it a violation of the FDCPA where otherwise it might not be a violation. The most obvious and pertinent examples are as to sewer service. *See e.g. Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 85 (2d Cir. 2015)

18

("while the operative complaint alleges that sewer service is 'the primary reason' few defendants appear in New York City Civil Court to defend against debt collection actions, plaintiffs have made clear that this is but one component of the overarching debt collection plan effectuated by defendants").

This case is also similar to *Currier v. First Resolution Investment Corp.,* 762 F.3d 529 (6th Cir. 2014). In *Currier*, the Court held that a debt collector violated 15 U.S.C. § 1692f where, three days after the consumer had filed a motion to vacate the default judgment that the debt collector knew was meritorious, the debt collector filed a lien on the invalid judgment. *Id.* at 534. The Court noted the conduct was a violation because the debt collector "did nothing to release the lien or correct the error…[and] when the state judge ruled from the bench that the judgment would be vacated, First Resolution *still* failed to release it." *Id.* [original emphasis]. The Court further held that this "was not a mere technical violation" and the fact that the judgment appeared valid on its face was a deceptive and unfair representation that there was a final judgment and a right to execute on that judgment. *Id.* at 534-535. Houslanger's violation here is even more egregious since the debt collector in *Currier* did eventually voluntarily release the invalid lien several weeks later, whereas Houslanger dragged out vacating the judgment for months and even after failing to produce a witness for the traverse hearing still attempted to have Mr. Galeas release his potential claims and to retain the deceptively and unfairly garnished wages.

**B.** **Houslanger's Attempts to Collect on Mr. Galeas, from the Income Execution to the Baseless Adjournments, Were Part of a Deceptive Scheme to Knowingly Benefit from the Fraud that Created the Sold Fraudulent Judgments, and Thus Violate GBL § 349.**

**1.** **Knowingly benefitting from fraud, particularly by and through the court system, is egregiously deceptive.**

Houslanger begins by arguing that Plaintiff's previous argument, that Houslanger's

19

enforcement of the Judgment was not protected by privilege, is unavailing because (1) *Polanco* addresses the privilege in the context of the FDCPA and conversion and (2) that Houslanger is distinguishable from the defendant NCOF in *Polanco* since Houslanger did not obtain the judgment it was enforcing unlike NCOF. As to the first argument, Plaintiff previously referenced *Polanco* because Houslanger's argument "is similar to the failed argument of NCOF" – while the claims are different, the principal that "a court order which is valid or fair on its face" is not enough by itself to excuse wrongful conduct. *Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 587 (S.D.N.Y. 2015) *quoting Calamia v. City of New York*, 879 F.2d 1025, 1031 (2d Cir.1989). And the differences between NCOF and Houslanger are not material to the analysis. Notably, *Polanco* held "if a jury were to find that sewer service occurred, then the conversion would have been initiated at the time Defendant took possession of Plaintiff's funds in or around 2006 through the fraudulently obtained default judgment." *Polanco,* 132 F. Supp. 3d at 589.

Taken to its logical conclusion, Houslanger is advocating for the court system to facilitate knowingly benefitting from fraud as long as the beneficiary did not commit the fraud that is being benefitted from. But treating a known-fraudulent judgment, procured with false affidavits of merit and service, as a valid judgment is itself deceptive. Houslanger attempts to disguise systematic deception as formalistic adherence to court procedure, but the Second Circuit has never tolerated such arguments. *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 96 (2d Cir. 2015)

Houslanger argues that it could not have known the judgment specifically as to Mr. Galeas was based in false representations because the affidavit of service bears the correct address and can only be seen as a lie when it is shown that Mr. Galeas did not have a wife and

20

the description of his "wife" was not consistent, as he did in his supplemental affidavit to the OSC. First, Houslanger knew of the circumstances of the *Sykes* case. FAC at ¶ 28; FAC at **Exhibit L** (*Sanders* Class Action) They knew that the judgments were based in false affirmations of service and were very likely based on sewer service. *Id.* The affidavits of merit for the Sold Fraudulent Judgments, including for Mr. Galeas, are facially ridiculous, merely alleging the original creditor as "ASSOCIATES." *Id.* at ¶ 56. Houslanger had NYC Marshal Moses stay execution pursuant to *Fisher v. Leucadia* on June 14, 2017, nearly a year before Mr. Galeas' OSC. *Id.* at **Exhibit K**. And Houslanger still did not act to remedy the fraud once Mr. Galeas' supplemental affidavit showing the affidavit of service was fraudulent was submitted (*Id.* at ¶¶ 68-70), nor did Houslanger even act once it was determined that Mr. Galeas had rebutted the affidavit of service and a traverse hearing was set (*Id.* at ¶¶ 71-87). Houslanger's inaction persisted throughout because their intent and knowledge were practically the same throughout – that the Sold Fraudulent Judgments were procured by the fraudulent practices of the *Sykes* Defendants, and Houslanger intended to profit on them to the detriment of vulnerable consumers like Mr. Galeas. *Id.* at ¶ 87.

This case is similar to *Guzman*, except whereas *Guzman* dealt with ratification of an agent's conduct by a principle (*Guzman v. Mel S. Harris & Assocs., LLC*, No. 16 CIV. 3499 (GBD), 2018 WL 1665252, at *8 (S.D.N.Y. Mar. 22, 2018)), this case deals with ratification of a judgment creditor's conduct by an assignee and its attorney. While the relationship is different here, the principles are the same. In *Guzman*, LR Credit was held to have violated the FDCPA "by continuing to execute on Mr. Guzman's default judgment despite having reason to know the validity of the judgment was questionable" (*Id.*) – just as Houslanger continued to execute and litigate to maintain Mr. Galeas' default judgment despite having reason to know the validity of

the judgment was questionable. FAC at ¶ 87. There is no reason that the knowledge must come from a plain reading of the pertinent documents – Houslanger knew what *Sykes* had uncovered about the Sold Fraudulent Judgments and "fail[ed] to investigate [...] and continu[ed] to enforce those judgments." *Coble v. Cohen & Slamowitz, LLP*, 824 F. Supp. 2d 568, 572 (S.D.N.Y. 2011). Houslanger and Virgo retained the benefits of the fraudulent affidavits – in fact, even at the traverse hearing where it was practically certain that the judgment would be vacated without Houslanger bringing the process server witness, Houslanger still sought to retain the benefits of the fraudulent affidavits through the Stipulation both releasing Mr. Galeas' potential claims and allowing Houslanger to retain the ill-gotten funds. FAC at ¶¶ 71-87

Finally, Houslanger cherry picks the holding of *Musah*, which in fact holds that "where the judgment was assigned to a third party, §1692e(3) requires that an attorney seeking to collect that judgment engage in a review of the case file sufficient to determine that the judgment debtor received notice of the assignment." *Musah v. Houslanger & Assocs., PLLC,* 962 F.Supp.2d 636, 641 (S.D.N.Y. 2013). The reason why *Musah* both holds that generally a valid judgment obviates the need for further review but carves out an exception for assignment to a third party is exactly the circumstances present here: to hold to the contrary would allow debt collectors like Houslanger to profit off of fraudulently obtained judgments simply by sticking their heads in the sand.

### 2. Houslanger's adjournments would mislead a reasonable consumer, and the adjournments were one of the greatest contributors to Mr. Galeas' emotional distress.

Houslanger first argues that baseless adjournments are not deceptive to the reasonable consumer under GBL § 349 because, they allege, the validity of Mr. Galeas' objection was clear, unlike a complicated issue like statutes of limitations. First, the facts at issue here (which

Houslanger carefully avoids) show plainly why baseless adjournments would be deceptive to a reasonable consumer: the service at issue was on April 3, 2007 (FAC at ¶ 21), more than a decade before the first adjournment at issue. A reasonable consumer could not be expected to have overwhelming confidence that they were not served process more than ten years ago, and contrary to Houslanger's assertion, these adjournments occurred prior to Mr. Galeas being able to review the affidavit of service so the palpably false assertion that service was through a non-existent wife would not appear until after the adjournments. *See* FAC at ¶ 69. Notably, the Court itself stated that the adjournments were "for opposition." *See* **Exhibit 4** (January 25, 2019 Order).

