UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
CARLOS VILLALBA, Administrator of the
Estate of RAMON GALEAS,

                        Plaintiff,

        - against -

HOUSLANGER & ASSOCIATES, PLLC,
TODD HOUSLANGER, and
VIRGO CAPITAL, LLC,

                        Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-4270 (PKC) (RLM)

PAMELA K. CHEN, United States District Judge:

Plaintiff, the Administrator of the Estate of Ramon Galeas,[1] brings this lawsuit against Defendants Houslanger & Associates, PLLC and Todd Houslanger (collectively, "Houslanger"), and Virgo Capital, LLC ("Virgo") (collectively "Defendants"), alleging that Defendants violated Sections 1692e, 1692f, and 1692g of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"), New York General Business Law ("GBL") § 349, and New York Judiciary Law § 487. Plaintiff also alleges that Defendants committed the tort of conversion. Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6), and Houslanger moves to strike certain allegations under Rule 12(f). For the reasons below, Houslanger's motions to dismiss and strike are denied in their entirety, and Virgo's motion to dismiss is granted in part and denied in part.

---

[1] Galeas died during this litigation (*see* Dkt. 42), and the Court substituted Carlos Villalba, as Administrator of Galeas's Estate, as Plaintiff (*see* 7/7/2021 Order Adopting Report and Recommendations; *see also* Dkt. 68).

## BACKGROUND

I.    **Factual Background**[2]

When Galeas commenced this suit, he was a 69-year-old man who spoke little English. (Amended Complaint ("Am. Compl."), Dkt. 22, ¶¶ 44, 85.)  He lived in Queens County, New York, and worked the night shift (10 p.m. to 6:30 a.m.) at Rite Aid.  (*Id.* ¶¶ 3, 41–43, 48.)

Sometime before 2007, Galeas was the victim of identity theft.  (*See id.* ¶ 19; *see also* Identity Theft Report, Dkt. 22-5.)  As a result of the identity theft, he accumulated credit card debt. (*See* Am. Compl., Dkt. 22, ¶ 19; *see also* Identity Theft Report, Dkt. 22-5.)

In 2007, LR Credit 11, LLC, through its collection law firm, Mel S. Harris & Associates, LLC (collectively, "LR Credit"), filed collection lawsuits against over 100,000 New Yorkers, including Galeas.  (Am. Compl., Dkt. 22, ¶¶ 15–16.)  LR Credit engaged in "sewer service," whereby it failed to serve summonses and complaints on the alleged debtors, but still submitted affidavits of service to the court, falsely attesting that service had been made on the alleged debtors. (*Id.* ¶¶ 16, 20–24.)  LR Credit then used the false affidavits of service to obtain default judgments against the alleged debtors, including Galeas.  (*Id.* ¶ 25.)  In 2009, a putative class of New York plaintiffs sued LR Credit (among others) alleging various causes of action based on this fraudulent practice of sewer service.  *See Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 283–85 (S.D.N.Y. 2012).

Virgo was chartered in November 2011.  (Am. Compl., Dkt. 22, ¶ 28.)  Two months after Virgo was chartered, it purchased approximately 15,000 default judgments from LR Credit,

---

[2] The Court "accept[s] as true all factual allegations" in the Amended Complaint "and draw[s] from them all reasonable inferences," but does not "credit conclusory allegations or legal conclusions couched as factual allegations."  *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020) (quotations and ellipses omitted).

including the judgment against Galeas.  (*Id.* ¶ 27.)  Virgo never notified Galeas that it had obtained the judgment.  (*Id.* ¶¶ 38–39.)

After LR Credit sold the 15,000 judgments to Virgo, the plaintiffs suing LR Credit were granted class certification, *see Sykes*, 285 F.R.D. at 294, and settled with LR Credit (Am. Compl., Dkt. 22, ¶ 26).  The parties to the settlement stipulated that LR Credit would stop collecting on the purported debts and cooperate in vacating the default judgments it had obtained based on the allegedly fraudulent affidavits of service.  (*Id.*)  They also "stipulated . . . that all [of the alleged debtors] in debt collection actions brought by LR Credit in New York would have been entitled to interpose a defense predicated upon 'fraud, misrepresentation, illegality, unconscionability, lack of due service, violations of law, or other illegalities.'"  (*Id.*)  After the settlement was approved, the New York Supreme Court entered an order vacating all of the default judgments that LR Credit still possessed, but not those that LR Credit had already sold.  (*See id.* ¶¶ 29–33.)

Virgo and Houslanger knew of, or at least had enough information to determine, the fraudulent circumstances by which LR Credit had obtained a default judgment against Galeas in Queens County Civil Court.  (*Id.* ¶¶ 34, 51–56.)  Nevertheless, Virgo employed Houslanger to collect on the judgment against him.  (*Id.* ¶¶ 27, 34.)  In 2016, Houslanger sought to collect on the judgment by, *inter alia*, garnishing Galeas's wages.  Houslanger "signed an income execution to Rite Aid" ("Income Execution"), directing Rite Aid to garnish Galeas's wages to satisfy the judgment.  (*Id.* ¶¶ 41–42.)  Rite Aid began garnishing Galeas's wages.  (*Id.* ¶ 43.)

Galeas noticed that money was being removed from his paychecks, but believed that this was to pay union dues.  (*Id.* ¶ 44.)  He realized that his wages were being garnished only when a family member explained that the reductions were not union dues.  (*Id.* ¶ 45.)  Having been the

victim of identity theft, and being unaware of the default judgment against him, Galeas experienced stress and "wanted to cry" whenever he saw his paycheck.  (*Id.* ¶ 93.)

In April 2018, Galeas appeared in the Civil Court action, and obtained an order to show cause as to why he should be required to pay the default judgment against him.  (*Id.* ¶ 57; *see also* Order to Show Cause, Dkt. 22-15.)  Galeas indicated that he had not been properly served in the underlying debt collection suit and that his first notice of a legal action against him was the Income Execution resulting in the garnishment of his wages.  (Order to Show Cause, Dkt. 22-15, at ECF[3] 2.)  He further noted: "It is not my debt.  I am a victim of identity theft.  I had no business dealings with the plaintiff [Virgo]."  (*Id.*)

On April 18, 2018, the Civil Court held a show cause hearing.  (Am. Compl., Dkt. 22, ¶¶ 57–58.)  Galeas was assisted during the hearing by the "Volunteer Lawyer for the Day" program.  (*Id.* ¶ 58.)  On behalf of Virgo, Houslanger offered to settle the case by ceasing collections, but did not offer to return the money that had already been garnished.  (*Id.* ¶ 59.)  Galeas rejected the offer, and the Civil Court granted Houslanger's request for a nearly six-month adjournment.  (*Id.*)[4]  Throughout the next five months, Defendants[5] continued to condition any agreement to vacate the default judgment on Galeas's agreement to forfeit the money already garnished from his wages.  (*Id.* ¶ 67.)  As a result of the garnishment and prolonged litigation, Galeas suffered emotional distress (*id.* ¶ 95), was unable to sleep (*id.*), and was concerned "during

---

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[4] Galeas's wages continued to be garnished until mid-July 2018 (*id.* ¶ 63), but these additional garnishments were returned to Galeas in December 2018 (*id.* ¶ 70).

[5] The Court refers to all "Defendants" hereafter in connection with the settlement in the Civil Action because Houslanger represented Virgo during the negotiation.

the more than eleven months that the court case was going on because he did not know if he was going to get his money back" (*id.* ¶ 91).

In January 2019, the Civil Court scheduled a traverse hearing to determine whether Galeas had been properly served in the underlying collection suit.  (*Id.* ¶ 71.)  Defendants did not prepare any evidence or witnesses.  (*Id.* ¶¶ 72–76.)  On March 6, 2019, the day of the hearing, Galeas again was represented by a volunteer attorney for the day.  (*Id.* ¶ 76.)  When the attorney asked Defendants whether a process server would appear as a witness to substantiate the underlying default judgment, a Houslanger attorney handed Galeas's volunteer attorney "a stipulation to vacate the judgment, discontinue the case with prejudice, and a general release" (the "Stipulation").  (*Id.*)  The Stipulation provided that "[a]ny sums currently held in trust by the New York City Marshal," who had executed the garnishment of Galeas's wages, would "be directed to be returned to [Galeas]," and that the collection action would be discontinued with prejudice.  (*Id.* ¶ 77 n.8; *see also* Stipulation, Dkt. 22-17, ¶¶ 1–2.)  But in a third paragraph, the Stipulation also provided, in convoluted and seemingly contradictory terms, that "[a]ny sums previously received, if any, may be retained by [Defendants]," and that Galeas would release any claims—including FDCPA claims—against Defendants.  (*See* Am. Compl., Dkt. 22, ¶ 77 n.8; *see also* Stipulation, Dkt. 22-17, ¶ 3.)  The volunteer attorney representing Galeas crossed out this additional language in the third paragraph, and both Galeas and Defendants signed the modified Stipulation.  (*See* Am. Compl., Dkt. 22, ¶ 86; *see also* Stipulation, Dkt. 22-17, ¶ 3.)

On December 6, 2018, while the Order to Show Cause was pending, $423.26 of Galeas's garnished wages were returned to him.  (Am. Compl., Dkt. 22, ¶ 70.)  According to the Amended Complaint, "[i]t is unclear whether this is the full amount that Defendants caused to be garnished from Mr. Galeas' wages."  (*Id.*)

## II.     Procedural Background

On July 24, 2019, Galeas filed a complaint against Defendants in this Court. (*See* Complaint, Dkt. 1.) On October 4, 2019, Houslanger sought a pre-motion conference to move to dismiss. (*See* Dkt. 16.) A month later, Virgo also requested a pre-motion conference to move to dismiss. (*See* Dkt. 21.) On November 20, 2019, while the pre-motion conference requests were pending, Galeas filed the Amended Complaint, alleging that Defendants had violated the FDCPA, GBL § 349, and New York Judiciary Law § 487, and had committed conversion. (*See* Am. Compl., Dkt. 22.) The same day, Galeas responded to the pre-motion conference requests. (*See* Plaintiff's Opposition to Houslanger's Request for a Premotion Conference ("PMC Opposition"), Dkt. 23; Dkt. 24.) The Court denied the pre-motion conference requests and set a briefing schedule for Defendants' proposed motions. (*See* 11/22/2019 Docket Order; 12/12/2019 Docket Order.) On January 30, 2020, Defendants served their motions to dismiss on Galeas. (*See* Dkts. 33, 34.) On March 11, 2020, Galeas served his response to Defendants' motions. (*See* Dkt. 40.)

On March 31, 2020, Galeas's counsel filed a notice that Galeas had died. (*See* Dkt. 42.) A day later, Defendants filed their motions to dismiss and reply briefs. (*See* Dkts. 43, 44, 45, 46.) Galeas's counsel indicated that it could not file Galeas's opposition brief, given that no party had been substituted as Plaintiff. (*See* Dkt. 47.)

Almost a year later, on March 2, 2021, Galeas's counsel moved to substitute Carlos Villalba, Administrator of Galeas's Estate, as Plaintiff. (*See* Dkts. 55, 56, 57.) Defendants opposed the motion for substitution on April 2, 2021. (*See* Dkts. 60, 61, 62, 63.) On June 21, 2021, Magistrate Judge Roanne L. Mann issued a Report and Recommendation recommending that the Court allow the substitution. (*See* Dkt. 68.) Judge Mann also directed the parties to file "submissions that supplement their respective Rule 12 filings to address whether Mr. Galeas's death extinguished any of the claims in the Amended Complaint." (*Id.* at 16.) In light of the

Report and Recommendation, Galeas's counsel filed his opposition to Defendants' motions to dismiss.  (*See* Plaintiff's Brief in Opposition to Defendants' Motions to Dismiss ("Pl. Br."), Dkt. 70.)  On July 6, 2021, Galeas's counsel and Virgo filed briefs to supplement their Rule 12 submissions.  (*See* Supplemental Memorandum in Support of Defendant's Motion to Dismiss ("Virgo Supp."), Dkt. 72; Plaintiff's Supplemental Memorandum in Opposition to Defendants' Motions to Dismiss ("Pl. Supp."), Dkt. 73.)  On July 7, 2021, the Court adopted Judge Mann's Report and Recommendation, thereby substituting Plaintiff for Galeas.  (*See* 7/7/2021 Order Adopting Report and Recommendations.)

Now before the Court are Defendants' motions to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6), and Houslanger's motion to strike under Rule 12(f).