But perhaps most importantly the question is not at all whether a reasonable consumer believes they have a valid basis to contest service (presumably any consumer who files an OSC does) but instead whether they believe, after Houslanger's adjournments, that Houslanger has a reasonable basis to fight their OSC. As *Diaz* notes, an attorney serving a complaint to collect a debt may cause a consumer to "reasonably assume[] that an attorney had conducted a meaningful review of the complaint and was representing that the claims in the complaint were actionable." *Diaz v. Portfolio Recovery Assocs., LLC,* 2012 WL 661456, at *14. The question was not whether a reasonable consumer would believe the attorney's representations by the truth of the matter stated, but whether that attorney had performed a meaningful review and, for whatever reason, determined the claims were actionable. The reasonable consumer is, simply put, not an attorney, so while Houslanger may believe that service of process is clear and easy to understand, a reasonable consumer could easily be misled by baseless adjournments (*see* FAC at ¶¶ 64-66) to believe that Houslanger had a legitimate reason in law for doing so. A reasonable consumer could know plainly that they had never been served process and still also believe, due

23

to Houslanger's misrepresentation, that on the basis of some legal reasoning Houslanger could fight and possibly defeat their OSC. For better or worse, the law is not intuitive to the reasonable consumer, but what is intuitive is that when lawyers take actions they do so based on legal reasoning. Unfortunately here that normally-sound intuition would be wrong because Houslanger sought adjournments to deceive a reasonable consumer into believing he might lose the case, wearing him down until he gave up, rather than based on a legitimate opposition to the OSC.

Houslanger relies on a line of cases which mistakenly held a requirement of actually-misleading to establish GBL § 349 that is neither found in the statute nor is line with the statute's broad remedial purpose and objective standard of evaluating deception. More recent Second Circuit precedent does not apply this requirement. *Compare Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) ("a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered an injury as result of the allegedly deceptive acts or practice") with *Solomon v. Bell Atl. Corp.,* 777 N.Y.S.2d 50, 55 (N.Y.App.Div.2004) ("[1] the plaintiff must prove that the defendant made misrepresentations or omissions that were likely to mislead a reasonable consumer in the plaintiff's circumstances, [2] **that the plaintiff was deceived by those misrepresentations or omissions** and [3] that as a result the plaintiff suffered injury" [emphasis added]). The Eastern District recently criticized the reasoning in *Solomon*: "[T]he court in *Solomon* mistakenly emphasized that an individual inquiry is necessary, by suggesting that there is a requirement that 'the plaintiff was deceived by those misrepresentations,' which as noted *supra*, is incorrect due to the less individualistic and more objective nature of the statutory elements." *Hasemann v. Gerber Prod. Co.*, 331 F.R.D. 239, 266 (E.D.N.Y. 2019); *see also Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 293 (S.D.N.Y. 2012)("Whether this practice violates [...] New York GBL § 349 [...] does not depend on

24

individualized considerations"). "[N]othing more is required than that a plaintiff suffer a loss because of defendants' act." *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 147 (S.D.N.Y. 2014). Notably, when applying the objective test for misleading conduct under the FDCPA, the Second Circuit criticized a district court for "placing considerable – if not dispositive – weight on the facts and circumstances surrounding Easterling's background, seemingly in an effort to establish that she was not, in fact, deceived by the Collection Letter." *Easterling v. Collecto, Inc.*, 692 F.3d at 234. "Instead, the operative inquiry in this case is whether the hypothetical least sophisticated consumer could reasonably interpret the Collection Letter's statement [...] as representing, incorrectly, that the debtor is completely foreclosed from seeking bankruptcy discharge of the debt in question." *Id.*

And when the courts in the Second Circuit have looked at instances of deceptive debt collection conduct under GBL § 349, they have held that being personally deceived is not required. *Hunter v. Palisades Acquisition XVI, LLC,* No. 16 CIV. 8779 (ER), 2017 WL 5513636, at *8 (S.D.N.Y. Nov. 16, 2017). In *Hunter*, Defendant Palisades argued that its debt collection conduct was not deceptive because Ms. Hunter "knew, or should have known, that the documents were related to the Judgment Collection Lawsuit which she successfully vacated." *Hunter* (internal quotations removed). The Honorable Judge Ramos astutely noted that "New York courts use an objective definition of 'deceptive.'" *Id. citing to Oswego*, 85 N.Y.2d at 26. Applying that standard, Judge Ramos found that "Even if Plaintiff herself thought she successfully vacated the judgment in 2014, seeing a hold on her account due to the Collections Lawsuit judgment would likely mislead her, or a reasonable consumer standing in her shoes, into believing the debt was still due." *Id.*

The Second Circuit's position on the harm of baseless adjournments is clear: "Attending

a hearing can be expensive, forcing consumers to take unpaid leave from work, incur additional dependent care expenses, and so on." *Arias,* 875 F.3d at 138. The Second Circuit was also clear on why a debt collector would do this: "[the hearing] was intended primarily to harass Arias, frustrate his exemption claim, and erect procedural and substantive challenges that Arias, *pro se,* was ill-equipped to handle." *Id.* And unfortunately those are the harms that Defendants inflicted on Mr. Galeas: he had anxiety about depending on family members to help navigate the English language courts, with every additional hearing presenting another opportunity where he may not have had someone to accompany him. S*ee* FAC at ¶ 90. He was very worried during the more than eleven months that the court case was going on because he did not know if he was going to get his money back and how long it would take to get it back. *Id.* at ¶ 91. Before and during every court appearance, he was anxious that the result was not going to be in his favor. *Id.* at ¶ 96. When he had to work the night before going to court, which Houslanger multiplied with baseless adjournments, he could not concentrate on the tasks he had to do. *Id.*

## C. Houslanger's Income Execution and Baseless Adjournments Sought to Perpetuate an Extreme Deception on the Court and Mr. Galeas that Caused Him to Suffer Emotional Distress, Thus Violating Judiciary Law § 487.

As an initial matter, Plaintiff incorporates all his arguments elaborated above as to why the income execution and baseless adjournments were egregiously deceptive.

### 1. Houslanger's intent is well-pleaded, and the alleged inconsistency with the allegations as to deceit is conclusory.

Houslanger argues that the allegations as to their intent are "inconsistent with Galeas' theory of deceit," but do not elaborate as to why. Beyond the conclusory nature of this argument, the allegations as to deceit and intent are clearly consistent: Houslanger did not accidentally have Virgo formed to purchase the Sold Fraudulent Judgments (FAC at ¶ 28) nor did they accidentally

26

attempt to collect on them, including their attempts to collect on Mr. Galeas (*Id.* at ¶ 41). Houslanger did not stumble into the Income Execution (*Id.*), and Houslanger did not accidentally request the adjournments (*Id.* at ¶¶ 59, 64-66) to deceive the Court and Mr. Galeas into believing that they had a legitimate basis for opposing the OSC. The fact that the intentionally deceitful conduct was meant to wear down Mr. Galeas just illustrates the harm and unfairness of the conduct rather than rebutting that it was intentionally deceitful. It was by intentionally misrepresenting a legitimate basis to oppose the OSC that Houslanger was able to obtain the adjournments that it used to wear down Mr. Galeas, which could make the least sophisticated consumer "feel compelled to pay the debt or misunderstand their potential rights to challenge the debt." *Somerset v. Stephen Einstein & Assocs., P.C.,* 351 F. Supp. 3d 201, 207-08 (E.D.N.Y. 2019).