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  In addressing the sufficiency of a complaint, a court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [it is] not required to credit conclusory

allegations or legal conclusions couched as factual allegations." *Hamilton v. Westchester County*, 3 F.4th 86, 91 (2d Cir. 2021).

## DISCUSSION

### I.     Plaintiffs' Claims Under the FDCPA

Plaintiff alleges that Defendants violated Sections 1692e, 1692f, and 1692g of the FDCPA. Defendants seek to dismiss the claims under Sections 1692e and 1692f on various grounds. Virgo also moves to dismiss the Section 1692g claims.

### A.     Legal Standard

#### 1.     The FDCPA

The "statutory purpose" of the FDCPA "is to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors[6] who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." *Vangorden v. Second Round, Ltd. P'ship*, 897 F.3d 433, 437 (2d Cir. 2018) (quotations omitted). "[T]he FDCPA creates a private right of action for debtors who have been harmed by abusive debt collection practices." *Benzemann v. Citibank N.A.*, 806 F.3d 98, 100 (2d Cir. 2015) (citing 15 U.S.C. § 1692k). It "is a strict liability statute," so a "plaintiff does not need to show intentional conduct on the part of the debt collector." *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 134 (2d Cir. 2017) (quotations omitted). "Because the FDCPA is remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated." *Id.* "[L]iability under the FDCPA

---

[6] As discussed below, Houslanger does not dispute that it is a "debt collector" under the FDCPA; Virgo, however, does.

8

can be established irrespective of whether the presumed debtor owes the debt in question." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 83 (2d Cir. 2015).

"Toward these ends, § 1692e and § 1692f each proscribe a 'non-exhaustive' list of specific unfair practices," and "the same conduct may support claims brought under multiple subsections." *Vangorden*, 897 F.3d at 437. Thus, although "[b]oth sections expressly prohibit specific conduct relating to debt collection, . . . the FDCPA 'enables the courts, where appropriate, to proscribe other improper conduct which is not specifically addressed.'" *Arias*, 875 F.3d at 134–35 (quoting S. Rep. No. 95–382, at 4 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696).

2.    Section 1692e

Section 1692e provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. A representation is "deceptive" under section 1692e if it is "open to more than one reasonable interpretation, at least one of which is inaccurate." *Arias*, 875 F.3d at 135. Courts "analyze the reasonableness of an interpretation from the perspective of the least sophisticated consumer, who, [the Second Circuit has] explained, lacks the sophistication of the average consumer and may be naive about the law, but is rational and possesses a rudimentary amount of information about the world." *Id.* (citation and quotations omitted). "The standard is objective, pays no attention to the circumstances of the particular debtor in question, and asks only whether the <u>hypothetical</u> least sophisticated consumer could reasonably interpret the representation in a way that is inaccurate." *Id.* (emphasis is original) (quotations omitted). "Employing the least sophisticated consumer standard ensures the protection of all consumers, even the naive and the trusting, against deceptive debt collection practices." *Id.* (quotations omitted).

3.    Section 1692f

"While § 1692e mainly targets practices that take advantage of a debtor's naivete or lack of legal acumen, § 1692f aims at practices that give the debt collector an unfair advantage over the debtor or are inherently abusive." *Vangorden*, 897 F.3d at 437 (quotations omitted).  Section 1692f provides that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt."  15 U.S.C. § 1692f.  "Although the FDCPA leaves the term 'unfair or unconscionable means' undefined," the Second Circuit has "held that the term refers to practices that are shockingly unjust or unfair, or affronting the sense of justice, decency, or reasonableness." *Arias*, 875 F.3d at 135 (quotations omitted).  "The least sophisticated consumer standard is used to determine whether a practice is unfair or unconscionable." *Id.*  "Like its counterpart, section 1692e, section 1692f contains a non-exhaustive list of unfair practices, including the collection of an invalid debt and taking or threatening to take non-judicial action to effect the dispossession of property without a legal right to do so." *Id.*

4.    Section 1692g

Section 1692g of "[t]he FDCPA requires that a debt collector attempting to collect a debt must, within five days after its initial communication, send the consumer a written notice containing, among other things, 'the name of the creditor to whom the debt is owed,' unless it provided that information in the initial communication." *Bryan v. Credit Control, LLC*, 954 F.3d 576, 581 (2d Cir. 2020) (quoting 15 U.S.C. § 1692g(a)(2)).  Section 1692g also "requires debt collectors to advise consumers of their right to dispute an asserted debt in writing 'within thirty days after receipt of the notice.'" *Vangorden*, 897 F.3d at 439 (quoting 15 U.S.C. § 1692g(a)(3)).  "The FDCPA does not offer a definition of 'initial communication.'" *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 212 (2d Cir. 2017).

5.      The Debt Collector Requirement

"The plaintiff in an FDCPA action bears the burden of proving the defendant's debt collector status." *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti*, 374 F.3d 56, 60 (2d Cir. 2004).  "The term 'debt collector' means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."   15 U.S.C.A. § 1692a(6); *see also Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1036 (2019).

"[T]he FDCPA's definition of 'debt collector' includes lawyers who regularly, through litigation, attempt to collect consumer debts." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 593 (2010).  Such "debt collectors can be subject to FDCPA liability based on actions taken in legal proceedings." *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 83–84 (2d Cir. 2018); *accord Heintz v. Jenkins*, 514 U.S. 291, 294 (1995) ("[T]he [FDCPA] applies to the litigating activities of lawyers.").   "[A] debt collector engages in unfair or unconscionable litigation conduct in violation of section 1692f when . . . it in bad faith unduly prolongs legal proceedings or requires a consumer to appear at an unnecessary hearing." *Arias*, 875 F.3d at 138.

6.      Bona Fide Error Defense (15 U.S.C. § 1692k(c))

"A debt collector may not be held liable in any action brought under [the FDCPA] if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c).  "Thus, under the statute, 'a debt collector asserting the bona fide error defense must show by a preponderance of the evidence that its violation of the Act: (1) was not intentional; (2) was a bona fide error; and (3) occurred despite the maintenance

11

of procedures reasonably adapted to avoid any such error.'" *Wagner v. Chiari & Ilecki, LLP*, 973 F.3d 154, 168 (2d Cir. 2020).   "Lawyers . . . have recourse to the affirmative defense in § 1692k(c)" and "may invoke the bona fide error defense, for instance, where a violation results from a qualifying factual error." *Jerman*, 559 U.S. at 599.

**B.**   **Plaintiff Adequately Alleges That Defendants Violated Sections 1692e and 1692f of the FDCPA**

Defendants contend that the Amended Complaint fails to state an FDCPA claim under Sections 1692e and 1692f.   The Court (1) concludes that the Amended Complaint adequately alleges that both Defendants violated those FDCPA Sections, (2) rejects Houslanger's counterarguments, and (3) rejects Virgo's counterarguments.

1.   The FDCPA Allegations Are Sufficient Under Sections 1692e and 1692f

By subjecting debt collectors to liability for using "false, deceptive, or misleading representation[s] or means in connection with the collection of any debt," 15 U.S.C. § 1692e, Section 1692e "prohibits a debt collector from 'threatening to take any action that cannot legally be taken,'" or from "the collection of an invalid debt," *Arias*, 875 F.3d at 138 (brackets omitted) (quoting 15 U.S.C. § 1692e(5)).   Courts have held that "[s]ewer service practice, followed by obtaining a default judgment, falls squarely within the actions prohibited by section 1692e." *Guzman v. Mel S. Harris & Assocs., LLC*, No. 16-CV-3499 (GBD), 2018 WL 1665252, at *9 (S.D.N.Y. Mar. 22, 2018) (quotations omitted); *see also Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 424 (S.D.N.Y. 2010).   "Such practices may also violate section 1692f," *Guzman*, 2018 WL 1665252, at *9, insofar as that provision prohibits using "unfair or unconscionable means to collect or attempt to collect any debt," 15 U.S.C. § 1692f.   And, as noted, "a debt collector engages in unfair or unconscionable litigation conduct in violation of section 1692f when . . . it in

bad faith unduly prolongs legal proceedings or requires a consumer to appear at an unnecessary hearing." *Arias*, 875 F.3d at 138.

Although Defendants here did not themselves engage in sewer service, the allegations in the Amended Complaint are sufficient to establish that Defendants knew or should have known that the default judgment against Galeas was obtained through sewer service. (Am. Compl., Dkt. 22, ¶¶ 34, 51–56.)  Nevertheless, "Defendants sought to collect from Mr. Galeas the fraudulently obtained judgment." (*Id.* ¶ 34.)  In fact, they garnished Galeas's wages and litigated the collection action against him for years.  (*See id.* ¶¶ 42–43, 59, 64.)

Only when the Civil Court directed Defendants to establish in court that the default judgment was valid did Defendants offer to drop the suit.  But, at that point, they had already garnished Galeas's wages and compelled him to litigate against a default judgment they knew or should have known was baseless.  And even then, rather than merely dismissing the case against Galeas, Defendants sought to "exchange" dismissal for Galeas's releasing any claims against them. (*Id.* ¶¶ 76–77 & n.8.)  They also sought to retain the garnished wages.  (*Id.* ¶¶ 67, 76–77 & n.8.) As the Amended Complaint points out, Defendants buried this "exchange" in the unnecessarily convoluted Stipulation.  (*Id.* ¶¶ 76–77 & n.8.)

In their motions to dismiss, Defendants do not dispute that the underlying default judgment against Galeas stemmed from fraud (*i.e.*, sewer service).  Nor could they, at this stage, given that the Amended Complaint alleges that Galeas "was the victim of sewer service." (*Id.* ¶ 24.)  Thus, Defendants cannot dispute that they attempted "the collection of an invalid debt," *see Arias*, 875 F.3d at 135, and, given their apparent knowledge of its invalidity, "in bad faith[,] unduly prolong[ed] legal proceedings or require[d] [Galeas] to appear at an unnecessary hearing," *id.* at 138.

13

The Amended Complaint also alleges that "Mr. Galeas never received, and on information and belief was never sent, a notice of assignment of the judgment when the judgment was allegedly assigned from LR Credit to Virgo." (Am. Compl., Dkt. 22, ¶ 38.) As Plaintiff points out, "the judgment debtor must receive notice of the assignment." (Pl. Br., Dkt. 70, at 50 (quoting *Musah v. Houslanger & Assocs., PLLC*, 962 F. Supp. 2d 636, 639–40 (S.D.N.Y. 2013)).) This also "provides a suitable basis for Plaintiff's FDCPA claims." *Musah*, 962 F. Supp. 2d at 639.[7]

### 2.  Houslanger's Motion to Dismiss the FDCPA Claims Under Sections 1692e and 1692f

In its motion to dismiss, Houslanger argues that it was unaware "that the affidavit of service submitted in Galeas' *specific case* was false or that the Judgment entered against him in the Civil Court was 'invalid.'" (Houslanger Br., Dkt. 44-3, at 10.) Houslanger cites *Musah* to argue that "the [default] [j]udgment had not been vacated when [Houslanger] issued the Income Execution and the existence of a valid judgment 'obviate[s] the need for further review of a case file.'" (Houslanger Br., Dkt. 44-3, at 11 (quoting *Musah*, 962 F. Supp. 2d at 641).) Essentially, Houslanger invokes the "bona fide error" defense, whereby, as noted, "[a] debt collector may not be held liable in any action brought under [the FDCPA] if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide

---

[7] In its motion to dismiss, Virgo argues that "[t]he November 17, 2016 income execution contained a notice of assignment." (Virgo Br., Dkt. 43-2, at 25.) This argument is unavailing. First, as in *Musah*, the Amended Complaint "has specifically alleged that [Galeas] did not receive any notice [of assignment]." *See Musah*, 962 F. Supp. 2d at 639. "Accordingly, a factual dispute exists between the parties as to whether or not [Galeas] received notice of the assignment," and "[s]uch a factual dispute is inappropriate for resolution on a motion to dismiss, where allegations are taken as true and read in a light most favorable to plaintiffs." *Id.* (quotations omitted). And even if Galeas received the Income Execution, the Court is skeptical that it provided adequate notice of the assignment. At best, it was an "attempt[] to collect on the judgment against [Galeas] at the same time that it attempted to inform [him], through indirect language, that [his] debt had been reassigned." *See Moukengeschaie v. Eltman, Eltman & Cooper, P.C.*, 277 F. Supp. 3d 337, 352 (E.D.N.Y. 2017).

error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."