Houslanger continued to garnish Mr. Galeas' wages from May 11, 2018 through July 12, 2018 (FAC ¶ 62, 63) in violation of the April 6, 2018 Order to Show Cause which ordered "enforcement of the Judgment be stayed" until and entry an order on the application to vacate the default judgment. *See* FAC at **Exhibit O** (OSC). This violates Judiciary Law 487. The violation is similar to the garnishment of money in Okyere: "The allegation that Moses took possession of the money despite being aware of the court order staying all enforcement proceedings is more than sufficient to allow the reasonable inference that Moses took the money despite knowing that he was prohibited from doing so." *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 534 (S.D.N.Y. 2013). *Okyere* held that this conduct "affront[ed] the sense of 'justice, decency or reasonableness.'" *Id.* at 531.

   2. **Plaintiff sufficiently plead that Houslanger engaged in its litigation conduct to knowingly benefit from fraud, including not discontinuing the action prior to the traverse hearing after Mr. Galeas had served**

27

**his Supplemental Affidavit.**

As aforementioned, Houslanger knew that the Sold Fraudulent Judgments were procured by the *Sykes* Defendants using false affidavits of merit and false affidavit of service. FAC at ¶ 56. The adjournments in the case were sought will full knowledge of what Mr. Galeas' judgment was part of, regardless of whether that was apparent from the face of the affidavit of service or not. And again, even if the affidavit of service could be relied on as Houslanger is attempting to, Houslanger went forward with a traverse hearing knowing that they would not bring the process server witness. *Id.* at ¶¶ 69-75. Houslanger is coy when they say there were no adjournments after that date – to the contrary, there was an even more stressful hearing for Mr. Galeas that would decide the fate of the judgment against him, and one which Houslanger persisted with despite now having the Supplemental Affidavit explaining why the affidavit of service was false and not having the process server witness. Houslanger deceptively went forward rather than discontinuing in the hopes of having Mr. Galeas unfairly enter into a Stipulation that would release his potential claims and retain the wages that were wrongfully taken from him. *Id.* at ¶¶ 76-87.

> **3. Houslanger knew from the day it purchased the Sold Fraudulent Judgments that they should not be collected on, so the adjournments were a perpetuation of collection that was per se deceptive, and were done in order to wear Mr. Galeas down.**

Perhaps Houslanger is right that baseless adjournments of a motion alone cannot qualify as "extreme" or "egregious" deceit for purposes of Judiciary Law § 487. But this case does not concern baseless adjournments where a debt collector might prolong the case because they merely do not have sufficient evidence to prove the debt is owed or cannot track down the process server. That behavior would be deceptive, but would not likely be egregiously so outside extenuating circumstances. What is extreme and egregious about the deceptive adjournments in

28

this matter is that they sought to wear down Mr. Galeas, to have him default, all to retain a judgment that they knew was procured by false affidavits. FAC at ¶ 87. These were not the baseless adjournments of a debt collector who did not do their homework or unethically sought to avoid the risk of an averse determination – these were part of a scheme to collect on the 15,000 Sold Fraudulent Judgments and avoid any liability for doing so.

### D. Houslanger Committed Conversion by Garnishing Mr. Galeas' Funds through a Judgment They Knew Was Fraudulent.

As earlier addressed, Houslanger fundamentally misunderstands the *Polanco* holding. The operative question is not whether Houslanger procured the fraudulent judgment but whether Houslanger knowingly used the fraudulent judgment to take the property unlawfully. The case law *Polanco* relies on suggests this analysis. *See Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49-50 (2d Cir. 1996) ("But where the defendant holds the property unlawfully"); *Frink Am., Inc. v. Champion Rd. Mach. Ltd.,* 2000 WL 754945, at \*2 (2d Cir. 2000) ("demand is excused where the defendant is not an 'innocent purchaser' of property, but instead is 'a wrongdoer'"). The Second Circuit in *Frink* recognized that what particular role the pertinent "wrongdoer" could occupy varies: "instead of the usual situation of a guilty seller and an innocent buyer, in this case there may have been an innocent seller and a guilty purchaser." *Id.* at \*3. The purpose of privilege under New York conversion law is "to allow an innocent to 'cure' its wrongful possession" (*Id.*), which, even at the traverse hearing after Mr. Galeas had rebutted the affidavit of service with his supplemental affidavit, Houslanger was trying to maintain rather than cure their wrongful possession with its provision in the Stipulation seeking to retain the wrongfully garnished funds. FAC ¶ 87. Houslanger was certainly not an innocent purchaser when it, by and through Virgo, bought the Sold Fraudulent Judgments (*Id.* at ¶ 28),

and even an innocent purchaser would risk its rightful privilege when, rather than cure its wrongful possession, it sought to retain it in an unfair Stipulation as Houslanger did. Executing on the Judgment during the pendency of the OSC stay (*see* FAC ¶ 61) also constitutes conversion.

### E. The Allegations as to Other Consumers Harmed by Similar Conduct from Houslanger Is Relevant to Establishing that Houslanger's Pattern and Practice Both for Establishing that It Was Consumer-Oriented under GBL § 349, for Establishing the Maximum Amount of Statutory Damages under the FDCPA, and for rebutting any defense of bona fide error.

"Allegations may be stricken 'where they have no bearing on the parties' claims or defenses, will likely be prejudicial, or where they have criminal overtones.'" *Hunter v. Palisades Acquisition XVI, LLC*, No. 16 CIV. 8779 (ER), 2017 WL 5513636, at *9 (S.D.N.Y. Nov. 16, 2017) *quoting Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 731 (S.D.N.Y. 2014). "However, the standard that must be met in order to strike material is a stringent one [...] the motion [to strike] will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." *Id.* [internal citations and quotations removed].

Allegations being unadjudicated is not synonymous with them being immaterial, and where those allegations would be found material "if it were mentioned in a news clipping or public testimony," it is no less material because it was drawn from a complaint. *In re Bear Stearns Mortgage Pass-Through Certificates Litigation*, 851 F.Supp.2d 746, 768 (S.D.N.Y. 2012), *citing Lipsky v. Commonwealth United Corp.*, 551 F.2d887 (2d Cir. 1976). In *Hunter*, Defendant Palisades moved to strike a complaint with allegations against its parent company, arguing that it was "completely irrelevant to Plaintiffs [sic] liability and damages claims." *Hunter*, 2017 WL 5513636, at *10. The Court rejected the argument, noting the cited complaint could be relevant to show (1) "Palisades' knowledge of allegations of impropriety against one of

its process servers"; (2) whether that knowledge made Palisades' actions "reckless" or "willful"; and (3) "the existence of similar allegations of misconduct could support Plaintiff's argument that Palisades' actions in this case had the 'potential to affect similarly situated consumers,' as required for Plaintiff's Section 349 claim." *Id.* Even if the allegations may not be admissible at a later trial, at the stage of a motion to dismiss "investigation and discovery on these allegations may well lead to admissible evidence establishing Defendants' alleged conduct." *Martinez v. Lvnv Funding, LLC*, No. 14CV00677RRMST, 2016 WL 5719718, at *4 (E.D.N.Y. Sept. 30, 2016) *citing In re OSG Sec. Litig.*, 12 F.Supp. 3d 619, 620-622 (S.D.N.Y. 2014). Courts have found that at a Motion to Dismiss stage, attaching other complaints alleging similar conduct evinces that "Defendants' conduct has affected consumers in a broad sense" even if "the cases are still unresolved." *Minner v. Navient Corp.,* No. 1:18-cv-1086S, 2020 WL 906628, at *11 (W.D.N.Y. Feb. 25, 2020).