15 U.S.C. § 1692k(c); *see also Jerman*, 559 U.S. at 599.[8]

But the Amended Complaint, on its face, does not support a bona fide error defense.  As the Amended Complaint alleges, LR Credit "stipulated as part of [the *Sykes*] settlement that all [of the alleged debtors] in debt collection actions brought by LR Credit in New York would have been entitled to interpose a defense predicated upon 'fraud, misrepresentation, illegality, unconscionability, lack of due service, violations of law, or other illegalities.'" (Am. Compl., Dkt. 22, ¶ 26.)  Although LR Credit had, by then, sold the judgment against Galeas to Virgo, that judgment materially resembled the apparently fraudulent judgments LR Credit did not sell.  (*See id.* ¶¶ 51, 56.)  Even "general[] aware[ness]" of the *Sykes* settlement therefore should have alerted Defendants here that the default judgment against Galeas arose from "fraud, misrepresentation, illegality, unconscionability, lack of due service, violations of law, or other illegalities."  (Am. Compl., Dkt. ¶ 26.)  Further, the complaint filed in the underlying collection suit against Galeas listed the original creditor merely as "ASSOCIATES" (*id.* ¶ 56; *see also* Dkt. 71-5), which should have compounded Defendants' suspicion as to its validity.

---

[8] Although Houslanger does not expressly raise a bona fide error defense, and argues only that Plaintiff "has not pled a viable FDCPA claim" (Reply Memorandum of Law in Further Support of the Houslanger Defendants' Motion to Dismiss, Dkt. 46, at 10), the Court construes Houslanger's argument as invoking the bona fide error doctrine insofar as Houslanger argues that an attempt to enforce an invalid judgment does not violate the FDCPA if the debt collector has a good faith belief that it is entitled to recovery, which is the essence of a bona fide error defense. *Cf. Gold v. Shapiro, Dicaro & Barak, LLC*, No. 18-CV-6787 (PKC) (SJB), 2019 WL 4752093, at *7 n.11 (E.D.N.Y. Sept. 30, 2019) ("If . . . a debt collector files a complaint with a good faith basis to believe that it is entitled to recover, . . . the FDCPA allows for that debt collector to plead bona fide error as an affirmative defense.  However, when a debt collector already knows that a debt is time-barred, . . . the FDCPA can impose liability for choosing to file a legal complaint alleging that it is entitled to payment despite that knowledge.").

More importantly, Defendants do not (and cannot, given the allegations in the Amended Complaint) identify any precautionary measures they took to confirm the validity of the judgment they sought to enforce against Galeas.  As noted, "a debt collector asserting the bona fide error defense must show by a preponderance of the evidence that its violation of the Act . . . occurred despite the maintenance of procedures reasonably adapted to avoid any such error."  *Wagner*, 973 F.3d at 168 (quotations omitted).  Courts in this Circuit have explained that "the mere existence of generic procedures is not enough; instead, the debt collector must show . . . that it took precautions meant to eliminate the specific error complained of by the plaintiff."  *Guzman*, 2018 WL 1665252, at *10 (quotations omitted).  Defendants point to no such precautions.  Rather, as noted, they rely on *Musah* to argue that the mere existence of the default judgment "obviate[d] the need for further review of [Galeas's] case file."  (Houslanger Br., Dkt. 44-3, at 11 (quoting *Musah*, 962 F. Supp. 2d at 641).)

But *Musah* arose in a different context and said only that "an *attorney's determination* that there exists a *valid* judgment *may* obviate the need for further review of a case file."  962 F. Supp. 2d at 641 (emphasis added).  Defendants here purchased and sought to enforce a default judgment that stemmed from a facially suspect affidavit of service and resembled thousands of default judgments the same seller apparently had obtained through "fraud, misrepresentation, illegality, unconscionability, lack of due service, violations of law, or other illegalities."  (*See* Am. Compl., Dkt. ¶¶ 22, 26, 51, 56.)  Given these serious and apparent concerns regarding the validity of the debt underlying the judgment they purchased, Defendants cannot simply rely on the existence of that judgment to avoid liability, at least at this stage.  *Cf. Currier v. First Resol. Inv. Corp.*, 762

F.3d 529, 537 (6th Cir. 2014) ("[W]hether or not [the defendant] had reason to believe that the lien was valid when filed is an issue of fact that is not relevant at the motion to dismiss stage.").[9]

In any event, Defendants not only failed to take precautionary measures before purchasing and attempting to enforce the default judgment, they continued to litigate that judgment against Galeas even after receiving additional indications that that the underlying debt was invalid.  For example, in April 2018, after Galeas obtained an order to show cause regarding the validity of the judgment, Defendants litigated the case for another eleven months without taking any "steps to obtain additional evidence to oppose the order to show cause." (*See* Am. Compl., Dkt. 22, ¶¶ 57–76.)  During that time, Defendants sought several adjournments (*see id.* ¶¶ 64, 66), refused to dismiss the collection suit without Galeas agreeing to surrender the wages that had already been garnished (*see id.* ¶ 67), and, for a time, continued to garnish Galeas's wages (*see id.* ¶¶ 61, 63). And despite having "no evidence to oppose[] a traverse hearing, Defendants still required Mr. Galeas to take off from work again to attend the hearing" (*id.* ¶ 73), at which point they sought to make a deal with Galeas that would have deprived him of the money that had been wrongfully garnished from his wages, as well as his right to pursue legal claims (*see id.* ¶¶ 67, 76–77 & n.8). These allegations are sufficient to sustain a claim that Defendants "in bad faith unduly prolong[ed] legal proceedings or require[d] a consumer to appear at an unnecessary hearing." *Arias*, 875 F.3d at 138.[10]

---

[9] The same rationale applies to Virgo's argument that it had "reason to believe the underlying judgment was valid." (Virgo Br., Dkt. 43-2, at 23 n.13.) This too "is an issue of fact that is not relevant at the motion to dismiss stage." *See Currier*, 762 F.3d at 537.

[10] Houslanger similarly argues that "any damages Galeas sustained . . . stemmed from a still-valid Judgment that [Houslanger] did not procure." (Reply Memorandum of Law in Further Support of the Houslanger Defendants' Motion to Dismiss, Dkt. 46, at 11.) But although Houslanger did not fraudulently procure the default judgment against Galeas, Houslanger sought to enforce the judgment allegedly knowing it had been fraudulently procured. The Court thus

Houslanger next argues that it did not violate the FDCPA because Galeas was represented by a volunteer attorney on the day of the traverse hearing when Houslanger offered the Stipulation. Houslanger points to a series of non-binding cases applying reasoning from a sentence in *Kropelnicki v. Siegel*, 290 F.3d 118, 128 (2d Cir. 2002), where the court "assume[d]," but expressly declined to decide, that "[w]here an attorney is interposed as an intermediary between a debt collector and a consumer, . . . the attorney, rather than the FDCPA, will protect the consumer from a debt collector's fraudulent or harassing behavior." (*See* Houslanger Br., Dkt. 44-3, at 6.) Houslanger contends that Plaintiff's "section 1692f claim fails because he is complaining about a communication made exclusively to a third-party representative." (*Id.*)

As an initial matter, this argument is largely beside the point. Although Houslanger's offer of the Stipulation is one aspect of the alleged FDCPA violations, the crux of the suit is Defendants' attempt to enforce an invalid default judgment through prolonged litigation. As noted, the FDCPA "prohibits a debt collector from 'threatening to take any action that cannot legally be taken,'" from "the collection of an invalid debt," and from, "in bad faith[,] unduly prolong[ing] legal proceedings or requir[ing] a consumer to appear at an unnecessary hearing." *Arias*, 875 F.3d at 135, 138. Offering the Stipulation was but one act of several in furtherance of this alleged abusive practice.

In any event, the Court concludes that the FDCPA applies to communications directed to consumers' attorneys. Despite its reservations in *Kropelnicki*, the Second Circuit "ha[s] not ruled

---

refers to the judgment as "invalid" insofar as it was unenforceable by a debt collector with knowledge of its fraudulent origin, not because the judgment was "facially" invalid. As discussed throughout this decision, Defendants ultimately may show they were innocent purchasers and enforcers who did not know of LR Credit's alleged fraud and thus believed the default judgments represented valid debts. But that is a question for a factfinder. As it stands, the allegations in the Amended Complaint paint a grotesque picture of outrageously abusive and disreputable conduct by Defendants as to Galeas and presumably many others whose debts Defendants purchased from LR Credit.

on whether an FDCPA claim may be brought for misrepresentations made to third parties," including debtors' attorneys.  *See Sykes*, 780 F.3d at 97 n.6.  The Fourth Circuit, however, has led a contingent of courts in holding that "the FDCPA covers communications to a debtor's attorney." *Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 233 (4th Cir. 2007); *accord Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 775 (7th Cir. 2007) (holding that a "letter [that] misrepresents the unpaid balance of the consumer's debt . . . would be actionable whether made to the consumer directly, or indirectly through his lawyer," in circumstances where, for example, the "false claim [would] be as difficult for a lawyer to see through as [the] consumer"); *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 368 (3d Cir. 2011) ("A communication to a consumer's attorney is undoubtedly an indirect communication to the consumer" that is covered by the FDCPA.); *Bishop v. Ross Earle & Bonan, P.A.*, 817 F.3d 1268, 1272 (11th Cir. 2016) ("We join the Third, Fourth, and Seventh Circuits in holding that a debt-collection notice sent to a consumer's attorney is" a communication covered by the FDCPA.).[11]

The Court agrees with those circuits that have deemed debt collection practices actionable under the FDCPA despite being directed to consumers' attorneys.  First, "there is nothing in the FDCPA that explicitly exempts communications to an attorney." *Allen*, 629 F.3d at 368.  "Section 1692e broadly prohibits '*any* false, deceptive, or misleading representation or means *in connection with the collection of any debt*.'" *Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291, 1301 (11th Cir. 2015) (quoting 15 U.S.C. § 1692e).  Likewise, the "broad language" of Section 1692f, "coupled with its illustrative examples of violative conduct support the conclusion that § 1692f

---

[11] Though the Ninth Circuit, by contrast, has held that "when the debt collector ceases contact with the debtor, and instead communicates exclusively with an attorney hired to represent the debtor in the matter, the [FDCPA's] strictures no longer apply to those communications[,]" *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 939 (9th Cir. 2007), as discussed below, the Court agrees with the circuits adopting the contrary view.

19

applies whether the unfair and unconscionable means are employed against consumers or non-consumers." *Id.* (citing 15 U.S.C. § 1692f).   Neither section "impl[ies] immunity for debt collection practices otherwise forbidden by the Act simply because those debt collection practices are directed at a consumer's attorney." *Id.*  By contrast, other provisions, such as Section 1692c, "explicitly refer[] to the 'consumer' and clearly and necessarily distinguish[] 'consumers' from 'attorneys' and other third parties." *Id.* (citing 15 U.S.C. § 1692c).

Second, "[i]t would create an odd situation, indeed, if the fact that a consumer was represented by an attorney somehow excused the debt collector from otherwise observing the FDCPA's requirements." *Id.* at 1303.  In a sense, the statute creates a cost-shifting mechanism. Rather than consumers bearing the burden to pay attorneys to protect against abusive debt collection practices, debt collectors bear the burden to avoid engaging in such practices.  *See Bishop*, 817 F.3d at 1277 (reasoning that exempting communications directed to consumers' attorneys "would require attorneys to expend client resources second-guessing the truthfulness of debt collection communications," which "is precisely the type of burden shifting" the FDCPA seeks to avoid).  This may mean debt collectors must expend resources to ensure that the default judgments they purchase are valid and enforceable, and that the debts they seek to collect can properly be collected.  *See Arias*, 875 F.3d at 138 (noting that the FDCPA protects against "the collection of an invalid debt").  This burden does not shift to a debtor simply because he or she can afford counsel—or because counsel volunteers—to expend time and effort ensuring that the debt collector has a basis for its claim.  Houslanger's argument essentially leads to the conclusion that, "[o]nce the consumer retains an attorney, . . . the debt collector is free to convey false or

misleading information to the consumer's attorney without fear of consequences." *Miljkovic*, 791 F.3d at 1304.[12]   The Court rejects Houslanger's motion to dismiss on this basis.[13]

Houslanger also argues that the FDCPA should not apply because the Civil Court had the power to protect Galeas by rejecting the Stipulation.   (Houslanger Br., Dkt. 44-3, at 6–7.) Houslanger relies on *Simmons v. Roundup Funding, LLC*, 622 F.3d 93, 96 (2d Cir. 2010), where the court explained that the FDCPA's "purpose is not implicated when a debtor is instead protected by the court system and its officers."   (Houslanger Br., Dkt. 44-3, at 7.)   But the court in *Simmons* was talking about bankruptcy proceedings, where debtors "do not need protection from abusive collection methods that are covered under the FDCPA because the claims process is highly regulated and court controlled." *Simmons*, 622 F.3d at 96.   The Second Circuit has since clarified that "the rationale of . . . *Simmons* reflects the special protections afforded a consumer under the Bankruptcy Code—protections that are unavailable where . . . the proceedings are in State court and the consumer, often unfamiliar with the law governing garnishment of bank accounts, has the benefit of neither counsel nor a bankruptcy trustee." *Arias*, 875 F.3d at 137.   The Civil Court action here was not a bankruptcy proceeding.   Further, the FDCPA is designed to prevent debt collectors from engaging in abusive debt-collection practices; it does not license debt collectors to engage in such practices simply because an alleged debtor may seek the protection of a state court.