The allegations which Houslanger seeks to strike concern the experiences of three other consumers: Barbara Stinson (FAC at ¶¶ 113-121), Isaac Levy (*Id.* at ¶¶ 98-112), and Wanda Cepeda (*Id.* at ¶¶ 124-134. All three were harmed by Houslanger's conduct, and are alleged to evince Houslanger's pattern and practice of illegal debt collection conduct. While Houslanger's arguments focus on the use of pattern and practice to establish the consumer-oriented element of GBL § 349, that is just one of the four ways it is relevant to Plaintiff's allegations. Pattern and practice evidence may be relevant to establish the award or amount of the award for punitive damages under certain circumstances. *See, e.g., Rocanova v. Equitable Life Assur. Soc. of U.S.*, 83 N.Y.2d 603, 613, 634 N.E.2d 940, 943 (1994) (discussing award of punitive damages in relation to and misconduct aimed against the public generally). Pattern and practice evidence is relevant to undermine the common affirmative defense in FDCPA cases that any violation of the

FDCPA was "unintentional" and a bona fide error despite policies and procedures reasonably tailored to avoid such violations. *See, e.g. Beasley v. Blatt*, 1994 WL 362185 (N.D. Ill. July 11, 1994). Lastly, pattern and practice is evidence is also relevant for the fact finder to determine the amount of FDCPA statutory damages.  To determine the amount of a defendant's liability under § 1692k(a)(2)(A), courts are to consider, among other relevant factors, "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional." 15 U.S.C. § 1692k(b)(1). "The amount of statutory damages is wholly within the discretion of the court." *Shapiro v. Credit Prot. Ass'n I, Inc.*, 53 F. Supp. 2d 626, 627 (S.D.N.Y. 1999). "[W]here there is no repeated pattern of intentional abuse," a lesser amount is often awarded. *Grammar v. Sharinn & Lipshie, P.C.*, No. 14 CIV. 6774 (JCF), 2016 WL 4249155, at *3 (S.D.N.Y. Aug. 5, 2016) *quoting Hirsch v. ANI Management Group, Inc.*, No. 12 CV 3454, 2013 WL 3093977, at *3 (E.D.N.Y. June 18, 2013).

## V.   ARGUMENT AS TO VIRGO CAPITAL LLC

Houslanger and Virgo have in essence operated as a single entity. FAC at ¶¶ 9-14. Virgo was created to profit off of the Sold Fraudulent Judgment (*Id.* at ¶ 28). This use of the corporate form by Houslanger is at odds with the most basic requirement of corporate formation – that the corporation is formed "for any lawful business purpose." N.Y. Bus. Corp. § 201. The unlawful acts of Virgo alleged below should be considered first and foremost as the acts of a corporation that at its core seeks to subvert the law.

### A.   The Court Only Needs to Consider the "Principal Purpose" Definition of Debt Collector under the FDCPA, and Plaintiff Has Adequately Pled that Virgo's Principal Purpose Is Debt Collection.

1. *Henson*'s holdings are limited to a definition of debt collector not at issue in this case since the Court expressly refused to rule on the "principal purpose" definition of debt collector and whether an entity can be both a creditor and debt collector.

The FDCPA, 15 U.S.C. § 1692a(6),[1] defines two types of businesses that qualify as "debt collectors." *See e.g. Goldstein v. Hutton, Ingram, Yuzek, Carroll & Bertolotti*, 374 F. 3d 56, 61 (2d Cir. 2004) (describing distinction). The two definitions are: (1) "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts" or (2) one who "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6) (hence referred to as the "principal purpose" and "due another" definitions respectively). "The Supreme Court has recently held, in *Henson v. Santander Consumer USA Inc.*, that an entity that purchases defaulted debt and then collects on it is not a debt collector based on the FDCPA's second ["due another"] definition of debt collector [...and] explicitly declined to address whether such an entity would be a debt collector based on the FDCPA's first definition of a debt collector, i.e., anyone who engages 'in any business the principal purpose of which is the collection of any debts.'" *Gold v. Shapiro, Dicaro & Barak, LLC*, No. 18CV6787PKCSJB, 2019 WL 4752093, at *4 (E.D.N.Y. Sept. 30, 2019) (J. Chen) *citing Henson v. Santander Consumer USA Inc.,* 137 S. Ct. 1718, 1720-21 (2017). The main fallacy of Virgo's argument is that it seeks to expand *Henson*'s holding that the owner of a debt is not a debt collector under the "regularly collects" definition to encompass a broader proposition, that creditors and debt collectors are always mutually exclusive under the FDCPA, that was not actually held by *Henson*.

*Henson* expressly declined to address the "principal purpose" definition of a debt collector under the FDCPA. *Henson,* 137 S. Ct. at 1721 ("the parties briefly allude to another

---

[1] 1692a(6) states, "The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects

statutory definition of the term 'debt collector' [...] in granting certiorari we didn't agree to address it either"). This limitation is intuitive: the facts of the case suggested that the "principal purpose" definition was not applicable, since Santander's "primary business is loan origination and not the purchase of defaulted debt." *Id.* at 1725. The issue was whether the debts owned by Santander were "owed or due another" sufficient to be it under that definition of a debt collector. *Id.* at 1721. So it was solely in the definition that *Henson* did address of "due another" that Justice Gorsuch considered whether Santander could be a creditor and a debt collector, noting further that it was done "without granting the premise that a person cannot be both a creditor and a debt collector with respect to a particular debt." *Id.* at 1724 [parentheses removed].

*Henson* does not put into question the innumerable decisions within the Second Circuit that have held debt buyers like Virgo liable under the "principal purpose" definition.[2]   In a similar context, the Southern District of New York held in *Guzman v. Mel S. Harris and Associates, LLC* that because "the Supreme Court made clear in *Henson* that its opinion dealt only with the second ["regularly collects"] definition set forth in the FDCPA, not the first

or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."

[2] *Gold v. Shapiro, Dicaro & Barak, LLC*, 2019 WL 4752093, at *4; *Digiacomo v. Midland Credit Mgmt.*, No 16-CV-01875 (KAM) (RER), 2019 WL 2256769, 2019 U.S. Dist. LEXIS 29715 (E.D.N.Y. Feb. 22, 2019)("the pleadings contain sufficient factual matter to establish that Midland Funding, LLC collects on debts by, at the very least, hiring debt collection law firms and filing debt collection actions in state court"); *Bradley v. Selip & Stylianou, LLP*, No. 17-CV-6224 (FPG), 2018 WL 4958964, at *5, n.3 (W.D.N.Y. Oct. 15, 2018) (noting that "[s]ince Henson, a number of courts have held that a debt purchaser who meets the 'principal purpose' definition stated above is a debt collector and may be liable under the FDCPA");; *Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 581 (S.D.N.Y. 2015); *Plummer v. Atl. Credit & Fin., Inc.*, 66 F. Supp. 3d 484, 489 (S.D.N.Y. 2014) ("arguing that a party cannot be a debt collector when it is collecting its own debts, but only where it is collecting debts 'owed or due another'[...] pertains only to the second definition of debt collector"); *Suquilanda v. Cohen & Slamowitz, LLP*, No. 10 CIV. 5868 PKC, 2011 WL 4344044, at *10 (S.D.N.Y. Sept. 8, 2011) ("all of the Encore Defendants are primarily engaged in the collection of debt"); *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 423 (S.D.N.Y. 2010) ("the Leucadia defendants are principally in the business of buying defaulted debts and seeking to collect on them"); *Kinel v. Sherman Acquisition II LP*, No. 05 CIV. 3456(RC)THK, 2006 WL 5157678, at *7 (S.D.N.Y. Feb. 28, 2006), *report and recommendation adopted*, No. 05 CIV. 3456(KMW), 2007 WL 2049566 (S.D.N.Y. July 13, 2007) ("purchasers of defaulted debt are covered by the FDCPA, without regard to their level of collection activity" under the principal purpose definition); *Farber v. NP Funding II LP*, No. 96 Civ. 4322, 1997 WL 913335, at *3

["principal purpose" definition] [and b]ecause LRC falls within the first definition, this Court need not address LRC's arguments as to the second." *Guzman v. Mel S. Harris & Assocs., LLC*, 2018 WL 1665252, at *4, fn. 5. The Court here should likewise not consider either the "due another" definition nor the application of it in *Henson*.