---

[12] Further, based on its experience at the trial level, the Court does not share the Ninth Circuit's view, which informed its position on this issue, that "[u]nsophisticated consumers are easily bullied and misled," whereas "[t]rained attorneys are not." *Guerrero*, 499 F.3d at 935.

[13] Another issue is whether the "least sophisticated consumer" standard applies when a debt collector communicates through the consumer's attorney.   For example, the Seventh Circuit has applied what has been called the "competent lawyer" standard. *See Evory*, 505 F.3d at 775.   Virgo contends that the "competent attorney" standard applies here.   (*See* Virgo Br., Dkt. 43-2, at 22.) Regardless of what standard applies to the specific communication to Galeas's volunteer attorney, however, the Amended Complaint, for the reasons explained, adequately states a claim.

And to the extent Galeas was counseled by a volunteer attorney for a day, the Court already has rejected this as a basis for dismissal.

Finally, Houslanger argues that merely proposing the Stipulation was not "unfair or unconscionable" under the FDCPA. (Houslanger Br., Dkt. 44-3, at 7–8.) It contends that FDCPA liability cannot arise from "giving Galeas *the option* to release [Houslanger] from potential liability." (*Id.* at 7.) The Court again disagrees.

To be sure, proposing a settlement offer that favors one's own side in a litigation is common. But "there is a large body of case law that supports the proposition that a communication offering a settlement is subject to the FDCPA." *Hayles v. Aspen Properties Grp., LLC*, No. 16-CV-8919 (MKV), 2020 WL 5764371, at *4 (S.D.N.Y. Sept. 28, 2020) (collecting cases). Knowingly prolonging a baseless litigation against a consumer, and, once the scheme is revealed, offering to settle that suit only if the consumer provides something in return, is "unfair or unconscionable litigation conduct," as well as an attempt to collect an invalid debt. *See Arias*, 875 F.3d at 135, 138. Defendants offered Galeas the Stipulation only after the Civil Court ordered them to show that the judgment against Galeas was valid and enforceable. (*See* Am. Compl., Dkt. 22, ¶ 57; *see also* Order to Show Cause, Dkt. 22-15.) According to the Amended Complaint, Defendants were "fully aware of the unlawful circumstances under which the LR Credit Judgments were obtained" (*see* Am. Compl., Dkt. 22, ¶ 34), and had no "evidence to oppose the order to show cause" (*id.* ¶ 65) or "to oppose[] a traverse hearing" (*id.* ¶ 73). In other words, Defendants knew, when they gave "Galeas *the option* to release [Defendants] from potential liability" (Houslanger Br., Dkt. 44-3, at 7), that the only "consideration" they could offer was the dismissal of their baseless debt-collection claim against Galeas—that is, "consideration" they were not entitled to leverage against Galeas in the first place. This might explain why Defendants ultimately agreed

to settle even when Galeas's volunteer attorney deleted the release provision from the Stipulation without offering anything new in exchange.  Perhaps Defendants hoped that Galeas, who spoke little English (*see* Am. Compl., Dkt. 22, ¶ 85), who had been embroiled in Defendants' prolonged debt-collection efforts for years (*see id.* ¶¶ 41–43, 59, 64), and who was not actually responsible for any debt (*see id.* ¶ 19), would be willing to sign the convoluted (and insidiously unfair) contract to be rid of the matter.

In any event, as discussed, offering the Stipulation here was just part of Defendants' efforts to "collect[] . . . an invalid debt" and "engage[] in unfair or unconscionable litigation conduct in violation of section 1692f" by "in bad faith unduly prolong[ing] legal proceedings."  *See Arias*, 875 F.3d at 135, 138.  Their potential FDCPA liability does not turn on the Stipulation alone.

Houslanger's motion to dismiss Plaintiff's claims under Sections 1692e and 1692f therefore must be denied.

3.   Virgo's Motion to Dismiss the FDCPA Claims Under Sections 1692e and 1692f

Taking a different approach, Virgo argues that the FDCPA does not apply because it is a "creditor," not a "debt collector."  Virgo points to the FDCPA's definition of "creditor" as "any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another."  15 U.S.C. § 1692a(4). Virgo contends that it is "a person 'to whom a debt is owed' and is not seeking to collect 'such debt for another.'"  (Virgo Br., Dkt. 43-2, at 7.)  Virgo argues that "'[d]ebt collector' and '[c]reditor' are mutually exclusive terms."  (*Id.* at 8–9.)  The Court disagrees on all counts.

First, the Amended Complaint adequately alleges that Virgo is a debt collector.  As noted, one definition of "debt collector" is "any person who uses any instrumentality of interstate

commerce or the mails in any business the principal purpose of which is the collection of any debts." 15 U.S.C. § 1692a(6). According to the Amended Complaint, "Virgo was chartered on November 18, 2011, just 2 months prior to purchasing" the allegedly fraudulent judgments from LR Credit. (Am. Compl., Dkt. 22, ¶ 28.) "Virgo's principal (indeed sole) purpose is the purchase of putative consumer debt, primarily (if not exclusively) the purchase of judgments rendered against consumers for lawsuits seeking to collect consumer debts." (*Id.* ¶ 8.) "Virgo then collects on those purchased judgments," through Houslanger, "by issuing thousands of information subpoenas, bank restraints, and garnishments, and sending thousands of collection letters." (*Id.*) Thus, "the pleadings contain sufficient factual matter to establish that [Virgo] collects on debts by, at the very least, hiring debt collection law firms and filing debt collection actions in state court." *See Digiacomo v. Midland Credit Mgmt., Inc.*, No. 16-CV-1875 (KAM) (RER), 2019 WL 2256769, at *2 (E.D.N.Y. Feb. 22, 2019), *report and recommendation adopted*, 2019 WL 1349483 (E.D.N.Y. Mar. 26, 2019).

Virgo contends that it merely "facilitated [Houslanger] in collecting the debt owed Virgo," and thus that "the Amended Complaint is devoid of any factual allegations that Virgo undertook any direct collection efforts." (Virgo Br., Dkt. 43-2, at 15.) Virgo relies on a line of cases summarized in *Schneider v. JTM Capital Management, LLC*, where the District Court of Oregon concluded that "passive debt buying companies" that "purchas[e] debts and hir[e] others to collect that debt" are not "debt collectors" under the "principal purpose" definition. No. 16-CV-2057 (JR), 2018 WL 2276238, at *3 (D. Or. Mar. 22, 2018), *report and recommendation adopted*, 2018 WL 2248451 (D. Or. May 15, 2018). Virgo echoes the court's statement in *Schneider* that "'collect' is a verb that requires action." *Id.* at *5.

More recently, however, the Eighth Circuit rejected Virgo's exact argument, explaining that "the FDCPA's principal purpose definition does not require the debt collector to 'collect' debts" directly, but instead encompasses debt buyers who hire law firms to collect on their behalf. *Reygadas v. DNF Assocs., LLC*, 982 F.3d 1119, 1125 (8th Cir. 2020).  As the court in *Reygadas* explained, an entity is a debt collector if its principal *purpose* is the collection of debts, even if the entity does not *directly carry out* that purpose.  *Id.*  Just as "a hospital's *purpose* is providing healthcare to patients, even though it relies on independent physicians and other entities to provide the care," the *purpose* of an entity that exclusively "hir[es] lawyers and debt collection agencies to collect debts" is "the collection of debts." *Id.* (emphasis added).  This does not mean "that *any* purchaser of defaulted consumer debt qualifies as a 'debt collector' under the 'principal purpose' definition," since there may be "consumer debt buyers who engage in a wider array of activities, such as originating consumer loans, reselling debt portfolios, or offering other financial services." *Id.* at 1125.  But Virgo's "principal (indeed sole) purpose is the purchase of putative consumer debt" that "Virgo then collects" through Houslanger.  (Am. Compl., Dkt. 22, ¶ 8.)  Thus, its principal purpose is the collection of debts, even though it uses Houslanger to carry out that purpose.  *See, e.g.*, *Barbato v. Greystone All., LLC*, 916 F.3d 260, 268 (3d Cir. 2019) (applying the "principal purpose" definition to a debt buyer because "'[c]ollection' by its very definition may be indirect, and that is the type of collection in which [a company that] buys consumer debt and hires debt collectors to collect on it" engages); *McMahon v. LVNV Funding, LLC*, 301 F. Supp. 3d 866, 884 (N.D. Ill. 2018) ("The Court fails to see why it should matter if the debt buyer hires a third party to actually collect its debt. . . .  If the collection of debts is precisely what sustains the business, unaided by any other significant sources of revenue, then the 'collection of . . . debts' must be the business's 'primary purpose.'"); *Meola v. Asset Recovery Sols., LLC*, No. 17-CV-1017

25

(MKB) (RER), 2018 WL 5020171, at *6 (E.D.N.Y. Aug. 15, 2018) (agreeing with the "courts in this Circuit [that] have interpreted the first prong of Section 1692a (6) to include an entity in the business of buying and collecting defaulted debts" through lawsuits), *report and recommendation adopted*, 2018 WL 4660373 (E.D.N.Y. Sept. 28, 2018).

This reading accords with Section 1692e, which provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means *in connection* with the collection of any debt." 15 U.S.C. § 1692e (emphasis added). "In connection" with its attempt to collect on the allegedly invalid default judgment, Virgo hired Houslanger to garnish Galeas's wages and litigate the Civil Court case.[14] This allegedly was "deceptive" or "misleading" insofar as it suggested that Galeas owed a debt he did not owe. *See Somerset v. Stephen Einstein & Assocs., P.C.*, 351 F. Supp. 3d 201, 207–08 (E.D.N.Y. 2019) (concluding that, where the defendants knew "full well the invalidity of the judgment they sought to enforce," the plaintiff stated a Section 1692e claim because "a consumer under such circumstances might feel compelled to pay the debt or misunderstand their potential rights to challenge the debt"). For similar reasons, the Amended Complaint states a claim against Virgo for "us[ing] unfair or unconscionable means" to collect a debt—namely, hiring a law firm to garnish Galeas's wages and pursue collection on a default judgment despite knowing the judgment was invalid. *See* 15 U.S.C. § 1692f; *see also Arias*, 875 F.3d at 134–35 (noting that "the same conduct may support claims brought under multiple

---

[14] Virgo responds that it "didn't file a lawsuit or otherwise engage in litigation to collect a debt," but "was merely represented by [Houslanger] in defending Plaintiff's Order to Show Cause." (Virgo Reply, Dkt. 45, at 10.) This argument misses the point. Virgo sought to collect an invalid judgment by garnishing Galeas's wages, and then, when Galeas contested the collection effort in Civil Court, litigated the case for almost a year despite knowing the judgment was invalid. That Virgo hired a law firm (Houslanger) in both the garnishment and Civil Court proceedings does not absolve Virgo of *its* role in seeking to collect an invalid debt through a prolonged litigation.

subsections"). Whether Virgo may be found liable for specific misrepresentations Houslanger allegedly made to Galeas is a separate question, but it is not a basis for dismissal of the FDCPA claims against Virgo.

Virgo argues that "[n]o facts are pleaded to conclude . . . that Virgo's principal purpose is the collection of debts," because "[t]he purchase of debts or judgments involves much more than the eventual collection efforts." (Virgo Br., Dkt. 43-2, at 10, 12.) Virgo claims that "investment"—not debt collection—"is a debt purchaser's *raison d'etre*," and that it "suffered a 100% loss on its investment when the purchased judgment was vacated in this case and it had nothing to do with any of [Defendants'] collection efforts." (*Id.* at 12.)