Virgo's analysis of the case is simply wrong. As aforementioned, *Henson* expressly stated it was not ruling on whether creditor and debt collector were mutually exclusive under the entirety of the FDCPA. The Court considered the question of whether Santander was a creditor because of the "default" test that some circuits had used to determine whether debts were "owed or due another." The Third Circuit has recognized this distinction. *Tepper v. Amos Fin., LLC*, 898 F.3d 364, 371 (3d Cir. 2018). And a similar analysis is apparent in the Second Circuit as it was for *Tepper* in the Third Circuit, as Your Honor acutely summarized in *Gold*:

> "In the Second Circuit, court have generally found that banks are creditors and therefore are not debt collectors [...] these cases do not address whether the FDCPA applies to a single entity that is both a creditor and a debt collector, *i.e.*, whether the FDCPA applies to the actions of a *debt buyer* whose only or principal business consists of purchasing defaulted debt and then collecting on that debt for its own profit, given that such an entity meets both the "creditor" and "debt collector" definition under the FDCPA." *Gold,* 2019 WL 4752093 at *4 (internal citations removed, original emphasis).

And as Your Honor also held in *Gold*, the analysis in *Tepper* has been persuasive and consequently adopted by the Court in *Bradley*. *Id. citing Bradley v. Selip & Stylianou, LLP,* No. 17-CV-6224 (FPG), 2018 WL 4958964, at *5-6 n. 3 (W.D.N.Y. Oct. 15, 2018) ("Since *Henson*, a number of courts have held that a debt purchaser who meets the 'principal purpose' definition stated above is a debt collector and may be liable under the FDCPA").

Accordingly it is unsurprising that two of the three cases in the Second Circuit cited by Virgo held that debt buyers were debt collectors under the "principal purpose"

(E.D.N.Y. Dec. 9, 1997)

definition. *Plummer v. Atl. Credit & Fin., Inc.*, 66 F. Supp. 3d at 489  and *Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d at 581.

The only other case in the Second Circuit cited by Virgo, *Teng v. Metropolitan Retail Recovery Inc.*, is a case where the defendant creditor was Citibank. *Teng v. Metro. Retail Recovery*, 851 F. Supp. 61, 66 (E.D.N.Y. 1994). Citibank in *Teng* and Santander in *Henson* are the kind of creditors that clearly do not have a principal purpose of debt collection even when they have purchased a debt – their "primary business is loan origination" (*Henson,* 137 S. Ct. at 1725), whereas Plaintiff has clearly and repeatedly alleged that Virgo's sole (let alone principal) purpose is debt collection. *See* FAC ¶¶ 8, 9, 12, 13, 14, 28.

### 2. Virgo's attempt to resurrect century old applications of the Commerce Clause is unavailing.

V Virgo tries to resurrect long-gone Commece Clause arguments by citing to an inapposite and non-binding case from the District of Hawaii that ruled its defendant was not a debt collector because its "principal business is parking enforcement activities, and not collection of debts." *Schroeder v. Diamond Parking, Inc.*, No. CIV. 12-00378 HG-RLP, 2013 WL 5348472, at *13 (D. Haw. Sept. 17, 2013), *aff'd on other grounds*, 646 F. App'x 505 (9th Cir. 2016). It has generally and pervasively been recognized in courts throughout the country, including the Second Circuit, that the use of telephones or mail is sufficient to put an entity, no matter how intrastate its business may be, under the regulation of Congress, including the FDCPA. *Ellis v. Solomon & Solomon, P.C.*, 599 F. Supp. 2d 298, 300 (D. Conn. 2009), *aff'd,* 591 F.3d 130 (2d Cir. 2010). Plaintiff has plainly alleged such use in the FAC. *See* FAC ¶ 8 ("Virgo then collects on those purchased judgments by using Houslanger – and only Houslanger – to collect on those judgments by issuing thousands of information subpoenas, bank restraints, and garnishments, and sending thousands of collection letters"). Additionally, documents attached to

the FAC clearly show use of mail in Virgo's business, from applications for its debt collector licensing from the NYC Department of Consumer Affairs (*see* FAC at **Exhibit A**) to the *Sanders* class action's allegations (*see* FAC at **Exhibit L**) to the Income Execution mailed by Virgo through Houslanger to NYC Marshal Moses (*see* FAC at **Exhibit N**).

### 3.   Virgo has the principal and indeed sole purpose of debt collection.

Virgo's arguments are both devoid of Second Circuit authority on the FDCPA's "principal purpose" definition of a debt collector and go far afield of the allegations of the FAC. Virgo relies on the interpretation of "principal purpose" used by a single district court, the District Court of Oregon, outside the Second Circuit. *See Schneider v. JTM Capital Management LLC,* No. 6:16-cv-2057-JR, 2018 WL 2276238 (D. Or. Mar. 22, 2018) and *McAdory v. M.N.S. & Assocs., LLC,* 2017 WL 5071263 (D. Or. Nov. 3, 2017). In addition to lacking binding authority on this Court, these decisions are not persuasive. Most notably the 9th Circuit did not find them persuasive, holding that:

> "Determining a business's principal purpose thus involves comparing and prioritizing its objectives, not analyzing the means employed to achieve them. Accordingly, the relevant question in assessing a business's principal purpose is whether debt collection is incidental to the business's objectives or whether it is the business's dominant, or principal, objective […we] decline to read a direct interaction requirement into the principal purpose prong based on the phrase 'the collection of any debts.' Further, DNF's interpretation of the principal purpose prong would largely collapse the two alternative definitions of debt collector." *McAdory v. M.N.S. & Assocs., LLC*, No. 18-35923, 2020 WL 1128813, at *3 (9th Cir. Mar. 9, 2020)

The 9th Circuit decision expressly overrules the District Court of Oregon's earlier ruling in the case (*Id.* at *7), which *Schneider* relied on (*Schneider,* 2018 WL 2276238, at *3-5), and thus *Schneider* should also be considered overruled.

It is unsurprising that the 9th Circuit overruled *Schneider* and *McAdory*. An "action" requirement is found nowhere in the statute – the sole question is whether the business has "the

principal purpose of...the collection of any debts." 15 U.S.C. § 1692a(6). The Court in *Schneider* strays far from the plain meaning of, let alone the Second Circuit's interpretation of, having a principal purpose of debt collection – courts in the Second Circuit have determined principal purpose through factors like "the percentage of its resources devoted to, and revenues derived from, such work, as well as whether the firm marketed itself as a debt collector or had a regular client relationship with a debt collecting business." *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti*, 374 F.3d 56, 61 (2d Cir. 2004). The question is not whether an entity is doing certain debt collection activities itself – Congress did not define it as a business whose "principal activity" or "principal conduct" is debt collection. This distinction has been recognized by a number of Circuit decisions that have since been found persuasive by courts in the Second Circuit. *See e.g. Schlegel v. Wells Fargo Bank, NA,* 720 F.3d 1204, 1209 (9th Cir. 2013) ("they argue that the word 'business' does not mean 'company,' but rather any activity of a company [...]We reject this argument because it is not supported by the statutory text"); *Plummer,* 66 F.Supp.3d at 489 ("Velocity maintains that it is not a 'direct' debt collector because it did not participate in any debt collection activity against Plaintiff [...] the reasoning in *Schlegel*, as it relates to the alternate first definition [of "principal purpose"], reinforces the conclusion that Velocity is a debt collector here"). And again *Henson* has no bearing on "principal purpose," so the demarcation by *Schneider* and Virgo of a pre- and post-*Henson* world is necessarily constrained to the "owed or due another" definition of debt collector – the definition which Plaintiff has acknowledged is not at issue with Virgo.