But Virgo's attempt to distinguish its "investment" activity from debt collection flouts the purposes of the FDCPA. In fact, the court in *Reygadas* explained that this exact argument "distort[ed] reality," since the defendant did "not sit[] idly, hoping a consumer who is delinquent on her payment obligations will volunteer payment," but rather took "affirmative steps to maximize collection of the debts it has purchased," including by hiring a law firm. 982 F.2d 1119, 1125. The Court agrees that "such debt purchasers or assignees are 'debt collectors' for purposes of the FDCPA," *Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 581 (S.D.N.Y. 2015), even if they prefer to call themselves "investors." *See Arias*, 875 F.3d at 134 ("Because the FDCPA is remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated.").

Virgo next argues that it is not a debt collector because the Amended Complaint does not allege that it uses any "instrumentality of interstate commerce or the mails" in seeking to collect debts. (Virgo Br., Dkt. 43-2, at 10–11.) Virgo relies on *Schroeder v. Diamond Parking, Inc.*, where the defendant "did not employ an instrumentality of interstate commerce in

issuing . . . parking penalty notices to [the] [p]laintiff," because "[t]he notices were affixed to [the] [p]laintiff's vehicle." No. 12-CV-378 (HG) (RLP), 2013 WL 5348472, at *13 (D. Haw. Sept. 17, 2013), *aff'd*, 646 F. App'x 505 (9th Cir. 2016). This argument is unavailing. Again, the FDCPA defines "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts." 15 U.S.C. § 1692a(6). As explained, the Amended Complaint adequately alleges that Virgo's principal purpose is the collection of debts. And Virgo uses Houslanger "to collect on [default] judgments by . . . sending thousands of collection letters." (Am. Compl., Dkt. 22, ¶ 8.) In this case, Virgo, through Houslanger, used the mails to direct Galeas's employer to garnish his wages. (*See* Dkt. 22-14.) And in carrying out Virgo's debt-collection efforts, Houslanger emailed the Marshal, copying a Virgo representative, regarding the garnishment. (*See* Dkt. 22-11.) Virgo thus uses "the mails" in its debt-collection business.[15]

Next, Virgo argues that "[t]he amended complaint fails to allege any direct misconduct by Virgo" because it "is not alleged to have made any phone calls, sent any letters, signed any documents, [or] otherwise communicated with or made any representations to anyone regarding the debt." (Virgo Br., Dkt. 43-2, at 19.) Virgo also contends that it cannot be held jointly or vicariously liable vis-à-vis Houslanger. (*Id.* at 20–21.) For substantially the same reasons already discussed, the Court disagrees.

The crux of the alleged FDCPA claim here is *Virgo's* attempt to collect an invalid debt and engage in unnecessarily prolonged litigation with Galeas. While Virgo hired Houslanger to pursue that purported debt through garnishment and later in court, the violation is the pursuit, not (at least,

---

[15] Although the FDCPA's definition of "debt collector" does not specify such a requirement, Virgo used the mails *in this case* at least when, through Houslanger, it directed Galeas's employer to garnish his wages. (*See* Dkt. 22-14.)

not solely) the litigation tactics, even if those tactics may subject Houslanger to additional or separate liability.[16]  Thus, for the reasons already provided, the Amended Complaint cannot be dismissed on the basis that Virgo "is not alleged to have made any phone calls, sent any letters, signed any documents, otherwise communicated with or made any representations to anyone regarding the debt."  (Virgo Br., Dkt. 43-2, at 19.)

Virgo also argues that it is a "creditor" under the FDCPA, and thus cannot be a "debt collector" because those terms are mutually exclusive.  (*Id.* at 9.)  As noted, a creditor is "any person who offers or extends credit creating a debt or to whom a debt is owed," 15 U.S.C. § 1692a(4), and a debt collector is, among other things, "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts," *id.* § 1692a(6).  This Court thus has observed that "a *debt buyer* whose only or principal business consists of purchasing defaulted debt and then collecting on that debt for its own profit . . . meets both the 'creditor' and 'debt collector' definition under the FDCPA."  *Gold v. Shapiro, Dicaro & Barak, LLC*, No. 18-CV-6787 (PKC) (SJB), 2019 WL 4752093, at *4 (E.D.N.Y. Sept. 30, 2019).  In other words, "a company that 'admits its sole business is collecting debts it has purchased' is a debt collector under the FDCPA because the principal purpose of its business is to collect debts, even though that business is also a creditor because it owns the debts it tries to collect."  *Id.* (brackets omitted) (quoting *Tepper v. Amos Financial, LLC*, 898 F.3d 364, 370–71 (3d Cir. 2018)).

---

[16] Virgo argues that its continued litigation of the default judgment against Galeas was not an attempt to collect a debt.  (Virgo Br., Dkt. 43-2, at 22.)  But, as noted, "debt collectors can be subject to FDCPA liability based on actions taken in legal proceedings," *Cohen*, 897 F.3d at 83–84, and "a debt collector engages in unfair or unconscionable litigation conduct in violation of section 1692f when . . . it in bad faith unduly prolongs legal proceedings or requires a consumer to appear at an unnecessary hearing," *Arias*, 875 F.3d at 138.

Virgo points out that the definition of creditor also expressly excludes "any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt *for another*." 15 U.S.C. § 1692a(4) (emphasis added). As Virgo notes, this exclusion would not necessarily apply to a debt buyer who seeks to collect the purchased debt *for its own account*. But just because the express exception to the creditor definition does not include an entity that collects purchased debts for itself, that does not mean an entity that otherwise counts as a creditor cannot *also* be a debt collector under Section 1692a(6). It means only that an assignee who collects a defaulted debt for another is not *also* a creditor.

Virgo relies on *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1721 (2017), to argue that "Virgo meets the statutory definition of a 'creditor' and cannot therefore also be a 'debt collector.'" (Virgo Br., Dkt. 43-2, at 9–10.) In *Henson*, the Supreme Court held that "a debt purchaser . . . may indeed collect debts for its own account without" being someone who "regularly collects or attempts to collect debts owed or due *another*." 137 S. Ct. at 1721–22 (emphasis added). But *Henson* expressly declined to hold "that a person cannot be both a creditor and a debt collector with respect to a particular debt." 137 S. Ct. at 1724. And it concluded only that a debt purchaser that collects the purchased debt may not be a "debt collector" under "the FDCPA's *second* definition of debt collector," *see Gold*, 2019 WL 4752093, at *4 (emphasis added) (quoting *Henson*, 137 S. Ct. at 1720–21), *i.e.*, "anyone who 'regularly collects or attempts to collect debts owed or *due another*,'" *Henson*, 137 S. Ct. at 1721 (emphasis added) (ellipses omitted) (quoting 15 U.S.C. § 1692a(6)). The Court in *Henson* "explicitly declined to address whether such an entity would be a debt collector based on the FDCPA's *first* definition of a debt collector, *i.e.*, anyone who engages 'in any business the principal purpose of which is the collection of any debts.'" *See Gold*, 2019 WL 4752093, at *4 (emphasis added) (quoting *Henson*, 137 S. Ct.

at 1720–21).  *Henson* thus said nothing about whether an entity with the principal purpose of collecting debts can be both a creditor and a debt collector.  By contrast, this Court has, as noted, observed that "a *debt buyer* whose only or principal business consists of purchasing defaulted debt and then collecting on that debt for its own profit . . . meets both the 'creditor' and 'debt collector' definition under the FDCPA."  *Id.* *4.  And, again, the Amended Complaint alleges that "Virgo's principal (indeed sole) purpose is the purchase of putative consumer debt, primarily (if not exclusively) the purchase of judgments rendered against consumers for lawsuits seeking to collect consumer debts."  (Am. Compl., Dkt. 22, ¶ 8).

Finally, Virgo argues that "according to the legislative history, 'creditor' and 'debt collector' are mutually exclusive."  (*See* Memorandum in Reply to Plaintiff's Opposition to Virgo Capital LLC's Motion to Dismiss ("Virgo Reply"), Dkt. 45, at 3; *see also* Virgo Br., Dkt. 43-2, at 8–9).  However, Virgo does not attempt to analyze the legislative history or point the Court to the aspects of the legislative history that supposedly support its argument, but merely cites a line of non-binding cases.  (*See* Virgo Br., Dkt. 43-2, at 8–9.)  Presumably, Virgo means to invoke Senate Report 95-382, which is cited in some of the cases Virgo identifies, and which observed that "[u]nlike creditors, who generally are restrained by the desire to protect their good will when collecting past due accounts, independent collectors are likely to have no future contact with the consumer and often are unconcerned with the consumer's opinion of them."  S. Rep. No. 95-382, at 2 (1977).  But the "good will" prophylactic does not seem applicable to entities such as Virgo, who "was chartered . . . just 2 months prior to purchasing" the allegedly fraudulent judgments from LR Credit (Am. Compl., Dkt. 22, ¶ 28), whose "principal (indeed sole) purpose is . . . the purchase of judgments rendered against consumers for lawsuits seeking to collect consumer debts" (*id.* ¶ 8), and who "then collects on those purchased judgments," through a law firm, "by issuing thousands

of information subpoenas, bank restraints, and garnishments, and sending thousands of collection letters" (*id.*). Such a business model sounds much more akin to that of an "independent collector[] . . . likely to have no future contact with the consumer and often . . . unconcerned with the consumer's opinion of them." S. Rep. No. 95-382, at 2. In any event, the Court is convinced by the reasoning in the post-*Henson* decision, *Tepper v. Amos Financial, LLC*, where the Third Circuit explained that someone engaged "in any business the principal purpose of which is the collection of any debts" remains "within the Act's reach," even if that person purchased the debt in question, because the phrase "'[a]ny debts' does not distinguish to whom the debt is owed." 898 F.3d at 370–71 (quoting 15 U.S.C. § 1692a(6)).[17]

Virgo's motion to dismiss Plaintiff's claims under Sections 1692e and 1692f therefore must be denied.

### C.   Plaintiff Does Not Adequately Allege That Defendants Violated Section 1692g of the FDCPA

Virgo also argues that the Amended Complaint fails to state a claim under Section 1692g of the FDCPA. (*See* Virgo Br., Dkt. 43-2, at 24–25.) The Court agrees.

As an initial matter, the basis for Plaintiff's Section 1692g claim is unclear. In the "statement of facts" section, the Amended Complaint alleges that, "[p]rior to their issuance of the Income Execution, neither Houslanger nor Virgo sent Mr. Galeas a letter with the disclosures

---

[17] Although Virgo also argues that "any violations of the FDCPA prior to November 16, 2016 . . . are time barred" (Virgo Br., Dkt. 43-2, at 18), Plaintiff alleges that Virgo violated the FDCPA only after November 16, 2016 (*see generally* Am. Compl., Dkt. 22), as Virgo acknowledges in its reply (*see* Virgo Reply, Dkt. 45, at 9 ("Plaintiff has clarified and conceded it is not pursuing liability for any actions before November 16, 2016 and is not alleging a conspiracy claims [*sic*] dating back prior thereto.")). Defendants thus do not contest that Plaintiff's Section 1692e and 1692f claims are timely. *See, e.g.*, *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021) ("Generally, the lapse of a limitations period is an affirmative defense that a defendant must plead and prove." (quotations and brackets omitted)).

required by 15 U.S.C. § 1692g of the FDCPA." (Am. Compl., Dkt. 22, ¶ 49.)  In the "summary of claims" section, it alleges that Defendants sought to collect on the purported default judgment "without sending Mr. Galeas a notice required by § 1692g of the FDCPA to allow Mr. Galeas to dispute the debt and stay collection proceedings until the debt was verified." (*Id.* at 2.)  But where the Amended Complaint delineates the causes of action, the FDCPA count alleges only that "Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f." (Am. Compl., Dkt. 22, ¶ 142.)  It says nothing about Section 1692g.