All of the uncorroborated factual allegations used by Virgo to argue that its principal purpose is not debt collection (Virgo MTD, p. 12, "The purchase of debts [...] any of the defendants' collection related activities") should be excluded from this Court's decision. *See e.g.*

*Chambers v. Time Warner, Inc.,* 282 F.3d 147, 155 (2d Cir. 2002) ("when a district court considers certain extra-pleading materials and excludes others, it risks depriving the parties of a fair adjudication of the claims by examining an incomplete record.")

Contrary to Virgo's unsubstantiated "*raison d'être*" (Virgo MTD, p. 12) and improperly cited Merriam-Webster Dictionary definitions, the courts in the Second Circuit, including post-*Henson*, have consistently held that entities that purchase debts and then collect on those purchased debts through thousands of information subpoenas, bank restraints, and garnishments, and sending thousands of collection letters (FAC at ¶ 8) has a principal purpose of debt collection and is accordingly a debt collector under the FDCPA. *See e.g. Digiacomo v. Midland Credit Mgmt.,* 2019 WL 2256769 ("the pleadings contain sufficient factual matter to establish that Midland Funding, LLC collects on debts by, at the very least, hiring debt collection law firms and filing debt collection actions in state court"); *Bradley v. Selip & Stylianou, LLP*, 2018 WL 4958964, at *5, n.3 (noting that "[s]ince *Henson*, a number of courts have held that a debt purchaser who meets the 'principal purpose' definition stated above is a debt collector and may be liable under the FDCPA"); *Meola v. Asset Recovery Sols., LLC*, 2018 WL 5020171, at *6 ("BIG is engaged in the principal business of buying and collecting charged-off consumer debts, and has no other business other than acquiring and collecting charged-off consumer debts" [internal citations omitted]).

Even Virgo's comparison of itself to "any investor or creditor" is devoid of facts that actually suggest to the contrary. Literally all businesses, including debt collectors, engage (or should engage) in assessments of risk in their investments – this does not describe purpose at all, let alone principal purpose. Virgo gives away its game when it says that a mortgage bank's principal purpose is the origination of loans and a debt purchaser's principal purpose is

"investment." The logical follow-up is to ask what that investment is in; it is in the collection of debts, as are the investments of all debt collectors, and consequently why courts have looked to revenue for determining "principal purpose" in addition to other factors. *Goldstein,* 374 F.3d at 61 (looking at "the percentage of its resources devoted to, and revenues derived from" debt collection).  The mortgage bank comparison breaks down further when Virgo asserts that "a mortgage bank's profits come from the collection of the debts secured by its mortgages" – this is a description of servicing, not collecting, a debt. Virgo's comparison inadvertently revealed exactly what differentiates it from creditors that are not debt collectors – Virgo does not (and Plaintiff has certainly not alleged in the FAC) extend credit, it does not underwrite loans, it does not provide any of the financial services that creditors excluded from the FDCPA provide, it engages in one singular business, as it does not even deny in the instant motion: the purchase of debts for collection. FAC at ¶ 8. This is notably different from Your Honor's decision in *Gold*, where it was correctly held that debt buyers are debt collectors under the FDCPA if they have a "principal purpose" of debt collection but where the Defendant at issue, BONY, was a bank and there was only a conclusory allegation that "more than half of Defendants' respective revenues derive from debt collection." *Gold*, 2019 WL 4752093, at *5. Debt collection is Virgo's sole business (FAC at ¶ 8), and central to this case, the singular reason it exists is to serve as a vehicle for Houslanger to collect on the Sold Fraudulent Judgments and turn a profit based on judgments obtained with false representations to the courts (*Id.* at ¶ 28).

    **4.** **The FDCPA was passed specifically with the intent of prohibiting wrongful conduct from debt collectors like Virgo that do not have the kind of customer relationship that an original creditor or debt servicer would have with a consumer.**

"[I]t is never [the Court's] job to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done had it faced a question that, on

everyone's account, it never faced." *Henson,* 137 S.Ct. at 1725. "[The] legislature says...what it means and means...what it says." *Id. quoting Dodd v. United States,* 545 U.S. 353, 357, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005) (internal quotation marks omitted; brackets in original). While Virgo cites the FDCPA's express purpose under 15 U.S.C. 1692(e), to "eliminate abusive debt collection practices by debt collectors," it then states without any basis that the FDCPA did not intend to include "purchase of debts by creditors who don't take any direct actions against consumers, but merely facilitate the collection of purchased debts on their own behalf." Virgo Motion, p. 17. And of course Virgo trips up in its own acrobatics of statutory interpretation – if Virgo is "facilitat[ing] the collection of purchased debts," and if it is doing so in an abusive way as alleged by Mr. Galeas, then it seems precisely to be within the ambit of the FDCPA's actual express purpose rather than Virgo's "rewrit[ing]...under the banner of speculation." *Henson,* 137 S.Ct. at 1725.

### B. No Allegations in the First Amended Complaint Are Outside the Statute of Limitations.

#### 1. The FDCPA and GBL § 349 claims are timely.

Virgo argues that "To the extent Plaintiff alleges that any such conduct prior to the running of the applicable statutes of limitation is attributable to Virgo, those claims are barred by the statute of limitations." Virgo Motion, p. 18. Virgo does not specify any further which claims it believes are barred by the statute of limitations other than for it to note that "factual allegations dating back to the commencement of the collection lawsuit brought by Mel Harris & Associates on behalf of LR Credit 11, LLC." *Id.* Virgo first took an action that violated the law, collecting on the Fraudulent Judgment via an income execution, on November 17, 2016. FAC at ¶ 41. While the Defendants' scheme to collect on the Sold Fraudulent Judgments while insulating themselves from any liability via the Stipulation was seemingly concocted back in 2012 when

41

the Sold Fraudulent Judgments were purchased by Virgo and other debt buyers run by Matthew Blake (*Id.* at ¶ 28), it was not manifested into an act comprising a violation of the FDCPA or GBL § 349 prior to the income execution (*Id.* at ¶ 41). Plaintiff has not made any conspiracy-type claims in this matter that could possibly date back prior to November 16, 2016. Plaintiff's claims are for violations of the FDCPA and GBL § 349, the latter of which has clearly been tailored to have the allegations of deceptive conduct around Defendants' debt collection (FAC at ¶ 146), and therefore the FAC can be plainly read as making claims for violations that began on November 17, 2016 since this is when the FAC alleges debt collection against Mr. Galeas began. *Id.* at ¶ 41.

### 2. The conversion claims are timely.

A conversion occurs when someone "intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. New York Organ Donor Network, Inc.,* 827 NYS 2d 96, 100 (Ct. App. 2006). A plaintiff claiming conversion must establish a) her legal ownership of a specific, identifiable piece of property, and b) the defendant's interference with her property interest in defiance of her rights. *Id.* Similar to the other claims, the conversion is this case concerns the debt collection activity of Defendants, specifically the wage garnishments that began on November 17, 2016 – that is the only money that has been alleged to have been taken in the FAC. *See* FAC at ¶¶ 42-43.

### C. Virgo Is Directly and Vicariously Liable for Violations of the FDCPA and GBL § 349, and for Committing Conversion.

#### 1. Virgo is directly liable for violations of the FDCPA and GBL § 349, and for committing conversion.

The specter of Virgo's prior arguments in its request for pre-motion conference [DE 21]

haunts its allegations as to Virgo's lack of direct liability. Rather than continuing to make the argument that Virgo cannot be held liable for conduct "performed for litigation purposes," perhaps because Your Honor squarely rejected such arguments in a previous decision[3], Virgo now simply retreats to saying what Virgo did not do ("not alleged to have mad any phone calls, sent any letters, signed any documents"). Virgo's litigation conduct (FAC at ¶¶ 38, 42, 49, 65-67, 77) is the elephant in the room – it was the plaintiff for the purposes of Mr. Galeas' OSC, and thus the baseless adjournments prolonging the litigation to wear Mr. Galeas down were actions taken by Virgo. *See also Id.* at ¶ 12 ("Virgo is also directly liable for its own misconduct as the putative judgment creditor assignee").