To the extent Plaintiff means to allege that Defendants attempted to collect a purported debt without sending the requisite disclosures under Section 1692g, the Amended Complaint does not allege that Defendants sent Galeas an "initial communication" triggering their obligations under Section 1692g, let alone what the initial communication would have been. *See Bryan*, 954 F.3d at 581 (noting that Section 1692g "requires that a debt collector attempting to collect a debt must, within five days *after its initial communication*, send the consumer a written notice" containing certain information (emphasis added) (quoting 15 U.S.C. § 1692g(a)(2)).  Because "Plaintiff has not alleged that [Galeas] received an initial communication that triggered Defendants' obligations under" Section 1692g, "the Amended Complaint fails to state a claim for a violation of section 1692g."[18]  *See Hoo-Chong v. CitiMortgage, Inc.*, No. 15-CV-4051 (JS) (AKT), 2017 WL 1232506, at *4 (E.D.N.Y. Mar. 31, 2017); *see also Antoine v. CitiMortgage, Inc.*, No. 15-CV-5309 (JMA) (GRB), 2017 WL 1133354, at *5 (E.D.N.Y. Mar. 24, 2017) (dismissing a Section 1692g(b) claim, in part because "plaintiffs [did] not identify any initial communication that would trigger plaintiffs' right to submit a letter disputing a debt, and by

---

[18] While this seems counterintuitive, Plaintiff has identified no contrary authority, and the Court has found none.

extension, defendants' obligation to respond to such a letter by verifying the debt"); *Saoulis v. Credit Control Servs., Inc.*, No. 20-CV-735 (BMC), 2020 WL 2836822, at *2 (E.D.N.Y. June 1, 2020) ("If Plaintiff did not receive the letter, then there is no evidence that Defendant engaged in any 'initial communication' with Plaintiff that would trigger its duties under § 1692g(a)." (quoting *Karimian v. CMRE Fin. Servs. Inc.*, No. 12-CV-8359 (SVW) (CW), 2013 WL 12114825, at *5 (C.D. Cal. May 14, 2013))).

And to the extent Plaintiff means to imply that the Income Execution, whereby Defendants garnished Galeas's wages, was the "initial communication," *see Somerset*, 351 F. Supp. 3d at 209 (finding that an "Income Execution was the 'initial communication'"), the Amended Complaint elsewhere suggests that the Income Execution was never sent to Galeas.  For example, the Amended Complaint alleges that Galeas realized his wages were being garnished only when a family member explained that the reductions were not union dues.  (Am. Compl., Dkt. 22, ¶ 45.) In fact, Plaintiff argues that "Virgo improperly assumes that the Income Execution was sent to [Galeas] when there are no allegations of such in the Complaint."  (Pl. Br., Dkt. 70, at 50.)  Galeas's independent discovery of the garnishment proceeding does not satisfy the "initial communication" requirement.  *Cf. Rodriguez v. Wells Fargo Bank for Holders of Harborview 2006-12*, No. 15-CV-7265 (JMA) (AYS), 2017 WL 1040729, at *7 (E.D.N.Y. Feb. 16, 2017) (rejecting the plaintiff's argument that her "discovery" of a document related to her mortgage "constituted an 'initial communication' under the FDCPA"), *report and recommendation adopted*, 2017 WL 1040401 (E.D.N.Y. Mar. 16, 2017); *Antoine*, 2017 WL 1133354, at *4 (dismissing a Section 1692g claim, in part because "[t]he complaint explicitly allege[d] that the [purported initial communication] was not sent to [the plaintiffs]," but "[i]nstead, [that the plaintiffs] discovered [the document] in the Clerk's Office").

As noted, the Amended Complaint also alleges that "Mr. Galeas never received, and on information and belief was never sent, a notice of assignment of the judgment when the judgment was allegedly assigned from LR Credit to Virgo." (Am. Compl., Dkt. 22, ¶¶ 38–40.) But although this "provides a suitable basis for Plaintiff's FDCPA claims" under other sections, *Musah* clarified that Section 1692g "has nothing to do with . . . the requirement to give a debtor notice that the debt has been assigned." 962 F. Supp. 2d at 639–40. To the extent the Amended Complaint alleges a violation of Section 1692g, therefore, that claim must be dismissed.

*   *   *

For the above reasons, Plaintiff's FDCPA claims may proceed under Sections 1692e and 1692f, but are dismissed to the extent they arise under Section 1692g.

## II.   Plaintiff's State Law Claims

Defendants next ask the Court to dismiss Plaintiff's state law claims alleging (1) a violation of GBL § 349, (2) a violation of New York Judiciary Law § 487, and (3) conversion. "[A] federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. §§ 1367(a), (c)). In reviewing Defendants' motions to dismiss Plaintiff's state law claims, the Court is mindful that when "one of a number of integrally related causes of action have to be tried, it makes little sense to grant a motion to dismiss as [to] one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion to dismiss was improperly granted." *Timmer v. City Univ. of New York*, No. 20-CV-2554 (PKC) (RLM), 2021 WL 3603465, at *17 (E.D.N.Y. Aug. 13, 2021).

35

A.    **New York General Business Law § 349**

1.    Legal Standard

New York's "General Business Law § 349 makes unlawful 'deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York].'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 124 (2d Cir. 2017) (quoting N.Y. Gen. Bus. Law § 349(a)).  "To state a claim for a § 349 violation, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'"  *Id.* (quoting *City of New York v. Smokes-Spirits.com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009)).

"[A]n act or practice is consumer-oriented when it has a broader impact on consumers at large."  *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 171 N.E.3d 1192, 1197 (N.Y. 2021) (quotations omitted), *reargument denied*, 175 N.E.3d 909 (2021).  By contrast, "a General Business Law § 349 claim does not lie when the plaintiff alleges only a private contract dispute" that is "unique to the parties, not conduct which affects the consuming public at large."  *Plavin v. Grp. Health Inc.*, 146 N.E.3d 1164, 1169 (N.Y. 2020), (quotations and brackets omitted), *reargument denied*, 149 N.E.3d 442 (2020).  Further, "the deceptive practice must be likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Nick's Garage*, 875 F.3d at 124 (quoting *Stutman v. Chemical Bank*, 731 N.E.2d 608, 611–12 (N.Y. 2000)).

2.    Houslanger's Motion to Dismiss the GBL § 349 Claim

Houslanger argues that the Amended Complaint does not state a claim against it under GBL § 349.  The Court disagrees.

First, "the dispute here is consumer oriented as pleaded because the facts alleged in the complaint are sufficient to create the inference that [Virgo] buy[s] consumer debts and judgments

in bulk." *McCrobie v. Palisades Acquisition XVI, LLC*, 359 F. Supp. 3d 239, 254–55 (W.D.N.Y. 2019). As noted, Virgo is "registered as a debt collector with the New York City Department of Consumer Affairs," whose "principal (indeed sole) purpose is . . . the purchase of judgments rendered against consumers for lawsuits seeking to collect consumer debts," which Virgo enforces by directing Houslanger to "issu[e] thousands of information subpoenas, bank restraints, and garnishments." (*See* Am. Compl., Dkt. 22, ¶ 8.) And Virgo purchased "approximately 15,000" default judgments from LR Credit. (*Id.* ¶ 27.) Defendants' "attempts to get [Galeas] to pay [a] debt (whether or not th[at] debt[] [was] owed to [Defendants]), including garnishing his wages, therefore is a 'consumer-oriented act.'" *McCrobie*, 359 F. Supp. 3d at 254–55.

Second, the Amended Complaint adequately alleges that Defendants' conduct was materially misleading for the reasons discussed with respect to the FDCPA claims. Essentially, "Plaintiff alleges that Defendants held themselves out as creditors of Plaintiff"—by attempting to enforce a default judgment debt—"when they knew or should have known" that judgment was invalid. *Hunter v. Palisades Acquisition XVI, LLC*, No. 16-CV-8779 (ER), 2017 WL 5513636, at *8 (S.D.N.Y. Nov. 16, 2017).

Houslanger argues that the Amended Complaint fails to state a claim under GBL § 349 because "there is a world of difference between [Houslanger] being generally aware of the [*Sykes* settlement] and being 'fully aware' that the affidavit of service submitted in Galeas' *specific case* was false or that the Judgment entered against him in the Civil Court was 'invalid.'" (Houslanger Br., Dkt. 44-3, at 10 (record citation omitted).) For the reasons explained with respect to the FDCPA claims, however, Houslanger's awareness that the judgment was invalid is an issue of fact. *Cf. Currier*, 762 F.3d at 537 ("[W]hether or not [the defendant] had reason to believe that the lien was valid when filed is an issue of fact that is not relevant at the motion to dismiss stage.").

At this stage, the Court need decide only whether the Amended Complaint alleges sufficient facts from which to plausibly to infer that Houslanger knew or should have known of the invalidity of the Judgment—which the Court has found the Amended Complaint does.

Houslanger also argues that despite Houslanger prolonging the litigation of an invalid default judgment, Galeas should not have been misled into believing he owed a debt if he in fact had never been served.  Essentially, Houslanger contends that if Galeas was never served by LR Credit in the underlying collection suit, he should have known that the default judgment was invalid, and thus that he should not have been misled when Defendants tried to collect.  But "[e]ven if Plaintiff [him]self thought" he had never been served, Houslanger and Virgo's pursuit of the collection effort against him "would likely [have misled him], or a reasonable consumer standing in [his] shoes, into believing the debt was still due."  *Hunter*, 2017 WL 5513636, at *8.  As the Amended Complaint alleges, Galeas was a 69-year-old man who spoke little English (Am. Compl., Dkt. 22, ¶¶ 44, 85), had been the victim of identity theft (*see id.*, ¶ 19; *see also* Identity Theft Report, Dkt. 22-5), and realized his wages were being garnished only when a family member explained that the reductions were not union dues (Am. Compl., Dkt. 22, ¶ 45).  Virgo, by contrast, is "registered as a debt collector with the New York City Department of Consumer Affairs," whose "principal (indeed sole) purpose is . . . the purchase of judgments rendered against consumers for lawsuits seeking to collect consumer debts," which Virgo enforces by directing Houslanger to "issu[e] thousands of information subpoenas, bank restraints, and garnishments" (*id.* ¶ 8).  Neither Houslanger nor Virgo notified Galeas that Virgo had obtained his alleged debt.  (*Id.* ¶¶ 38–39.)  Instead, they sought to collect that purported debt through an extensive collection process.  Given these circumstances, Galeas was entitled to "reasonably assume[] that an attorney had conducted a meaningful review of the [judgment] and was representing that the claims . . . were actionable."

*Diaz v. Portfolio Recovery Assocs., LLC*, No. 10-CV-3920 (ERK), 2012 WL 661456, at *14 (E.D.N.Y. Feb. 28, 2012), *report and recommendation adopted*, No. 10-CV-3920 (MKB) (CLP), 2012 WL 1882976 (E.D.N.Y. May 24, 2012).

In response, Houslanger relies on *Gabriele v. American Home Mortgage Servicing, Inc.*, 503 F. App'x 89, 95 (2d Cir. 2012) (summary order), *Strobel v. RJM Acquisitions LLC*, No. 13-CV-2467 (JS) (AKT), 2014 WL 507510, at *5 (E.D.N.Y. Feb. 6, 2014), and *Scarola v. Verizon Communications, Inc.*, 45 N.Y.S.3d 464, 465 (App. Div. 2017).  (Houslanger Br., Dkt. 44-3, at 12 n.12.)  In *Gabriele*, the Second Circuit affirmed dismissal of an FDCPA claim that the alleged debt collector, during a foreclosure lawsuit, "falsely stated that it had forwarded [two] exhibits" to the plaintiff.  503 F. App'x at 95.  The Court explained that this was unlikely to mislead the plaintiff, who was "represented by counsel, . . . into believing that he had already received an exhibit he had not received."  *Id.*  The allegedly false statements had nothing to do with the validity of the underlying debt; rather, the "alleged misstatements in court filings amounted to mere technical falsehoods that misled no one" and "were not misleading or deceptive as to the nature or legal status of [the plaintiff's] debt."  *Id.* (quotations and brackets omitted).  In *Strobel*, the court dismissed an FDCPA claim alleging that a collection letter was "deceptive insofar as it suggest[ed] that Plaintiff was previously and properly notified of the assignment when no such assignment took place."  2014 WL 507510, at *6.  And in *Scarola*, the court dismissed a GBL § 349 claim because the defendant's "continued billing after termination of the [plaintiff's telecommunications] account was not deceptive or materially misleading, because it was clearly in error."  45 N.Y.S.3d at 465.

Here, in contrast to all three cases, Defendants' persistent collection effort could have reasonably led Galeas to believe he owed money on a default judgment, regardless of whether he

knew he had not been served in the underlying suit.  That is, the collection effort was not misleading simply because it could have made Galeas question whether he had been served years earlier in the underlying suit by LR Credit, but because a law firm's claims that Galeas owed a debt could have made him question whether he in fact owed money, even if he knew he had not been served.  In any event, "[e]*ven if* Plaintiff [him]self thought" the judgment was invalid, Houslanger and Virgo's unrelenting collection effort against him "would likely [have misled him], or a reasonable consumer standing in [his] shoes, into believing the debt was still due."  *Hunter*, 2017 WL 5513636, at *8 (emphasis added); *see also Somerset*, 351 F. Supp. 3d at 207–08 (distinguishing *Gabriele* in a case where the defendant garnished the plaintiff's wages to collect on a fraudulent judgment, because "it is only logical that a consumer under such circumstances might feel compelled to pay the debt or misunderstand their potential rights to challenge the debt").