### 2. Virgo is an alter ego of Houslanger and thus joint and severally liable for its violations.

"Under New York choice of law principles, [t]he law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotations omitted). Since Virgo was incorporated in New York (*see* FAC, **Exhibit J**), New York law governs. When the corporate form is used "to perpetrate a fraud, or so dominate and disregard the corporate form that the corporation primarily transacts their personal business, the Court may pierce the corporate veil and impose liability directly." *Mar. Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.*, 689 F. Supp. 1340, 1348 (S.D.N.Y. 1988) *citing Kirno Hill Corp. v. Holt,* 618 F.2d 982, 985 (2d Cir.1980). Under New York law, a number of factors are considered to determine whether a corporation is merely an "alter ego" of another corporation or individual and thus that all of the entities are essentially "one whole entity": "(1) the absence of

---

[3] *Gold,* 2019 WL 4752093, at *8, *quoting Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP,* 875 F.3d at 137.

the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991). "[D]isregarding corporate separateness is a remedy that 'differs with the circumstances of each case.'" *Id. quoting American Protein Corp. v. AB Volvo,* 844 F.2d 56, 60 (2d Cir. 1988). The question that is ultimately put before the jury is a balancing test of whether "the policy behind the presumption of corporate independence and limited shareholder liability—encouragement of business development—is outweighed by the policy justifying disregarding the corporate form—the need to protect those who deal with the corporation." *Wm. Passalacqua Builders, Inc.,* 933 F.2d at 139. An extensive review of the factual record is needed to make a determination of whether the corporate form should be disregarded (*see e.g. Id.* at 139-140), so at the stage of a motion to dismiss, the Plaintiff must allege facts "beyond relationships 'typical of a majority shareholder or parent corporation' which courts have found to be insufficient to veil piercing as a matter of law." *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 349–50 (S.D.N.Y. 2013) *quoting Fletcher,* 68 F.3d at 1459-160; *see also American Protein*, 844 F.2d at

44

59 ("the issue of corporate disregard is generally submitted to the jury"). In *Maritime Ventures Intern., Inc.,* the Plaintiff sufficiently pled a *prima facie* case for piercing the corporate veil where there was evidence that the corporation was "a personal business opportunity," that there was not evidence of the corporation compensating the other corporation for transferring a right, that there was disregard for corporate formalities, and that the corporation was inadequately capitalized. *Mar. Ventures Int'l, Inc.*, 689 F. Supp. at 1348-1349. "Courts are not required to find that every factor is present, and no one factor is dispositive." *Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd.*, 401 F. Supp. 3d 433, 440 (S.D.N.Y. 2018).

Plaintiff has similarly pled sufficient facts to establish Virgo as an alter ego of Houslanger and pierce its corporate veil. As an initial matter, Plaintiff alleges that "Virgo was created to knowingly benefit from LR Credit's fraud by purchasing the Sold Fraudulent Judgments and having them collected on by Defendant Houslanger" (FAC at ¶ 28) – thus Plaintiff has alleged that the corporation was created for its alter ego, Houslanger, to perpetrate fraud. Additionally, Plaintiff has pled five of the ten *Passalacqua* factors: (1) the absence of corporate formalities (FAC at ¶ 10), (2) overlap in ownership, officers, directors, and personnel (*Id.* at ¶¶ 10-13), (3) common office space, address, and telephone numbers (*Id.* at ¶ 13), (4) the amount of business discretion by Virgo (*Id.* at ¶¶ 13, 28), and (5) whether Virgo was treated as an independent profit center (*Id.* at ¶¶ 13, 28). These five factors are more than enough to allege that the relationship between Houslanger and Virgo is not typical. Plaintiff alleges that Virgo only collects judgments through Houslanger. *Id.* at ¶¶ 13, 28. Virgo is managed by Matthew Blake, who simultaneously is the Director of Recovery Operations at Houslanger (*Id.* at ¶ 13 and **Exhibit C**), the managing agent of Virgo (*Id.* at **Exhibit A**), and the CEO of Aries Capital Partners, Inc. (*Id.* at ¶ 11). Blake uses both Virgo and Aries, along with other entities (such as but

not limited to Aquarius and DEMI, LLC), to purchase consumer debts exclusively for collection by Houslanger. *Id.* at ¶¶ 27, **Exhibits L and S**. Blake identifies himself as both the "managing agent" of Virgo and as an "owner, partner, or corporate officer of the license holder" of Virgo, evincing a lack of corporate formalities . *Id.* at **Exhibit A** Blake uses the same email address, "mattblake@ariesdata.com" for both Aries and Virgo. *Id.* at ¶ 11. Aries, Houslanger, and Virgo share an office space at 243 Route 100, Somers, NY 10589-3203. *Id.* at ¶¶ 11, 13. Aries and Virgo also shared a previous address of 45 Kensico Drive, Mount Kisco, NY 10549. *Id.* at **Exhibit A**. All of these entities also share a telephone number and personnel, most notably Blake who is an officer of all three companies. *Id.* at ¶ 13. Notably on Blake's LinkedIn page (*Id.* at **Exhibit C**), Blake lists himself as a "Client" and "Director" of Houslanger for an overlapping period of time. Plaintiff is not the first to note the lack of separation between Blake, the debt buyers such as Virgo that he manages, and Houslanger – as the *Sanders* class action alleged: "The Houslanger Firm's Director of Recovery Operations, Matthew Blake, is also the managing agent of Defendants Virgo and Aquarius; Mr. Blake is also an owner, partner or corporate officer of Defendant Virgo." *Id.* at **Exhibit L**, ¶ 13.

When all of this information is weighed against "the encouragement of business development" (*Wm. Passalacqua Builders, Inc.,* 933 F.2d at 139), the balance weighs towards disregarding the corporate form: there is no public purpose in encouraging the development of businesses which were created to allow debt collectors like Houslanger to profit off of known fraudulent judgments. *Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*, 417 U.S. 703, 713, 94 S. Ct. 2578, 2584, 41 L. Ed. 2d 418 (1974) ("courts of equity, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form").

### 3. Virgo is vicariously liable for violations of the FDPCA and GBL § 349, and for committing conversion.

The traditional rules of vicarious liability make principals liable to third parties for acts committed by their agents within the scope of the agency. *Fils-Aime v. Ryder TRS, Inc.*, 837 N.Y.S.2d 199, 200 (App. Div. 2d Dep't 2007). *See also Meyer v. Holley*, 537 U.S. 280, 285 (2003); *accord Security Pacific Mortg. & Real Estate Servs., Inc. v. Herald Ctr., Ltd.*, 891 F.2d 447, 448 (2d Cir. 1989) (per curiam). Vicarious liability applies to torts in general, including conversion. *Clients' Sec. Fund of State v. Grandeau*, 72 N.Y.2d 62, 67 (Ct. App. 1988) (law partners, who are agents of one another, are liable for conversion committed by any other partner, even if they had no knowledge of it.)

A principal-agent relationship exists when the principal, consents to allow the agent to act on his behalf and subject to his control; and where the agent consents to so act. *Meyer*, 537 U.S. at 286; Restatement (Third) of Agency, § 1.01; *Fils-Aime*, 837 N.Y.S.2d at 200. The principal need only have the *right* to control the agent's conduct; it need not actually control every detail of the agent's conduct. *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1546 (S.D.N.Y. 1991); *Mazart v. State*, 441 N.Y.S.2d 600, 605 (Ct. Claims 1981); 2A N.Y. Jur. 2d Agency § 1. An agency relationship may exist even where the principal's right of control is limited to making management and policy decisions affecting the agent. *See Basic Books, Inc.,* 758 F. Supp. at 1546; *Mazart*, 441 N.Y.S.2d at 605.