Next, Houslanger argues that the Amended Complaint fails to plead that Defendants actually deceived Galeas, because Galeas continued to litigate the Civil Court case, apparently suggesting he knew he did not actually owe any money.  (Houslanger Br., Dkt. 44-3, at 13.) Houslanger contends that Galeas "may have felt like Houslanger had taken advantage of him, but Galeas was not fooled."  (*Id.* (quotations omitted).)  According to Houslanger, actual deception "is a crucial element to sustain a GBL [§] 349 claim."  (*Id.* (quoting *Aguaiza v. Vantage Props., LLC*, No. 105197/08, 2009 WL 1511791, at *7 (N.Y. Sup. Ct. May 21, 2009).)

But courts in this district have rejected this argument, explaining that the line of cases Houslanger cites "mistakenly emphasized that an individual inquiry is necessary, by suggesting that there is a requirement that the plaintiff was deceived by [the alleged] misrepresentations." *Hasemann v. Gerber Prod. Co.*, 331 F.R.D. 239, 266 (E.D.N.Y. 2019) (quotations omitted).  This view "is incorrect due to the less individualistic and more objective nature of the statutory

elements." *Id.* (quotations omitted); *accord Hunter*, 2017 WL 5513636, at *8 ("New York courts use an objective definition of 'deceptive,' which is 'limited to those acts likely to mislead a reasonable consumer acting reasonably under the circumstances.'" (brackets omitted) (quoting *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995))).[19]   The Court therefore rejects Houslanger's argument that actual deception is necessary under GBL § 349.[20]

### B.   New York Judiciary Law § 487

#### 1.   Legal Standard

New York Judiciary Law § 487 governs "[m]isconduct by attorneys."  N.Y. Judiciary Law § 487.  "Under Judiciary Law § 487(1), an attorney who is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party is guilty of a misdemeanor and may be liable to the injured party for treble damages in a civil action."  *Bill Birds, Inc. v. Stein L. Firm, P.C.*, 149 N.E.3d 888, 890 (N.Y. 2020) (quotations and brackets omitted).  The statute "imposes liability for the making of false statements with scienter," but it "does not require a showing of justifiable reliance."  *Id.* at 891.  "In other words, liability under the statute does not depend on whether the court or party to whom the statement is made is actually misled by the attorney's intentional false statement."  *Id.*

---

[19] This reading of the statute also comports with basic notions of equity, which Houslanger flouts with its "no harm, no foul" argument—*i.e.*, even where a debt collector uses deceptive and unfair practices, it is entitled to absolution if the consumer is savvy enough to detect the deception.

[20] Virgo raises only one argument as to the GBL § 349 claim that differs from Houslanger's arguments—namely, Virgo reiterates its argument that it cannot be held directly or vicariously liable.  (*See* Virgo Br., Dkt. 43-2, at 19–22.)  The Court rejects this argument for the same reasons as in the FDCPA context.

2.    Houslanger's Motion to Dismiss the Judiciary Law § 487 Claim

Houslanger argues that the Amended Complaint fails to state a claim under New York Judiciary Law § 487.  The Court disagrees.

First, Houslanger argues that "there was no deceit," because Plaintiff does not say what about Houslanger's requests for adjournments during the litigation was deceitful.  (Houslanger Br., Dkt. 44-3, at 13–14.)  But according to the Amended Complaint, Houslanger offered Galeas the Stipulation, which would have eliminated Galeas's legal claims against Defendants and allowed them to retain the money they had wrongfully garnished from his wages, despite Houslanger's "full[] aware[ness] of the unlawful circumstances under which the LR Credit Judgments were obtained" (*see* Am. Compl., Dkt. 22, ¶ 34), and even though Defendants had no "evidence to oppose the order to show cause" (*id.* ¶ 65) or "to oppose[] a traverse hearing" (*id.* ¶ 73).  This is a sufficient allegation of deceitful conduct, even though Galeas was not "actually misled by" the Stipulation (insofar as his volunteer attorney struck the deceptive paragraph).  *See Bill Birds*, 149 N.E.3d at 890.

Second, Houslanger argues that the Amended Complaint "fails to allege that [Houslanger] acted with the intent to deceive Galeas."  (Houslanger Br., Dkt. 44-3, at 14.)  But although Galeas was not required to agree to the Stipulation, and ultimately did not agree to the deceptive portions, it was a convoluted legal document offering illusory consideration—*i.e.*, Defendants' agreement not to collect on an invalid judgment.  The Amended Complaint sufficiently alleges that Defendants made this offer intending to trick Plaintiff, who spoke little English, insofar as Defendants agreed to strike the unfair provision, at no additional cost, simply because Galeas's volunteer lawyer noticed it.

Third, Houslanger argues that the Amended Complaint fails to allege that Houslanger sought adjournments after learning that the underlying judgment was invalid.  (*Id.*)  This argument

is unavailing.  As discussed, the Amended Complaint adequately alleges that Defendants knew the judgment was invalid even before they began the collection effort, and still sought to leverage that judgment against Galeas by pursuing it unless he agreed to the Stipulation.  Whether the evidence will support this allegation "is an issue of fact that is not relevant at the motion to dismiss stage." *See Currier*, 762 F.3d at 537.

Fourth, Houslanger contends that "baseless adjournments" do not "qualify as 'extreme' or 'egregious' deceit for purposes of Judiciary Law § 487."  (Houslanger Br., Dkt. 44-3, at 14.)  But, as in *Somerset*, "[t]he gravamen of the Plaintiff's allegations is that the Defendants" garnished Galeas's wages and litigated a judgment against him "knowing full well the invalidity of the judgment they sought to enforce," 351 F. Supp. 3d at 207, not simply that they sought adjournments.

Fifth, Houslanger argues that the Amended Complaint fails "to plead actual damages," because, "[i]f anything, the multiple adjournments *benefitted* Galeas by affording him the opportunity to" more effectively litigate the case.  (Houslanger Br., Dkt. 44-3, at 15.)  Again, however, Houslanger's alleged deceit is not merely its seeking adjournments; Houslanger also garnished Galeas's wages and attempted to enforce a judgment against him "knowing full well the invalidity of the judgment [it] sought to enforce."  *Somerset*, 351 F. Supp. 3d at 207.  The alleged "actual damages" include the distress Galeas suffered (Am. Compl., Dkt. 22, ¶ 95), his inability to sleep as a result (*id.*), his concern "during the more than eleven months that the court case was going on because he did not know if he was going to get his money back" (*id.* ¶ 91), and his "want[ing] to cry" whenever he saw his paycheck (*id.* ¶ 95).  The Court therefore rejects

Houslanger's claim that "Galeas should be thankful for the adjournments."[21]   (Houslanger Br., Dkt. 44-3, at 16.)

*       *       *

For these reasons, the New York Judiciary Law § 487 claims may proceed.

### C.   Conversion

####    1.   Legal Standard

"A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession."  *Colavito v. New York Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006).  "'Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights."  *Pappas v. Tzolis*, 982 N.E.2d 576, 580 (N.Y. 2012) (quotations omitted).

####    2.   Houslanger's Motion to Dismiss the Conversion Claim

Houslanger argues that "Galeas' conversion claim must fail" because Houslanger did not procure the allegedly fraudulent default judgment against Galeas.  (Houslanger Br., Dkt. 44-3, at 16.)   Houslanger relies on the principle that "one is privileged to commit acts which would otherwise be a trespass to a chattel or a conversion when he acts pursuant to a court order which is valid or fair on its face," unless "*the actor* procured the order by means of an intentional misrepresentation to the issuing authority."  (*Id.* (brackets and ellipses omitted) (quoting *Calamia v. City of New York*, 879 F.2d 1025, 1031 (2d Cir. 1989)).)

---

[21] The Court cannot help but note that aside from being specious, this argument is gratuitously insensitive.

44

But Houslanger's argument conveniently ignores the principle that "while an innocent purchaser for value who lacks notice that his vendor had obtained the goods through fraud is not liable for conversion, if the purchaser has knowledge of the fraud he is indeed liable for conversion." *Buy This, Inc. v. MCI Worldcom Commc'ns, Inc.*, 209 F. Supp. 2d 334, 343 (S.D.N.Y. 2002) (collecting cases). As discussed, the Amended Complaint adequately alleges that Houslanger knew that the judgment it enforced through garnishment had been obtained through fraud. That Houslanger was not the entity that procured the fraudulent judgment is immaterial, given that Houslanger took Galeas's money—*i.e.*, garnished his wages—allegedly knowing that it had no right to do so.

### 3. Virgo's Motion to Dismiss the Conversion Claim

Virgo moves to dismiss the conversion claim on similar grounds, arguing that it had "reason to believe the underlying judgment was valid." (Virgo Br., Dkt. 43-2, at 23 n.13.) Again, however, this "is an issue of fact that is not relevant at the motion to dismiss stage," s*ee Currier*, 762 F.3d at 537, and the Amended Complaint sufficiently alleges the opposite, so as to proceed to discovery. Virgo also notes that "before the judgment was vacated, on December 6, 2018," the garnished money was returned to Galeas. (Virgo Br., Dkt. 43-2, at 24.) But even to the extent all the garnished money was returned to Galeas, and leaving aside any consideration of whether the returned amount included interest, this necessarily occurred after the allegedly improper garnishment, and, in any event, Galeas's wages continued to be garnished from the time the state court ordered Defendants to show cause on April 18, 2018 (*see* Am. Compl., Dkt. 22, ¶¶ 57–58), until mid-July 2018 (*id.* ¶ 63).

## III. Virgo's Arguments Concerning Substitution

On June 21, 2021, Judge Mann directed the parties to "supplement their respective Rule 12 filings to address whether Mr. Galeas's death extinguished any of the claims in the Amended

Complaint." (Dkt. 68, at 16.) On July 6, 2021, Virgo filed a supplemental memorandum arguing that (A) "[a]bsent the deceased Plaintiff's personal knowledge and ultimate testimony," Plaintiff "cannot plausibly establish that Defendants caused any of the deceased Plaintiff's emotional distress damages"; (B) "Punitive, Exemplary, and Injunctive relief are not available to Plaintiff" under the FDCPA or GBL § 349; and (C) "Plaintiff's claims that Defendants attempted to collect a debt without first sending a Notice of Assignment and 1692g Notice are speculative and time barred." (Virgo Supp., Dkt. 72, at 1.)

## A.     Emotional Distress Damages

First, Virgo argues that "[e]ven if [substitute Plaintiff] Carlos Villalba can plausibly establish that the deceased Plaintiff suffered emotion distress," the Amended Complaint "does not plausibly plead that the Defendants were the cause of the deceased Plaintiff's emotion distress." (*Id.* at 3.) Virgo argues that only Galeas's testimony could establish his emotional distress, and, since Galeas is deceased, that the Court should not treat his emotional distress allegations as true at the motion to dismiss stage. (*Id.* at 3–5.)

Judge Mann already expressed skepticism of Virgo's argument, explaining that, "without citing any relevant authority, and without having deposed Mr. Villalba to test his knowledge of the facts alleged in the Amended Complaint, defendants argue that the elements of the claims cannot plausibly be alleged without the decedent's testimony." (*See* Dkt. 68, at 9 n.4.) The Court is similarly skeptical. As Virgo acknowledges, the Court must "accept as true all factual allegations" in the Amended Complaint "and draw from them all reasonable inferences." *Hamilton*, 3 F.4th at 90–91. Although the Court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations," *id.* at 91, the allegations relating to Galeas's emotional distress are neither. They are merely allegations Virgo thinks Plaintiff will not be able to *prove* without Galeas's testimony. "Whether this is so is a question of fact that cannot be

resolved on this Rule 12(b)(6) motion." *See Todd v. Exxon Corp.*, 275 F.3d 191, 214 (2d Cir. 2001). Virgo is free to raise this argument on a motion for summary judgment or at trial.[22]

## B.   Punitive, Exemplary, and Injunctive Relief

Second, Virgo contends that neither the FDCPA nor GBL § 349 allow for punitive damages, and that "substitute Plaintiff lacks standing to seek punitive, exemplary, and injunctive relief." (Virgo Supp., Dkt. 72, at 6.) For the most part, the Court disagrees.