Following these rules, the attorney-client relationship is one that may give rise to a principal-agent relationship, and therefore to vicarious liability. A client has the power to control its attorney in "material respects" if it wishes to do so. *Okyere I*, 961 F. Supp. 2d at 517, citing, *inter alia*, *Martsolf v. JBC Legal Grp., P.C.,* 2008 WL 275719, at *10–11 (M.D.Pa Jan. 30, 2008) (the mere existence of an attorney-client relationship, where debt collector had retained

47

law firm and transmitted information to firm for the purposes of debt collection, showed exercise of control sufficient to impose vicarious liability); *Oei v. N. Star Capital Acquisitions, LLC,* 486 F.Supp.2d 1089, 1094-95 (C.D.Cal. 2006) (imputing principal-agent relationship and vicarious liability even without an explicit showing of control).

The U.S. Supreme Court itself "has made clear that 'clients must be held accountable for the acts and omissions of their attorneys.'" *Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 584 (S.D.N.Y. 2015) (*Polanco II*), *quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 396–97 (1993) (*quoting Link v. Wabash R. Co.,* 370 U.S. 626, 633–34 (1962)). In *Polanco II*, the plaintiff alleged that debt collector through its debt collection law firm had refused to return restrained funds after the underlying judgment was vacated. 132 F. Supp. 3d at 570-75. The court observed that because the defendant had voluntarily chosen its attorney as its representative in the action, it could not "now avoid the consequences of the acts or omissions of this freely selected agent." *Id.* at 584. "Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts'….' " *Id.*, *quoting Link,* 370 U.S. at 633–34 (internal citation omitted).

In *Hunter v. Palisades*, the debt buyer Palisades was found to be vicariously liable based on allegations that (1) the debt collector S&L was its attorney, and (2) that Palisades acted through S&L to collect judgments. *Hunter v. Palisades Acquisition XVI, LLC*, No. 16 CIV. 8779 (ER), 2017 WL 5513636, at *9 (S.D.N.Y. Nov. 16, 2017). These are precisely the facts before the Court as to Virgo – Houslanger was Virgo's exclusive attorney (FAC at ¶¶ 8, 28) and Virgo collected on the judgment against Mr. Galeas through Houslanger (*Id.* at ¶¶ 41-42). Virgo "must be held accountable for the acts and omissions of" Houslanger. *Polanco,* 132 F. Supp. at 584,

48

*quoting Pioneer*, 507 U.S. at 396–97. Thus Virgo is vicariously liable for Houslanger's violations of the FDCPA and GBL § 349, and for committing conversion.

### D. Virgo Is Liable for Failing to Provide a 1692g Notice and a Notice of Assignment.

#### 1. Virgo failed to provide Mr. Galeas with a 1692g notice.

Virgo's argument that a 1692g notice need only be sent by a debt collector to comply with the statute is immaterial to the present motion – Plaintiff alleged, as Virgo itself noted, that neither it nor Houslanger sent a letter with the 1692g disclosures. FAC at ¶ 49. Notably, the case relied on by Virgo, *Schneider*, was converted to a motion for summary judgment upon the debt collector providing evidence extrinsic to the complaint, most pertinently an affidavit establishing that the first communication with the debtor occurred in 2009 rather than 2013 and that this communication was a validation notice. *Schneider v. Cont'l Serv. Grp., Inc.*, No. 13-CV-5034 JG MDG, 2013 WL 6579609, at *2 (E.D.N.Y. Dec. 16, 2013). While Virgo does elsewhere make some conclusory statements outside the four corners of the complaint, the information before this Court is readily distinguishable from the situation in *Schneider*.

Alleging that neither Virgo nor Houslanger sent a letter with 1692g disclosures is not conclusory because per se Mr. Galeas has personal knowledge of letters sent to him. By Virgo's standard it would become practically impossible for consumers to bring 1692g claims when debt collectors do not provide a validation notice at all – Virgo wishes to have Plaintiff's allegation denied on the basis of mere speculation that, contrary to the allegation, the letter could have been sent, and the courts have consistently held that "speculation is not enough to defeat a motion to dismiss." *Bd. of Trustees of Operating Engineers Pension Tr. v. JPMorgan Chase Bank, Nat. Ass'n*, No. 09 CIV. 9333 BSJ DCF, 2012 WL 1382274, at *3 (S.D.N.Y. Apr. 20, 2012) *citing In re Lehman Bros. Sec. & ERISA Litig.*, 683 F.Supp.2d 294, 303 (S.D.N.Y.2010).

49

### 2.   Virgo failed to provide Mr. Galeas with a notice of assignment.

Virgo improperly assumes that the Income Execution was sent to Plaintiff when there are no allegations of such in the Complaint. In fact, the Complaint alleges that Mr. Galeas was not aware the income garnishments were income garnishments until a family member explained that the debits from his paycheck were not due to union dues. FAC at ¶¶ 43-46. Virgo's contention that Mr. Galeas failed to allege that NYC Marshal Moses failed to comply with CPLR 5231(d) is not material for this Motion. Certainly that could be why the notice of assignment was not received by Mr. Galeas, but at this point Plaintiff is not aware why he did receive the notice, he only knows that he did not actually receive it. FAC at ¶¶ 38-40. And it is receipt, not service, that is the operative analysis for a notice of assignment in New York. "[T]he judgment debtor must receive notice of the assignment in order for this requirement to be satisfied." *Musah v. Houslanger & Assocs., PLLC*, 962 F. Supp. 2d 636, 639–40 (S.D.N.Y. 2013) (collecting cases). And this is not some mere procedural formality – failure to provide notice of assignment (as well as failure to provide the 1692g notice) is part and parcel of Defendants' scheme for collecting on the Sold Fraudulent Judgments. FAC at ¶¶ 54, 97, 128, **Exhibit L** (*Sanders* Complaint), ¶¶ 76, 81, 88, 109, **Exhibit R** (*Levy* Complaint), ¶¶ 36-39. Like the historic precedent for this issue, the consequences of failure to provide notice were "confusion and injustice." *Tri City Roofers, Inc. v. Ne. Indus. Park*, 61 N.Y.2d 779, 781, 461 N.E.2d 298, 299 (1984). For the least sophisticated consumer like Mr. Galeas, when deductions suddenly begin appearing on their paychecks it is not intuitive why they are happening or who to ask for that information. Without clear notice, it is difficult to track down what the debt is and where it came from, and thus be able to establish that the debt was not owed. This is precisely what Defendants intended with both Mr. Galeas and other consumers. *See* FAC, **Exhibit L** (*Sanders* Complaint), ¶¶ 76, 81, 136, 143.

## VI.     CONCLUSION

Plaintiff respectfully requests that the Defendants' Motions to Dismiss be denied in their entirety.

Dated: Brooklyn, New York
        March 11, 2020

Respectfully submitted,
/s/
Ahmad Keshavarz
The Law Office of Ahmad Keshavarz
Attorneys for Plaintiff Barba Stinson
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax: (877) 496-7809
ahmad@NewYorkConsumerAttorney.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Defendants Houslanger & Associates, PLLC and Todd Houslanger
By and through their attorneys of record
Adam M. Marshall
Brett A. Scher
Kaufman, Dolowich, Voluck
135 Crossways Park Dr, Suite 201
Woodbury, NY 11797
(516) 283-8731
amarshall@kdvlaw.com
bscher@kdvlaw.com

Defendant Virgo Capital, LLC
By and through their attorneys of record
Aleksander Powietrzynski
Winston & Winston P.C.
155 E. 44th Street, 5th Floor, Suite 142
New York, New York 10017
Tel: (212) 922-9483
alex@winstonandwinston.com

Date:  <u>March 11, 2020</u>
Brooklyn, NY
/s/
Ahmad Keshavarz