Although at least one court in this Circuit has concluded that "damages on [an FDCPA] claim are limited to actual damages, costs and attorneys' fees, and 'such additional damages as the court may allow,'" *Guzman*, 2018 WL 1665252, at *14 n.20 (quoting 15 U.S.C. § 1692k(a)), Plaintiff's claim for punitive damages is "rooted in his conversion and GBL § 349 claims," not his FDCPA claim (*see* Pl. Supp., Dkt. 73, at 5). "Punitive damages are available for conversion where circumstances show that the conversion was accomplished with malice, insult, reckless and willful disregard for plaintiff's rights, or by other proof evidencing the aggravated nature of the act." *Andrews v. 27 Red Music Publ'g, LLC*, No. 15-CV-7544 (AJN), 2021 WL 4392050, at *2 (S.D.N.Y. Sept. 24, 2021) (quotations omitted). And, contrary to Virgo's purported statement of the law, "[p]unitive damages may be awarded on a cause of action for violation of GBL § 349 where the complaint alleges conduct that 'evidences a high degree of moral culpability, or where the conduct is so flagrant as to transcend mere carelessness, or where the conduct constitutes willful or wanton negligence or recklessness.'" *Gonzalez-Vasquez v. Mayors Auto Grp.-Woodside, LLC*, 110 N.Y.S.3d 213, 2018 WL 3341227, at *2 (Sup. Ct. 2018) (quoting *Wilner v.*

---

[22] Incidentally, Plaintiff submitted an affidavit attesting that he has personal knowledge of Galeas's emotional distress, the source of that knowledge, and the cause of that distress. (*See* Dkt. 73-1.) Virgo may attempt to discredit Plaintiff's testimony, but it cannot preempt such testimony.

*Allstate Ins. Co.*, 893 N.Y.S.2d 208, 218 (App. Div. 2010)).[23]   "[T]he standard for punitive damages under conversion and GBL § 349 is for all practical purposes the same."   *Morales v. Kavulich & Assocs., P.C.*, 294 F. Supp. 3d 193, 198 n.4 (S.D.N.Y. 2018) (citing *Home Ins. Co. v. American Home Prods.*, 550 N.E.2d 930, 934 (N.Y. 1990)).   "Because [the punitive damages question] is an issue of interpreting the character of [a defendant's] actions, it creates a material question of whether [the defendant's] conduct qualifies as wanton and reckless or malicious."   *Id.* at 199.   Here, "[i]t is a question best left to the jury."   *Id.*   The Court thus declines to dismiss Plaintiff's requests for punitive damages.

Next, Virgo contends that Plaintiff lacks standing to seek punitive damages on behalf of Galeas.   But New York Estates, Powers and Trusts Law ("EPTL") § 11-3.2(b) provides that "[n]o cause of action for injury to person or property is lost because of the death of the person in whose favor the cause of action existed . . . ."   EPTL § 11-3.2(b).   Although EPTL § 11-3.2(b) bars the recovery of punitive damages in a personal injury action "where the death occurs on or before August [31, 1982]," that limitation is inapplicable here because Galeas died after August 31, 1982.   Because Plaintiff, as Galeas's representative, may seek any form of damages that would have been available to Galeas, the claim for punitive damages based on the GBL § 349 and conversion claims survives Galeas's passing.   *See id.*

Virgo argues that "EPTL 11-3.2(b) only addresses punitive damages and not exemplary nor injunctive damages."   (Virgo Supp., Dkt. 72, at 7.)   Virgo also points out that "EPTL 11-3.2(b)

---

[23] "District courts in this Circuit are divided as to whether punitive damages under GBL § 349 are capped at $1,000."   *Stinson v. Houslanger & Assocs., PLLC*, No. 18-CV-11350 (JPO), 2021 WL 4443289, at *8 (S.D.N.Y. Sept. 28, 2021); *compare, e.g.*, *Bueno v. LR Credit 18, LLC*, 269 F. Supp. 3d 16, 23 (E.D.N.Y. 2017) ("[S]ection 349 of the GBL allows for recovery of punitive damages in excess of $1,000.00" (analyzing competing cases)), *with Guzman*, 2018 WL 1665252, at *14 ("Plaintiff's punitive damages on his GBL § 349 claim are limited to $1,000" (analyzing competing cases)).   The Court need not, and does not, resolve this issue at this time.

does not create a right to punitive or other damages." (*Id.*)  But these arguments are beside the point.  EPTL 11.3-2(b) merely provides that "[n]o cause of action for injury to person or property *is lost* because of the death of the person."  EPTL § 11-3.2(b) (emphasis added).  The provision does not list what claims a deceased plaintiff's representative *can* pursue, it lists only those claims a representative *cannot* pursue (namely, punitive damages on behalf of someone who died before August 31, 1982).  Plaintiff thus has standing to seek whatever form of relief Galeas would have been able to obtain.[24]

Finally, Virgo contends that Plaintiff lacks standing to seek injunctive relief "because the underlying state court judgment had been vacated against the deceased Plaintiff and the deceased Plaintiff did not owe any debt to Defendants."  (Virgo Supp., Dkt. 72, at 8.)  Virgo is correct that "to maintain an action for injunctive relief, a plaintiff cannot rely on past injury but must show a likelihood that he will be injured in the future." *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 (2d Cir. 2020) (quotations and ellipses omitted).  "Such an allegation of future injury will be sufficient only if 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Dorce v. City of New York*, 2 F.4th 82, 95 (2d Cir. 2021) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).  Here, Plaintiff alleges only past misconduct by Defendants, and does not present any facts to suggest "threatened injury is certainly impending, or

---

[24] Virgo inexplicably argues that Plaintiff also lacks standing to seek punitive damages because no "future conduct could affect the deceased Plaintiff or the substituted Plaintiff," so "such damages can only be intended to be punitive and are thereby extinguished."  (Virgo Supp., Dkt. 72, at 8.)  But punitive damages *are* intended to be punitive.  Virgo fails to explain why Plaintiff cannot seek punitive damages to vindicate a punitive purpose.

there is a substantial risk that the harm will occur." *Id.*  Plaintiff's request for injunctive relief under GBL § 349 therefore must be dismissed.[25]

### C.    Supplemental Arguments as to Section 1692g

In its supplemental brief, Virgo also argues that "Plaintiff's claims that Defendants attempted to collect a debt without first sending a Notice of Assignment and 1692g Notice are speculative and time barred."  (Virgo Supp., Dkt. 72, at 1.)  For the reasons already discussed, Plaintiff's Section 1692g claims must be dismissed, so this argument is moot.

*       *       *

In sum, the Court finds that the substitution of Galeas's estate administrator as Plaintiff does not extinguish any of his claims, except that Plaintiff's 1692g claim is dismissed for reasons unrelated to Virgo's substitution arguments.

## IV.    Houslanger's Motion to Strike

In addition to the allegations pertaining to Defendants' interactions with Galeas, the Amended Complaint identifies other instances in which Houslanger allegedly engaged in similar misconduct toward others.  (*See* Am. Compl., Dkt. 22, ¶¶ 97–134.)  Houslanger moves to strike these allegations.

### A.    Legal Standard

Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R.

---

[25] Virgo also argues that "the FDCPA does not provide for injunctive relief and Courts have found that injunctive relief is unavailable to FDCPA Plaintiffs."  (Virgo Supp., Dkt. 72, at 6 (citing *Milton v. Rosicki, Rosicki & Assocs., P.C.*, No. 02-CV-3052 (NG), 2007 WL 2262893, at *3 (E.D.N.Y. Aug. 3, 2007).)  But Plaintiff asks the Court to enter "[a]n order, pursuant to *GBL 349(h)*, enjoining and directing Defendants to cease violating *that statute*" (*see* Am. Compl., Dkt. 22, ¶ 160g (emphasis added)); his request for an injunction does not arise under the FDCPA.

Civ. P. 12(f).  Still, "motions to strike material *solely* on the ground that the matter is impertinent and immaterial are disfavored." *Brown v. Maxwell*, 929 F.3d 41, 52 n.42 (2d Cir. 2019) (quotations omitted).  "[T]he motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).  "Courts should not tamper with the pleadings unless there is a strong reason for doing so." *Id.*  "Because 'the questions of relevancy and admissibility in general require the context of an ongoing and unfolding trial,' courts should be especially reticent to wade into evidentiary issues on the basis of the pleadings alone." *Hunter*, 2017 WL 5513636, at *10 (quoting *Lipsky*, 551 F.2d at 893).

### B.      The Court Declines to Strike the Additional Allegations

The additional allegations here involve Houslanger prolonging unsupported debt-collection suits against purported debtors and offering unfair settlement stipulations like the one offered to Galeas.  (*See, e.g.*, Am. Compl., Dkt. 22, ¶¶ 100–02, 118–19.)  Because these allegations are relevant to Plaintiff's GBL § 349 claim and punitive damages request, the Court declines to strike them.

In *Hunter*, the Southern District declined to strike allegations regarding a separate complaint a third-party had filed against the defendant years before, relating to similar issues of sewer service.  2017 WL 5513636, at *10.  The court explained that "[t]he existence of allegations of impropriety against a process server used by [the defendant] (and related entities) may ultimately be relevant in [multiple] respects."  *Id.*  The court reasoned that the defendant's "knowledge of allegations of impropriety against one of its process servers and against similar entities could inform whether or not their actions in this case were 'reckless' or 'willful,' as required for the award of punitive damages," and "the existence of similar allegations of misconduct could support [the plaintiff's] argument that [the defendant's] actions in this case had

51

the potential to affect similarly situated consumers, as required for Plaintiff's Section 349 claim." *Id.* (quotations omitted).  The allegations Houslanger challenges here are similarly relevant to Plaintiff's claims in this case.

First, if Houslanger has been sued for this behavior before, that bears on whether the practice "has a broader impact on consumers at large," *Himmelstein*, 171 N.E.3d at 1197 (N.Y. 2021) (quotations omitted), or is "unique to the parties," *Plavin*, 146 N.E.3d at 1169 (quotations and brackets omitted), and thus whether it is "consumer-oriented" under GBL § 349, *see Nick's Garage*, 875 F.3d at 124.  Houslanger responds that "Galeas chose to withdraw his GBL § 349 claim regarding the Stipulation," so whether "Defendants' use of the Stipulation potentially affects other consumers (i.e., whether the conduct is 'consumer-oriented') is irrelevant."  (Houslanger Br., Dkt. 44-3, at 18 (citing PMC Opposition, Dkt. 23, at 2).)  As Houslanger points out, Plaintiff's PMC Opposition says that "[t]o the degree that Plaintiff's Original Complaint is based on the Stipulation as deceptive under 1692e or GBL [§] 349, Plaintiff has filed a First Amended Complaint to make clear the Stipulation demand violates 1692f."  (PMC Opposition, Dkt. 23, at 2.)  But Plaintiff's PMC Opposition also claims that part of Houslanger's GBL § 349 violation involved "attempt[ing] to pressure Plaintiff into signing the Stipulation."  (*Id.* at 3.)  And the Amended Complaint alleges that "Plaintiff does not bring a GBL [§] 349 claim based *solely* on the language in the Stipulation."  (Am. Compl., Dkt. 22, ¶ 147 (emphasis added).)  Thus, as Houslanger admits, "if read literally, the [Amended Complaint] does not *exclude*" a GBL § 349 claim based on the language in the Stipulation.  (Houslanger Br., Dkt. 44-3, at 4 n.4.)  In any event, the allegations Houslanger moves to strike, concerning additional lawsuits, are not based "solely" on the language of the similar stipulations in those cases.

Second, as in *Hunter*, Houslanger's "knowledge of [similar] allegations of impropriety," *Hunter*, 2017 WL 5513636, at *10, is potentially relevant to whether its present "conduct constitutes willful or wanton negligence or recklessness" to support Plaintiff's claim for punitive damages, *see Gonzalez-Vasquez*, 2018 WL 3341227, *2 (quoting *Wilner*, 893 N.Y.S.2d at 218). Houslanger's motion to strike therefore must be denied.

## CONCLUSION

For the above reasons, Houslanger's motions to dismiss and strike are denied in their entirety.  Virgo's motion to dismiss is granted in part and denied in part.  Plaintiff's Claims under 15 U.S.C. §§ 1692e and 1692f may proceed.  Plaintiff's New York General Business Law § 349 claims may proceed.  Plaintiff's New York Judiciary Law § 487 claims may proceed.  Plaintiff's conversion claims may proceed.  Plaintiff may pursue punitive damages under GBL § 349 and for conversion.  To the extent Plaintiff alleges Defendants violated 15 U.S.C. § 1692g, that claim is dismissed.  To the extent Plaintiff seeks injunctive relief under GBL § 349, that request is dismissed.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 28, 2022
        Brooklyn, New York